JUDGE SULLIVAN

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

CHAN AH WAH & LIM CHEOK KEE WILLY

# 15 CV 8974

Civil Action:_____

                           Plaintiffs      **JURY TRIAL DEMANDED**

Against

HSBC NORTH AMERICA HOLDINGS INC;
HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC BANK USA N.A.;
HSBC SECURITIES (USA) INC., HSBC PRIVATE
BANK

                           Defendants

----------------------------------------------------------x


## **COMPLAINT**

## TABLE OF CONTENTS

Page:

NATURE OF THE ACTION...................................................................1

JURISDICTION, VENUE, AND COMMERCE........................................5

PARTIES.........................................................................................6

      Plaintiffs.................................................................................7

      Defendants..............................................................................7

FACT..............................................................................................8

  The FX Market...............................................................................9

      The WM/Reuters and Use......................................................13

      WM/Reuters Closing Spot Rate is Vulnerable to Collusion...................14

      The FX Market Is Concentrated and Dominated by Defendants.............15

      The FX Market Is Unregulated and Opaque...................................18

  Defendants Conspired to Fix the WM/Reuters Closing Spot Rates..............19

      Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire......................................19

      Defendants Shared Confidential Customer Order Information to Manipulate the WM/Reuters Closing Spot Rates..............................21

      Using Shared Information, Defendants Agreed to Execute Concerted Trading Strategies to Manipulate the WM/Reuters Closing Spot Rates.....23

  Defendants' Conspiracy Resulted in Artificial Pricing for Exchange-Traded Instruments..................................................................................29

      A. The FX Futures and Options Market.......................................29

      B. Prices of FX Futures Contracts Are Impacted by the WM/Reuters Closing Spot Rates and Prices of the Underlying Currency Pairs...................38

i

Government Investigations…………………………..………………………51

U.S. Department of Justice ("DOJ")……………………………………....51

Commodity Future Trading Commission ("CFTC")……………………57

New York State Department of Financial Services…………………………59

Additional United States and State Investigations…………………….......60

United Kingdom Financial Conduct Authority ("UK-FCA")……………60

European Commission ("EC")…………………………………………………62

Switzerland……………………………………………………………………63

Germany……………………………………………………………………………64

Hong Kong Monetary Authority ("HK-MA")………………………………64

Monetary Authority of Singapore ("SG-MA")……………………………65

Australia Securities and Investment Commission ("ASIC")………………65

New Zealand……………………………………………………………………65

Financial Stability Board ("FSB")……………………………………...……66

Defendants' Public Filings Confirm Investigations and Cooperation……………67

Terminations, Suspensions, and Departures of Defendant Employees……………69

Bank of America……………………………………………………………70

Barclays……………………………………………………………………………70

BNP Paribas……………………………………………………………………..70

Citigroup……………………………………………………………………………70

Credit Suisse……………………………………………………………………..71

Deutsche Bank……………………………………………………………………..71

Goldman Sachs………………………………………………72

HSBC………………………………………………………72

JP Morgan…………………………………………………..72

Morgan Stanley……………………………………………72

RBS………………………………………………………72

UBS………………………………………………………..73

ANTITRUST INJURY TO PLAINTIFFS……………………………74

FRAUDULENT CONCEALMENT……………………………76

CLAIM FOR RELIEF…………………………………………..82

REQUEST FOR RELIEF…………………………………………86

DEMAND FOR JURY TRIAL……………………………………86

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CHAN AH WAH & LIM CHEOK KEE WILLY

Civil Action:_____

Plaintiffs

Against                                      **COMPLAINT**
                                             **JURY TRIAL DEMANDED**
HSBC NORTH AMERICA HOLDINGS INC;
HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC BANK USA N.A.;
HSBC SECURITIES (USA) INC., HSBC PRIVATE
BANK
                          Defendants
-------------------------------------------------------------x

    Plaintiffs, Chan Ah Wah and Lim Cheok Kee Willy, husband and wife ( "Chans")
alleges as follows:

## NATURE OF THE ACTION

    1.       This is an action for injuries suffered from the conspiracy by major
banks including Defendants' attempt to manipulate/*already* manipulated benchmark
rate in FX market violated Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C.§§
1,3., Section 1, 3 of Clayton Act and overcharging of transaction fees, interest and
commission of Defendants "HSBC".

BACKGROUND

    2.       The foreign currency or foreign exchange ("FX") market is the world
largest and most actively traded financial market. The FX market revolves around
spot transactions ("FX Spot Market"). The FX spot market is a global market in
which participants buy and sell currencies. Defendants dominates spot trading, acting
as one of the counterparties in approximately 98% of spot volume in the United
States.[1] A spot transaction involves the exchange of currencies between two

---

[1]    Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives
Markets: Turnover in the United States, April 2013 (available at http://nyfed.org/1dnmT1x), at 6
[hereinafter Fed Triennial Bank Survey 2013].

counterparties on a value date that is within two bank business days' time. Not only do spot transactions account for approximately half of daily FX turnover in the United States, roughly $620 billion,[2] but they affect other instruments Defendants sell to their customers, such as outright forwards and FX swap. Collectively, FX spot transactions, outright forwards, and FX swaps are referred to herein as "FX Instruments."

3.       Customers can order spot transactions for immediate execution, in which case Defendants quote them the current market price. Customers can also order spot transactions to be settled at a fixing rate, which is the exchange rate for a currency pair calculated at a single point of time. Defendants guarantee the transactions will be settled at the fixing rate, as means of valuing global currency holdings and indexes that span multiple currencies.

4.       In the FX Spot Market, currencies are traded against one another in pairs. For example, the euro/U.S. Dollar ("EUR/USD") or the Japanese Yen/U.S. dollars ("YEN/USD") currency pair is the most traded currency pair by volume, with a worldwide trading volume that can exceed $500 billion per day, in a market involving the exchange of currencies valued at approximately $2 trillion a day. Defendants are the dominant dealers and horizontal competitors in the global market, with 84.25% of all trades in the market in 2013.

5.       The most widely used fixed rates are the "WM/Reuters Closing Spot Rates." For "Trade Currencies," which include the twenty-one of the most liquid traded currencies against the U.S. Dollar and the euro, the WM/Reuters Closing Spot Rates is based on actual trades, using bids and offers extracted from certain electronic system during one minutes window ("fix period"). WM/Reuters determines the bid and offer rates based on the captured transacted rate and bid-offer spread. WM/Reuters calculates the median of these bids and offer rates and from these medians determines a "mid trade rate." WM/Reuters calculates a "mid order rate."

---

[2]    Fed Triennial Bank Survey 2013, at 3.

6.       The WM/Reuters Closing Spot Rates are calculated at 4:00 p.m. London time (11:00 a.m. New York time). Because the London market closes at this time, the WM/Reuters Closing Spot Rates are known as the "London fix," the "fix," or the "London close." All orders and transactions are weighted equally, regardless of their notional sizes.

7.       The FX Spot Market is an over-the-counter market and, as such, is decentralized and requires financial institutions to act as dealers willing to buy and sell a currency. A spot transaction involves the exchange of currencies between two counterparties on a value date that is within two bank business days' time. Not only do spot transactions account for approximately half day of daily FX turnover in the United States, roughly $620 billion, but they affect other instruments Defendants sell to their customers, such as outright forwards and FX swaps. Collectively, FX spot transactions, outright forwards and FX swaps are referred to herein as "FX instruments." Dealers, also known throughout the FX Spot Market as market makers, therefore play a critical role in ensuring the continued functioning of the market. The Defendant acted as dealer, in the United States and elsewhere, for currency traded in the FX Spot Market. Plaintiffs are Defendants' customer.

8.       A dealer in the FX Spot Market quotes prices at which the dealer stands ready to buy and sell the currency. These price quotes are expressed as units of a given currency, known as the "counter" currency, which would be required to purchase one unit of a "base" currency, which is often the U.S. dollar and so reflects an "exchange rate" between the currencies. Dealers generally provide price quotes to four decimal points, with the final digit known as a "percentage in point" or "pip." A dealer may provide price quotes to potential customers in the form of a "bid/ask spread," which represents the difference between the price at which the dealer is willing to buy the currency from the customer (the "bid") and the price at which the dealer is willing to sell the currency to the customer (the "ask"). A dealer may quote a spread, or may provide just the bid to a potential customer inquiring about selling currency or just the ask to a potential customer inquiring about the buying currency.

9.     A customer wishing to trade currency may transact with a dealer by placing an order through the dealer's internal, proprietary electronic trading platform or by contracting the dealer's salesperson to obtain a quote. When a customer accepts a dealer's quote, that dealer now bears the risk for any change in the currency's price that may occur before the dealer is able to trade with other dealers in the "interdealer market" to fill the order by buying the currency the dealer has agreed to sell to the customer, or by selling the currency the dealer has agreed to buy from the customer.

10.     This case involves a conspiracy by Defendants to manipulate the WM/Reuters Closing Spot Rates. By communicating directly with one another, including in closed network chat rooms with names such as "The Cartel," "The Bandits Club," and "The Mafia," Defendants exchanged confidential customer order information and trading positions. Defendants agreed on concerted strategies for trading in and around the setting of the WM/Reuters Closing Spot Rates. Their collusive trading tactics included "front running/trading ahead," "banging the close," and "painting the screen." Chat room transcripts reveal the details of Defendants' collusion. Through these tactics, Defendants caused injury and damage to Plaintiffs.

11.     Defendants' conspiracy to manipulate the WM/Reuters Closing Spot Rates impacted the pricing of trillions of dollars' worth of FX instruments, inflicting severe financial harm on Plaintiffs.

12.     Law enforcement and regulatory authorities around the world, including in the United States, Europe, Asia, Australia, and New Zealand are engaged in open and active investigations into Defendants' conduct in the FX market. A number of Defendants are seeking immunity, or otherwise cooperating with authorities in these investigations, by producing voluminous documents, including chat room transcripts and other conspiratorial communications.[3] As a direct result of these global

---

[3]     Except as alleged in this Complaint, neither Plaintiffs nor other members of the public have excess to the underlying facts relating to Defendants' improper activities. Rather, that information lies exclusively within the possession, custody, or control of Defendants and

investigations, Defendants have terminated and suspended numerous personnel with supervisory authority over their FX operations

13.     On June 12, 2013, Bloomberg reported that FX traders at "some of the world's largest banks" had been "rigging" the Fix by "pushing through trades before and during the 60-second window when the benchmarks are set." During the fall of 2013 and the first quarter of 2014, the media reported global investigations into the manipulation of the Fix, including in the United States, United Kingdom, European Union, Switzerland, Germany, Hong Kong, Singapore, Australia and New Zealand.

14.     Some of these investigations have resulted in settlements and penalties. On November 12, 2014, the Commodity Trading Futures Commissions levied civil penalties of $310 million each on Citibank and JPMorgan, $290 million each on RBS and UBS, and $275 million on HSBC, the Officer of the Comptroller of Currency assessed civil penalties of $250 million against bank of America, and $350 million each against Citibank and JPMorgan; the UK-Financial Conduct Authority fined Citibank $358 million, HSBC $343 million, JPMorgan $352 million, RBS $344 million; and UBS $371 million; and Switzerland's FINMA fined UBS (approximately) $139 million. Other investigations remain ongoing.

## JURISDICTION, VENUE AND COMMERCE

15.     This Court has jurisdiction over the subject matter of this action under Section 4, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15(a), 22 and 26, and under 28 U.S.C. §§ 1331 and 1337, Section 22 of Commodity Exchange Act, 7 U.S,C. §25.

---

other insiders, which prevent Plaintiffs from further detailing Defendants' misconduct. Moreover, the numerous pending government investigations throughout the world,  including the U.S. Department of Justice, Criminal and Antitrust Divisions, concerning FX benchmark manipulation will likely yield information from Defendants' internal records or personnel that bears significantly on Plaintiffs' claim. Further, in the absence of such records and of Defendants' internal FX trading data, Plaintiffs are unable to identify with greater specificity the exact timing of Defendants' coordinated manipulation of the WM/Reuters Closing Spot Rates. Plaintiffs thus believe further evidentiary support for their allegations will come to light after a reasonable opportunity for discovery.

16.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District. During the "Relevant" Period (from 2009 through mid 2012), Defendants used the instrumentalities of interstate commerce to effectuate their conspiracy.

17.     New York Donnelly Antitrust Act

18.     USC Article III Section 2 U.S.C.

19.     The Edge Act, 12 U.S.C. § 632 Corporacion Venezolana de Formento v. Vintero Sales Corp. (2nd Cir. 1980) (citation omitted)

20.     This court has personal jurisdiction over Defendant. And under the New York Statue long-arm §302 (a) (1). Defendant has (1) transacted business in the United States, including in this District; (2) exchanged currency with Plaintiffs throughout the United States; including this District; (3) had substantial contacts with the United States, including in this District; and/or (4) committed substantial acts in furtherance of their conspiracy in the United States, including this District.

21.     Venue is proper under pursuant to Section 4, 12, and 16 of the Clayton Act. 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C. 1391 (b), (c) and (d) because one or more of the Defendant resided, transacted business, was found, or had agents in this District, a substantial part of the events giving rise to Plaintiffs' claims rose in this District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. 28 U.S.C. §1367 in New York State because there is an ongoing case.

22.     Defendants' collusive and manipulative acts took place in substantial part in the United States and were conducted by persons and entities subject to the laws of the United States, including its states and territories. The connection between the alleged conduct and the United States is demonstrated herein. Defendants' unlawful conduct occurred in the United States and had a substantial effect in the United States.

## PARTIES

PLAINTIFFS

23.     Plaintiffs are residing at 115 East Street, New Hyde Park, New York 11040 USA. Plaintiffs traded in FX Spot transactions, outright forward, FX swap, and derivatives including FX futures and option contracts directly with Defendant HSBC before and during the "Relevant" period, and have been injured in its business or property by reason of Defendant's violation of law alleged herein.

DEFENDANTS

United States Registered Entity

24.     Defendant HSBC Holdings PLC is a United Kingdom public limited company headquartered in London, England. Defendant HSBC Bank PLC is a United Kingdom public limited company headquartered in London, England and is wholly owned subsidiary of HSBC Holding PLC. Defendant HSBC North America Holdings Inc. is a Delaware corporation headquartered in New York, and is a wholly owned subsidiary of HSBC Holdings PLC. Defendant HSBC North America Holdings, Inc. is the holding company for HSBC Holdings PLC's operations in the United States. Defendant HSBC Bank USA N.A. is a National banking Association with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of HSBC North America Holdings Inc. and HSBC Bank USA, N.A.; HSBC Securities (USA) Inc. is also a clearing member of the CME and HSBC Private Bank is subsidiary; are referenced collectively as defendants in this action as "HSBC."

25.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

26.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers,

employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

27. Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

28. Various other persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaints.

## FACTS

29. Plaintiff Mr. Chan is a 6th grade educated man and Plaintiff Mrs. Chan is a 10th grade educated woman. Plaintiffs worked for 3 decades and save enough money to provide for the health and education of their three children.

30. Plaintiffs worked hard and also solely pay for their parent and sibling's daily care and expenses.

31. In mid January 2000, Plaintiff Mrs. Chan gave birth to their oldest son in New York City who is a U.S. Citizen and subsequently two younger children in Malaysia.

32. Since Plaintiffs' oldest son at that time aged two almost died because he suffered three times of Anaphylactic allergic reaction while in business trip with parent, Plaintiffs had to enroll him to medical facilitated international school for a proper school nurse is available in case of another attack.

33. In August 2010, Defendants directly deducted Plaintiffs' FX losses and inflated transaction fees, interest and commissions from Plaintiffs' cash deposit saving account of US$2.3 million and mailed Plaintiffs balance of US$200,000.00 in form of checks to their house without Plaintiffs agreeing or not. So Plaintiffs could not afford their children's private school fee. The children have to stop schooling. Plaintiffs strived for schooling and proper medical needs for them.

Plaintiffs then decided to bring them back to New York.

34.    Plaintiff Mrs. Chan suffered and was treated with PTSD ("Post Trauma Stress Disorder"), Plaintiffs' children is also disturbed emotionally and socially by Defendant's misconduct and ill-intention.

35.    At the time, Plaintiff has to sell all his mortgaged supported investment in real estate properties at a great loss to realize his cash flow to pay debt.

36.    Plaintiff Mrs. Chan also could not pay for the foreign housekeeper to care for her 90 years olds dementia mother who was living with her then in Singapore. She was sent to public hospital housed for dementia patient with her relative's help. Her mother passed away two years ago without Plaintiff Mrs. Chan by her side. Plaintiff Mrs. Chan's parent adopted her six days after birth, her adoptive father passed away in 1989 after a stroke paralyzed him for eight years.

37.    Back in Malaysia, Plaintiff Mr. Chan also has to stop supporting his old aged parent for his mother was paralyzed from stroke and his younger brother's addiction rehabilitation fee and their daily expenses.


THE FX MARKET OVERVIEW

38.    The Foreign Exchange ("FX") market, in which traders are able to buy, sell, exchange, and speculate on currencies. It is the largest and most actively traded financial market in the world. According to the most recent BIS Triennial Central Bank Survey,[4] global trading in FX averaged $5.3 trillion per day in April 2013, up from $4.0 trillion in April 2010.[5] U.S trading in FX averaged $1.263 trillion per day in April 2013, up from $864 billion in April 2010.[6] This growth in FX trading was largely driven by growth in market participation by "other financial institutions," which include pension funds, mutual funds, insurance companies, and hedge funds **and retail customers**.[7] The FX market comprised of many instruments including spot, forwards, swaps, futures, and option contracts.

39.    Currencies are traded in pairs. In April 2013, the top three currency pairs accounted for over half of all FX market turnover globally: EUR/USD (24.a%),

USD/JPY (18.3%), and GBP/USD (8.8%).[8] In April 2013, the U.S. dollar was on one side of 87% of all FX transactions globally[9] and on 98% of all FX transactions in the United States.[10]

40.     Three types of FX instruments account for approximately 95% of transactions in the FX market in the United States.[11]

> Spot – An agreement to exchange sums of currency at an agreed-on exchange rate on a value date that is within two bank business days' time.

> Outright Forward – An agreement to exchange sums of currency at an agreed-on exchange rate on a value date that will be in more than two bank business days' time. The exchange rate for a forward transaction is called the forward outright.

> FX Swap – A combination of a spot transaction plus an outright forward done simultaneously, but in the opposite direction.

41.     The FX market revolves around spot transactions. Both outright forwards and FX swaps are derived from the underlying spot price. Every time the

---

[4]     The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and OTC derivatives markets." Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results (available at https://www.bis.org/publ/rpfx13fx.pdf) [hereinafter BIS, Triennial Bank Survey, Preliminary Results 2013], at 3. Central banks, including the Federal Reserve Bank of New York, and other authorities in 53 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world. *Id.*

[5]     BIS, Triennial Bank Survey, Preliminary Results 2013, at 3.

[6]     Fed Triennial Bank Survey 2013, at 1.

[7]     Fed Triennial Bank Survey 2013, at 3.

[8]     BIS, Triennial Bank Survey, Preliminary Results 2013 at 3.

[9]     BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 2.

[10]    Fed Triennial Bank Survey 2013, at 4.

[11]    Fed Triennial Bank Survey 2013, 3-4.

spot price moves, outright forward and FX swap price move. An outright forward is the spot price plus the interest differential or "cost of carry." The cost of carry is determined mathematically from the overall cost involved when lending one currency and borrowing another during the time period stretching from the spot date until the forward date. Outright rates are quoted in swap points, also called forward points. By adding (premium) or subtracting (discount) these swap points from the spot rate, the full outright forward rate is calculated. Similarly, an FX swap is determined by the spot price because it is a simultaneous spot transaction and a reverse outright forward – a spot forward swap. An FX swap is a contract to buy a amount of the base currency at an agreed rate (spot), and simultaneously resell the same amount of the base currency for a later value date to the same counterparty (outright forward), also at an agreed rate (vice versa).

42.    Trading in the FX market opens on Monday at 7:00 a.m. in New Zealand. One hour later, Sydney, Australia opens. Trading continues throughout Asia as Tokyo, Hong Kong, and Singapore begin trading. Trading then shifts to Europe. One hour later, London opens. At midday London time, New York opens for trading. New York and London (the two largest FX trading centers) are open simultaneously for several hours, including at 4:00 p.m. London time (11:00 a.m. New York time) when the WM/Reuters Closing Spot Rates are determined. The FX trading day ends at 5:00 p.m. in New York for booking purposes. As New York's day ends, a new trading day reopens in New Zealand. The FX trading week closes on Friday at 5:00 p.m. in New York. With the advent of electronic trading, it is possible do some trading over the weekends.

43.  The following chart graphically illustrates the 24-hour nature of the FX market:

| FX MARKET HOURS | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| New Zealand | | | | | | | | | | | | | | | | | | | | | | | |
| | Sydney | | | | | | | | | | | | | | | | | | | | | | |
| | | Tokyo | | | | | | | | | | | | | | | | | | | | | |
| | | | Hong Kong | | | | | | | | | | | | | | | | | | | | |
| | | | | | Frankfurt | | | | | | | | | | | | | | | | | | |
| | | | | | | London | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | New York | | | | | | | |

44.  Approximately 98% of FX trading occurs over the counter ("OTC"),[12] meaning that it does not occur on a centralized exchange. For example, to initiate a spot transaction in the OTC market, a customer (such as Plaintiff) contact a dealer bank (such as Defendant) for a quote, providing the currency and quantity. The dealer quotes a "bid."   The bid is the price at which the dealer is willing to buy currency. At the same time, the dealer quotes an "ask." The ask is the price at which the dealer is willing to sell currency. The customer then buys, sells, or passes. The difference between the bid and ask is the "bid-ask spread" and is how the dealer is compensated.

45.  Customers execute FX trades either by a telephone call to a salesperson at a dealer bank or through an electronic communication network ("ECN"). An ECN is a computer system that a customers can use to place orders with dealer banks over a network. ECN platforms include single-bank proprietary platforms and multibank dealer systems. Multibank dealer systems include platforms such as Reuters, Bloomberg, EBS, KCG Hotspot, and Currenex.

---

[12]     BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 1.

46.    The following is a sample conversation between a dealer and customer placing an FX spot trade for immediate execution via an ECN. This conversation would take place in a brief span of time, perhaps less than one minute.[13]

| Sample Dealing Conversation (Spot) | | *Explanation* |
|---|---|---|
| Customer | HIHI FRIENDS | |
| Dealer | HIHI | |
| Customer | EUR on 50 PLS? | *Customer request a quote from dealer on 50 million euros. Customer does not reveal whether it is a buyer or seller.* |
| Dealer | 50/55 | *Dealer quotes its bid-ask spread. This spread equals 1.2350/1.2355, as 1.23 is understood by both parties.* |
| Customer | I SELL | *Customer agrees to sell 50 euros at the bid price of 1.2350.* |
| Dealer | VALUE 03 AUG2012 TO CONFIRM 50 MIO EUR AGREED AT 1.2350 BUY EUR MY EUR TO BANK LDN THANKS AND BIBI | *Dealer confirms the trade and instructs customer to deliver the euros to its bank in London* |
| Customer | TO CONFIRM 50 MIO EUR I SELL EUR @1.2350 VALUE 03 AUG 2012 MY USD TO BANK NY THANKS AND BIBI | *Customer confirms trade and instructs dealer to deliver the dollars to its bank in New York.* |

47.    In above example, the dealer buys euros from the customer at 1.2350. The dealer would also selling 50 million euros to another customer or group of customers at 1.2355. The dealer buys at 1.2350 and sells at 1.2355, earning the bid-ask spread of .0005 as its compensation as a market-maker. The wider the spread, the more money a dealer makes. Thus, dealers are incentivized to quote wider bid-ask spreads. Competition among dealers, however narrow bid-ask spreads.

---

[13]    David F. DeRoss, FOREIGN EXCHANGE OPERATION: MASTER TRADING AGREEMENTS, SETTLEMENT, AND COLLATERAL (Wiley 2014), at 103

48.     Dealers record and analyze their customers' trading histories, such as in the example above. As a result, dealers can often predict a customer's trading patterns, even before a customer place an order. This is particularly sensitive information.

49.     Dealers' salespeople and traders are in regular communication. Salespeople inform the traders of incoming potential orders, confirm bid and ask prices, and ultimately convey placed orders to the trading desk. Traders are aware of all potential and pending trades that could be processed through their desks.

The WM/Reuters Rates and Uses

50.     While an FX trade may be entered into and executed at any time, customers often use what are called daily fixing rates. A fixing rate is a published exchange rate at a moment in time or over a short interval of time. To place an order at a fixing rate, a customer gives the dealer instructions to buy or sell a quantity of currency at a fixing rate. The dealer guarantees execution at the fixing rate. The WM/Reuters rates are the most important fixing rates in the FX markets. WM/Reuters publishes fixing rates for spot rates and forwards.[14]

51.     The most widely used WM/Reuters spot rates are the WM/Reuters Closing Spot Rates for Trade Currencies, which are calculated around 4:00 p.m. London time (11:00 a.m. New York time). WM/Reuters defines Trade Currencies to include, among others, the major currencies traded against the U.S. dollar and the euro.[15]

52.     For Trade Currencies, the WM/Reuters Closing Rates are calculated using the median of a snapshot of bid and ask order rates and actual spot transactions in the 30 seconds before and the 30 seconds after 4:00 p.m. London time (11:00 a.m. in New York). Trades and rates from Currenex, Reuter Dealing 3000, and EBS are used in the validation and calculation.

---

[14]     The WM Company, WM/Reuters Spot & Forward Rates Methodology Guide (available at http://bit.ly/109jnj0), at 3 [hereinafter WM/Reuters Guide].

[15]     See WM/Reuters Guide, at 3.

53.     The process for capturing the information used to calculate the WM/Reuters Closing Rates is automated and anonymous. Because these rates are based on the median value of the transactions, the WM/Reuters Closing Rates do not take the notional size of the quotes and transaction into account; all quotes and transactions are weight equally.

54.     The WM/Reuters forward rates are published as premiums or discounts to the WM/Reuters spot rates.[16] Thus, manipulation of the WM/Reuters spot rates (as alleged herein) will necessarily impact the WM/Reuters forward rates.

55.     WM/Reuters spot rates are also customarily used to mark-to-market FX exposures. Before WM/Reuters spot rates became the standard benchmark, portfolio managers used different methods to mark-to-market, some of which were dependent on a single dealer's quote. WM/Reuters spot rates were rapidly adopted to mark FX exposures to market because the WM/Reuters spot rates had the advantages of universality and independence from any specific dealer.

56.     The widespread use and acceptance of WM/Reuters rates as a pricing mechanism and as the primary benchmark for currency trading globally has caused the WM/Reuters Closing Spot Rates to occupy a crucial role in the operation of financial markets.

WM/Reuters Closing Spot Rate is Vulnerable to Collusion

57.     Defendants understood the methodology used to calculate the WM/Reuters Closing Spot Rates is vulnerable to manipulation. For example, in a July 4, 2008 meeting of the Bank of England's Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group,[17] the WM Company gave a presentation on the median calculation of the WM/Reuters rates to chief currency traders from RBS, HSBC, Deutsche Bank, Morgan Stanley, JPMorgan, and Citigroup. In response to this presentation, the chief dealers in attendance admitted that the methodology was susceptible to manipulation:

> It was noted that WM/Reuters do not use traded volumes data in the calculation of the spot rates. While they have access to Reuters volume data, the same is not the case for EBS data. The Chief

Dealer group agreed that actual traded volumes is a key consideration in the calculation of accurate fixings and suggested that this would be a useful next step in the development of WM/Reuters' model. Furthermore it was suggested that using a snapshot of the market may be problematic, as it could be subject to manipulation. Perhaps WM could use a window of observations, and determine at what point to fix using volume data[18]

58.     As explained below, Defendant seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates.

<u>The FX Market Is Concentrated and Dominated by Defendants</u>

59.     Beginning in the late 1990s, the FX market experienced a substantial increase in concentration, with the number of banks covering 75% market share declining:



FX Market Concentration

---

[16]     WM/Reuters Guide, at 6.

[17]     The Chief Dealers Sub Group of the Bank of England's Foreign Exchange Joint Standing Committee was established in 2005 for the purpose of facilitating discussions between chief dealers at major dealer banks and Bank of England staff concerning developments in the foreign exchange markets. The Chief Dealers Sub Group consists of 11 chief traders active in the London FX market and top Bank of England officials. The Chief Dealers Sub Group meets three to four times per year. Between 2005 and 2013, representatives from Defendants' co-conspirator Barclays (2005-2012), Merrill Lynch (Bank of America) (2006-2007), Defendant HSBC (2007-2013), JPMorgan (2007-2009, 2011-2013), Morgan Stanley (2005-2008, 2010-2011), Goldman Sachs (2009-2013), BNP Paribas

60.     Defendants now dominate the FX market. According to the 2012 and 2013 FX Surveys by Euromoney, an industry publication, Defendants' individual and aggregate shares of the global FX market for the past two years are:

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| **Deutsche Bank** | 14.57% (1) | 15.18% (1) |
| **Citigroup** | 12.26% (2) | 14.90% (2) |
| **Barclays** | 10.95% (3) | 10.24% (3) |
| **UBS** | 10.48% (4) | 10.11% (4) |
| **HSBC** | 6.72% (5) | 6.93% (5) |
| **JPMorgan** | 6.60% (6) | 6.07% (6) |
| **RBS** | 5.86% (7) | 5.62% (7) |
| **Credit Suisse** | 4.68% (8) | 3.70% (8) |
| **Morgan Stanley** | 3.52% (9) | 3.15% (9) |
| **Goldman Sachs** | 3.12% (10) | 2.75% (11) |
| **BNP Paribas** | 2.63% (11) | 2.52% (12) |
| **Bank of America** | 2.41% (12) | 3.08% (10) |
| **Defendants' Aggregate Market Share:** | 83.8% | 84.25% |

61.     Defendants also dominate the U.S. spot market. The Federal Reserve Bank of New York reported that as of April 2013, the top ten banks engaged in 98% of all spot volume in the FX market, up from 91% in April 2010. Moreover, the five

---

(2009-2013), Deutsche Bank (2005-2012), RBS (2005-2013), UBS (2005-2013), Credit Suisse (2005-2008), and Citigroup (2005-2013), participated in the Chief Dealers Sub Group.
Foreign Exchange Joint Standing Committee Chief Dealers' Sub Group Meeting Minutes, 2005-2013 (available at http://bi.ly/1eMBcAq and http://bit.ly/1kDSdSj).
[18]     Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Draft Minutes of the 4 July 2008 Meeting at HSBC, 8 Canada Square, London E14 5HQ
 (available at http://bit.ly/1eMBcAq), at 71.

largest banks by volume accounted for 80% of spot transactions in the United States in April 2013.[19]

62.     This rise of ECNs also contributed to the concentration of the FX market. To maintain their market position, Defendants made heavy investments in software and hardware that smaller banks could not afford. Defendants are the best-informed participants in the FX market and have created an information barrier to entry.

63.     The FX market has other high barrier to entry. A large amount of capital is required to provide liquidity to customers. FX dealers must provide immediate liquidity to customer based on the assumption that inventory can be offloaded within the day.

64.     The FX market is controlled by a small and close-knit group of traders employed by Defendants. As a result of market concentration and the financial crisis, Defendants' FX trading desks have undergone staff reductions, resulting in each bank now having between eight to ten traders. These traders have strong ties formed by working with one another in prior trading positions. Many of these traders also live near each other, many living in the same neighborhoods in the Essex countryside just northeast of London's financial district. They belong to the same social clubs, golf together, dine together, and sit on many of the same charity boards. As Andre Spicer, a professor at the Cass Business School in London, said, "The foreign-exchange market has a very strong culture, in which practitioners feel more attached to each other than they do their banks. It is also dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."[20] These social and professional ties in the FX trading community create incentives and opportunities for collusion. As one former Citigroup banker noted, "This is a market in which price fixing and collusion could actually work. [21]

---

[19]     Fed Triennial Bank Survey 2013, at 6.

[20]     Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 19, 2013) (available at http://bloom.bg/1hA9KXj).

The FX Market Is Unregulated and Opaque

65.     Notwithstanding its size, importance, and concentration, the FX market is one of the world's least regulated financial markets, with most trading taking place away from exchanges. The United States does not have any specific rules or agencies governing FX spot, outright forward, or FX swap transactions, and such transactions are exempt from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 11-203, 124 Stat 1376 (2010).

66.     There is no centralized exchange or institution that collects and posts real-time trade information, such as order flows and volume. While Defendants' proprietary ECNs allow them to match buyers with sellers, Defendants' real-time order flow and volume data is not available to the market, such as it would be on an exchange, where the entire market knows who is buying and selling at a given moment. Defendants closely guard their real-time order flow and volume data and do not make it commercially available for purchase. What goes on inside these proprietary platforms is known only to the Defendants. Absent an agreement to collude, each bank would not share this information with one another; however, as explained here, Defendants *did* share this information with one another.

67.     Defendants enjoy informational advantages over Plaintiffs and other investors as a result of this market opacity. Knowledge of a customers' identity, trading patterns, and orders allows Defendants to predict the direction of market movements. Defendants' ability to predict-and manipulate-market movements grows when they share this information with one another.

68.     With relatively few firms having a large share of the FX market protected by high barriers to entry, and with the lack of regulation and limited access to real-time pricing and volume information, the FX market exhibits characteristics that antitrust law and economics have identified as making a market susceptible to collusion and manipulation.

---

[21]     Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big Fix*, FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl)

## DEFENDANTS CONSPIRED TO FIX THE WM/REUTERS CLOSING SPOT RATES

69.     Beginning at least as early January 1, 2003, Defendants conspired to manipulate the WM/Reuters Closing Spot Rates. Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the London fix. Based on the shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the WM/Reuters Closing Spot Rates. Defendants' collusive actions allowed them to eliminate their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs.

### Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire

70.     Defendants' top-level traders used electronic communications to meet and conspire for over a decade. Defendants' top-level traders conspired by communicating directly with one another via electronic communications, including chat rooms, instant messages, and email. Defendants brazenly named their chat rooms "The Cartel," "The Bandits' Club," "The Mafia," and "One Team, One Dream." These modern-day electronic chat rooms replaced the classic, smoke-filled backrooms of the past. The transcripts of these chat rooms are reportedly "peppered with allusions to drinks, drugs and women."[22]

71.     Entry into chat rooms, such as The Cartel, was coveted among traders because of the influence its members exerted in the FX market.

72.     Defendants' top-level traders ran the chat rooms. For example, Richard Usher ran The Cartel while he was JPMorgan's chief currency dealer in London and head of spot trading for G10 currencies from 2010-2013 and as a trader at RBS before then.

---

[22]     Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix*, FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIIUfl).

73.     The Cartel's membership numbered a half-dozen or more of Defendants' top traders. Other members of The Cartel included:

Rohan Ramchandani, Citigroup's head of spot trading in London;\

Matt Gardiner, Barclays' director of spot trading for EUR/USD from 2007 to 2011;

Chris Ashton, former head of Barclays voice spot trading globally; and

Niall O'Riordan, UBS's co-global head of G-10 and emerging market spot trading.

74.     Notably, Usher, Ramchandani, Gardiner, Ashton, and O'Riordan each have been suspended or fired from their respective institutions.

75.     Transcript of The Cartel's communications reveal that Defendants exchanged information on customer orders and agreed to trading strategies to manipulate the WM/Reuters Closing Rates.[23] Often, after manipulating the WM/Reuters Closing Rates, The Cartel members "would send written slaps on the back for a job well done."[24]

76.     The chat rooms often focused on manipulating a particular currency pair. For instance, Defendants formed "The Sterling Lads" to manipulate the exchange rate between British pounds sterling and U.S. dollars (GBP/USD or "cable") – the world's third most-traded currency pair.

77.     As a direct result of the numerous government investigations, Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, and UBS now ban their traders from participating in multibank chat rooms.

---

[23]     Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates,* BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibWUxj).
[24]     Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates,* BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibWUxj).

**Defendants Shared Confidential Customer Order Information to Manipulate the WM/Reuters Closing Spot Rates**

78.     Through electronic means, Defendants shared their confidential customer order information with one another. Each Defendant aggregated its client orders to determine what its individual net position in a specific currency was going to be at London fix. Defendants then shared this information with one another to determine their aggregate net position in a specific currency at the fix. By sharing and aggregating their confidential customer order flows, Defendants could determine, in advance, which way the market should move.

79.     Defendants' sharing of their confidential customer information violates the Federal Reserve Bank of New York's Guidelines for Foreign Exchange Trading Activities," which have been in place for decades. Specifically, Guidelines note:

> Confidentially and customer anonymity are essential to the operation of a professional foreign exchange market. Market participants and their customer expect that their interests and activity will be known only by the other party to the transaction… and an intermediary, if one used.
>
> *It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction…*[25]
>
> \*          \*          \*
>
> Customer anonymity should not be circumvented with the use of slang or pseudonyms. If confidentiality is broken, management must act promptly to correct the conditions that allowed the event to occur… *Staff should not pass on confidential and nonpublic information outside of their institution. Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.* It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction…..

---

[25]     Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 11 (emphasis added).

*Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information.* [26]

80.    Defendants have already produced evidence to government investigators confirming that their traders "inappropriately share[d] market-sensitive information with rivals."[27] Evidence obtained by government investigations confirms that "[s]hortly before the fix…it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place.[28] A transcript provided by RBS to the UK-FCA revealed that JPMorgan's Richard Usher wrote "messages to trader at other firms [that] included details of his trading positions."[29] Defendants' traders confirmed that "chatroom discussions between rival traders … allowed them to share information about pricing and order books."[30]

81.    A number of Defendants have admitted to the Bank of England that they shared their confidential customer information. On April 23, 2012, the Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group met at BNP Paribas' London office. Citigroup's Rohan Ramchandani, who was one of The Cartel members, was present. James Pearson (RBS), and Martin Millet (Bank of England) were also present.[31] A person familiar with the UK-FCA's investigation disclosed to the media

---

[26]    Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 26 (emphasis added).

[27]    Chiara Albanese, Katie Martin and David Enrich, *Banks Fix on Sales in Probe,* WALL STREET JOURNAL (Nov 19, 2013) (available at http://on.wsj.com/P2iHS8)

[28]    Katie Martin and David Enrich, *Forex Probe Uncovers Collusion Attempts, Global Investigation Has Reportedly Found London-Based Trader Worked Together in Trying to Manipulate Currencies,* WALL STREET JOURNAL (Dec. 19, 2013) (available at http://on.wsj.com/101YOWr).

[29]    Gavin Finch, Liam Vaughan, and Suzi ring, *Ex-RBS Trader in UK. Probe Said to Be JPMorgan's Usher,* BLOOMBERG (Oct 14, 2013) (available at http://bloom.bg/1ip3Yer).

[30]    Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix,* FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl).

[31]    Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdsj) .

that a senior trader present at the meeting turned over his meeting notes. According to the notes, the traders told Bank of England officials that they shared information about customer orders before currency benchmarks were set.[32] The official meeting minutes concealed the admissions made at the meeting.[33]

82.     In March 2014, the Bank of England suspended a staff member as it launched an internal investigation into whether employees knew about or condoned manipulation of the WM/Reuters Closing Spot Rates. The Bank of England's investigation included the search and review of 15,000 emails, 21,000 Bloomberg and Reuters chat room transcripts, and more than 40 hours of telephone records.

83.     At least four chief traders who participated in the Bank of England's Chief Dealers Sub Group have been suspended or terminated by their institutions. Richard Usher (JPMorgan) was placed on leave in October 2013. Rohan Ramchandani (Citigroup) was placed on leave in October 2013 and then terminated in January 2014. Robert de Groot (BNP Paribas and Citigroup) was suspended in March 2014. Niall O'Riordan (UBS) was suspended in October 2013. As detailed herein, Usher, Ramchandani, and O'Riordan were also members of The Cartel chat room.

**Using Shared Information, Defendants Agreed to Execute Concerted Trading Strategies to Manipulate the WM/Reuters Closing Spot Rates**

84.     By sharing their individual trading positions, Defendants gained an understanding of the overall flows across the FX market. According to traders, banks "would share details of orders with brokers and counterparts at bank through instant

---

[32]     Suzi Ring, Gavin Finch and Liam Vaughan, *BOE Staff Said to Have Condoned Currency Traders' Conduct,* BLOOMBERG (Feb. 7, 2014) (available at http://bloom.bg/1d5bQmn).

[33]     Foreign Exchange Joint Standing Committee Chief Dealers, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdSj)

messages to align their strategies" and "improve their chances of getting the desired move in the benchmark."[34]

85.     A Bloomberg article from June 12, 2013, reported that current and former employees of some of the world's largest banks disclosed the banks have "been front-running client orders and rigging WM/Reuters rates by pushing through trades before and during the 60-second windows when the benchmarks are set."[35]

86.     Former and current FX traders and persons familiar with the government and internal investigations have revealed some details of Defendants' collusive manipulation of the WM/Reuters Closing Spot Rates. Defendants' tactics include "front running/trading ahead," "banging the close," and "painting the screen."

87.     Traders "front run" on customer information when they receive customer orders that could move the market and then trade their own proprietary positions prior to executing their customers' market-moving trades. Large client orders come from, for example, tracker funds, which typically place orders as much as an hour before the WM/Reuters Closing Spot Rates are set. Such an order gives trader information about the direction the market will move, and traders from the largest dealer banks have admitted that they use the information to positions that benefit the bank – to the detriment of the customer.

88.     According to a former trader, even one large transaction can move the market.

The trader stated:

---

[34]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients,* BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[35]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients,* BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[I]f he received an order at 3:30 p.m. to sell 1 billion Euros ($1.37 billion) in exchange for Swiss francs at the 4 p.m. fix, he would have two objectives: to sell his own euros at the highest price and also move the rate lower so that at 4 p.m. he could buy the currency from his client at a lower price.

He would profit from the difference between the reference rate and the higher price at which he sold his own euros. A move in the benchmark rate of 2 basis points [0.02 percent], would be worth 200,000 franc ($216,000).[36]

89.     Nevertheless, absent collusion, a Defendant "front running" the market would still face risk that another Defendant with a larger position could take in the opposite direction at the same time. If this were to happen, the Defendant's strategy would backfire, and the Defendant would, in industry parlance, get "run over." For instance, if in the above example, the trader decided to sell 1 billion euros in exchange for Swiss francs, but another market participant traded the opposite direction and sold Swiss francs for 2 billion euros, the market price would move higher, not lower, as the trader had anticipated based on his client's order. If, as a consequence, the market moved 2 basis points higher, the trader would lose 200,000 francs ($216,000) on the transaction.

90.     To avoid this risk, Defendants agreed to "front run" together by "improperly working as a pack" and agreeing "to a sequence for placing their own trades to their advantage."[37]

_____

[36]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy); Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).

[37]     Katie Martin and David Enrich, *Forex Probe Uncovers Collusion Attempts*, WALL STREET JOURNAL (Dec. 19, 2013) (available at http://on.wsj.com/1h7x0j4); Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy); Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Trader's Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18,2013) (available at http://bloom.bg/1ibwUXj).

91.     The following front running example illustrates the trading mechanics of front running.



**3:45pm**     A customer call Defendant's FX desk to convert some of its U.S. dollars into £600m of sterling. The customer asks if the trade can be settled at the market benchmark price, the WM/Reuters Closing Spot Rate.

**3:48pm**     The trader immedi/,,ately buys £50m ("front running") for Defendant bank's own trading account at the market price of 1.6000 dollars to the pound. The trader knows he has a very large amount of pounds to buy over the next 12 minutes that will move the market higher.

**3.50pm**     The £50m trade has caused the price of pounds to tick up to 1.6010, and the trader buyers £100m at that price. He repeats this trade every two minutes, which drives the price higher each time. He stops when he has bought a total of £600m for his client by 4:00 p.m. at an average price of 1.6035.

**3:52pm**     The trader buys £100m at an average rate of 1.6020 moving the price higher.

**3.54pm**     The trader buys £100m at an average rate of 1.6030 moving the price higher.

**3.56pm**     The trader buys £100m at an average rate of 1.6040 moving the price higher.

(26)

**3.58pm**       The trader buys £100m at an average rate of 1.6050 moving the price higher.

**4:00pm**       The trader buys the final £100m at an average rate of 1.6060. The WM/Reuters Closing Spot Rate is calculated at 1.6060. The trader fills the customer's order at the WM/Reuters Closing Spot Rate of 1.6060, thereby selling £600m to the client, leaving him with only a £50m exposure, which he sells into the market at 1.6060.

The trader filled his customer's order and sold the £50m he bought for the Defendant Bank at the higher market rate. As a result, the customer received his £600m at a cost of $963.6m (£600m x 1.6060). However, Defendant bank has only paid $962.1m (£600m x the average price of 1.6035), meaning it made $1.5m from the customer's transaction. In addition, the trader gained $300,000 on the £50m "front running" side bet, and in total, made $1.8m for Defendant bank in the 15 minutes preceding the WM/Reuters Closing Spot Rate.[38]

92.       Defendants also engaged in "banging the close" to manipulate the WM/Reuters Closing Spot Rates and thereby fix the prices of FX instruments. "Banging the close" occurs when traders break up large customer orders into small trades and concentrate the trade in the moments before and during the 60-second fixing window in order to spike the published rates up or down. Because the WM/Reuters Closing Spot Rates are based on the median of trades during the calculation window and not weighted for the average notional amount of a transaction, the rates are susceptible to manipulation by banging the close. **That is, 100 trades of $1 will impact the WM/Reuters Closing Spot Rates to a greater degree than a single trade of $100.** Plaintiffs were used as tool like other individual investors to generate profits for Defendants' benefits.

93.       As explained by numerous sources, "[t]o maximize profits, dealers would buy or sell client orders in installments during the 60-second window to exert the most pressure possible on the published rate... Because the benchmark is based on

---

[38]       Simon Goodley, *Odds stacked in favour of the smart operator*, THE GUARDIAN (Mar. 13, 2014).

the median of transactions during the period, placing a number of smaller trades could have a greater impact than one big deal. [39]

94.     Defendant also manipulated the WM/Reuters Closing Spot Rates and thereby fixed the prices of FX instrument by "painting the screen." Painting the screen occurs when Defendants place phony orders with one another to create the illusion of trading activity in a given direction in order to move rates prior to the fixing window. After the WM/Reuters Closing Spot Rates were calculated, Defendant reversed those trades.

95.     Thus, by agreeing in chat rooms and instant messages to "front run" the execution of customer orders, "banging the close," and "paint the screen," Defendants manipulated the WM/Reuters Closing Spot Rates and thereby fixed the prices of the FX instruments.

96.     Absent collusion and manipulation, executing trades at the WM/Reuters Closing Spot Rates would pose more risk for Defendants than other order types. It pose more risk because, by agreeing to trade at a rate determined sometime in the future (even the relatively near future), there would be, in the absence of collusion, an increased risk that the market will move against Defendants. Despite this increase in risk, Defendants commonly incentivized their sales forces, through items such as increased "sales credits," to execute transactions at the WM/Reuters Closing Spot Rates.

97.     In recent testimony before the Treasury Committee of the House of Commons, Bank of England governor, Dr Mark Carney, elaborated:

> [T]he dealers want a quiet life. They want the ability to both
> promise to their clients that they will deliver the 4 pm fix and
> not have any risk in delivering that promise. Other market
> activity around the 4pm fix by others, whether they are
> hedge funds, asset managers, corporate, whatever, will make
> that promise riskier.

---

[39]     Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy);

That is the dealer's job, in making that promise. What they
have done, which is alleged and which is being investigated
around the world, is having developed a pattern of making
those promises, they decided to cheat to make their life easier,
to collude across the dealers...

***

Easier and richer sometimes goes together – it does not
always go together – to buy happiness. That is what is being
alleged, so you have a circumstance, and obviously, I was
not present at the meeting and one reads into the minutes,
where you have a circumstance where you have volatility
because of the market functioning, and the dealers want to
change that. What is being investigated is whether they tried
to change it by colluding, sharing client information and
doing above and beyond. That is fundamentally against the
principles of fair markets. It is unacceptable and it has to be
prosecuted to the full extent of the law...[40]

## DEFENDANTS' CONSPIRACY DIRECTLY CREATED ARTIFICIAL PRICING FOR FX EXCHANGE-TRADED INSTRUMENTS

### A. The FX Futures and Options Market

98.     FX futures contracts are connected to FX benchmark rates. The futures
contract is a cash settled for which the final settlement rate, a component of the
contract price, is equal to the reciprocal of the spot benchmark rate. The WM/Reuters
for the other 139 less liquid currencies (the "non-trade currencies") are set by similar
methodology. Because these currencies are less liquid, WM/Reuters relies on
indicative quotes (submissions) derived from a Reuters computer feed that solicits
"indications of interest" from market participants as part of its fixing methodology.
WM/Reuters captures independent snapshots of indicative quotes for bids and offers,
and selects the median rate from these quotes as the 4 p.m. WM/Reuters fix. The FX
market is concentrated and dominated by Defendants.

---

[40]     House of Commons, Treasury Department, Oral Evidence: The Foreign Exchange
Market Review, HC 1147 (March 11, 2014) (available at http://bit.ly/1h0YSb1).

99.     For instance, in a Resolution Plan filed with the Federal Reserve, Defendants described as its foreign exchange operations as a "core business line" that "provides services in foreign exchange (FX) spot, forwards, swaps and other related derivatives."[41] Defendants also consistently appears on *Euromoney*'s surveys of the top participants in the global FX market.

100.     WM/Reuters also provide fix rates forward and non-deliverable forward contracts using methodology similar to that used for non-traded currencies. Fix rate for forward and non-delivered forward contracts are published using a premium or discount to the spot rate for relevant currency pair. FX spot market prices, including benchmark rates, directly impact the prices of exchanged-traded FX futures and options contracts

101.     For spots and forwards, dealers (also called market makers) exist to provide liquidity and to ensure there is always a counterparty for any transaction. To initiate an FX spot or forward transaction, a customer contacts a dealer indicating the currency and quantity she wishes to trade, and inquires as to the price. The dealer states prices at which it is willing to buy and sell. The customer then decides whether to buy, sell, or pass. The dealer is compensated for its services by way of the gap between the quoted buy and sell prices, the "bid-ask spread." Dealer profit by providing this service to customers.

102.     Historically and to a large extent today, FX spot and forward transactions were carried out by telephoning a salesperson or voice broker at a dealer bank, who would receive the trade information, provide a bid and an ask price, and often accept a trade. Because FX salespeople have strong institutional relationships and keep track of clients' order histories, they are often able to predict client trading even before an order is placed. Throughout the order process salespeople are in regular contact with traders. They inform the traders of incoming potential orders, they confirm bid and

---

[41]   HSBC   Holdings   plc   US   Resolution   Plan   (Jul.   1,   2014)   (available   at http://www.federalreserve.gov/bankinforeg/resolution-plans/hsbc-2g-20140701.pdf).

ask prices, and they ultimately convey placed orders to the trading desk for processing. Thus, generally traders are aware of all potential and pending trades that could be processed through their desks. During the period, Plaintiff directly deal with Defendant's trading desk dealer for spot, forward and swap transactions.

103.    Beginning in the late 1990s, the FX market has seen changes that tightened bid-ask spreads and increased concentration as well as market power among the dealers, including Defendants. In the late 1990s and continuing to the early 2000s, electronic trading platforms emerged as a way to process foreign exchange transactions. In response to their customers' demands for increased electronic trading, dealers—including many of Defendants—launched proprietary electronic trading platforms in the early 2000s.

104.    The effect of these trading platforms was to narrow bid-ask spreads by lowering dealers' operating costs and reducing execution times. While in the 1980s the bid –ask spreads in the over-the-counter market were roughly 20 times those in the inter-dealer market, they have since compressed and are roughly equal. These bid-ask spreads have only reduced further since the financial crisis.

105.    As the *Financial Times* reported, based on interviews with traders, given that spreads are "the only source of client-driven income for banks in forex trades," this reduction in spreads "may have encouraged traders to seek less transparent ways to cut their risk."[42]

106.    The introduction of electronic trading also resulted in increase market concentration among FX dealers. Because dealers have been forced to invest heavily in electronic trading technology while at the same time quoting tighter bid-ask spread, smaller dealers have largely exited the FX market. This increased concentration facilitated the collusion at issue in this compliant.

---

[42]    Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix,* FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl).

107.    As the market has become more concentrated, the community of FX traders at dealer banks has also shrunk. These traders receive bonuses tied to their individual profits and the profits of the entire trading floor. Since the financial crisis, there have been staff reductions and the FX trading desks, even at the largest banks such as Defendants, are typically staffed with only eight to ten traders, many whom have worked previously with their counterparts in other banks. Thus the market is dominated by a small group of individuals, often with strong social ties formed by working with each other at some point in the past. In fact, many of these traders live near each other, socialize together, belong to the same social clubs, and participate on the same professional committees.

108.    The *Financial Times* reports that interviews with more than a dozen foreign exchange veterans and investors suggest these changes in the structure of the Defendants' businesses and the small, close-knit exchange trader community have increased incentives and opportunism for collusion.[43] As one former Citi banker noted, "This is a market in which price fixing and collusion could actually work.[44]

109.    While an FX spot or forward contract may be entered into and executed at any time, investors often use what are called WM/Reuters rates as the price in a spot or forward transaction.

110.    A WM/Reuters rate, calculated largely based on actual trades by a joint venture between State Street Corp. (which owns World Markets Co. or "WM") and Reuters, provides a    standardized rate.

111.    An FX future contract is an agreement, similar to an outright forward, in which parties agree to buy or sell a certain amount of currency on a specified future date. FX spot market prices, including the WM/Reuters Closing Spot Rates, impact the value of FX futures contracts by determining the price of the currency pair to be exchanged, i.e., the "commodity underlying" each FX future contract.

---

[43]    Schafer et al., supra note 20.

[44]    *Id.*

112.    FX futures contracts can be traded on several public exchanges, including the CME and ICE, however, most FX futures contracts are traded on the Chicago Mercantile Exchange - CME group Inc. ("CME") and ICE Clear Credit LLC ("ICE") as the operator of the world's foremost derivatives marketplace, offered exchanges for trading in derivatives and a clearinghouse.

113.    A clearing house is an entity designed to reduce counterparty risk by turning a bilateral trade into two separate transactions: a sale from the seller to the clearinghouse, and then a sale from the clearinghouse to the buyer. Because every trade participant faces the same counterparty – the clearinghouse – traders need not evaluate counterparty risk for each deal. Clearinghouse can lay the groundwork for full-blown exchanges by bringing buyers and sellers to a central platform, creating infrastructure for trade processing, and obviating the need for repeated risk assessments.

114.    For many years, most of the trading at the CME had been conducted via open outcry – the method of shouting and using hand signals to trade. This was the physical auction style of buying and selling of futures contracts in designated trading pits on the trading floor of the exchange. Those trading pits are closing now as trading has increasingly migrated to the CME's electronic auction trading platform called Globex. ICE contracts are traded on its proprietary electronic platform.

115.    The trading hours are specified. On Globex, trading is open 23 hours a day, five days a week.

116.    A substantial number of persons who trade FX futures and options on futures on exchanges also trade FX Instruments in the OTC market. Proprietary trading groups, such as hedge funds and quantitative trading groups, are responsible for approximately half the daily notional volume of trades on the CME. A large number of these entities trade both on exchange and OTC ("Over the Counter") as part of their business and investment strategies. Additionally, other traders, such as commercial hedgers, **portfolio managers,** and non-defendant banks, trade both on exchanges and OTC.

117.    Both the CME and ICE are designated contract markets pursuant to Section 5 of the CEA (7 U.S.C. § 7), and specify the term of trading FX futures contracts and options, including the trading unit, price quotation, trading hours, trading months, minimum and maximum price fluctuations, and margin requirements.

118.    These "standardized" terms facilitate exchange-based trading and distinguish an FX futures contract from an outright forward transaction, which is conducted OTC between private parties and can be customized to a certain extent based on their needs. For example, while two parties to an outright forward can pick a date in the future on which currency will be exchanged, FX futures contracts are always settled on the third Wednesday of either March, June, September, and December, following the quarterly cycle of International Monetary Market or "IMM" dates. There are 20 contract months listed in the March quarterly cycle (March , June, September, December), which means the listed contracts available extend out of five years. Similarly, each FX futures contracts is for a standardized amount of currency, e.g. € 125,000, while the parties to an outright forward can choose the amount of currency that will be exchanged in the future.

119.    FX futures contracts generally expire, *i.e.* stop trading, on the second business day immediately preceding the third Wednesday of the contract month unless that day is a holiday. For example, the last trading day for the March 2015 EUR/USD contract was on Monday, March 16, 2015 (*i.e.*, the second business day immediately preceding the third Wednesday of the contract month).

120.    In all futures contracts of the major currency pairs listed at the CME, the base currencies (the one listed first in the pair) are the foreign currency. The counter currency is U.S. dollar, which means the gain or losses will be denominated in U.S. dollars.

121.    The CME currently offers around 100 different FX futures contracts. The major currency futures pairs are EUR/USD, JPY/USD, GBP/USD, CAD/USD, CHF/USD, and AUD/USD. Each FX futures contract is "priced based on," *i.e.*, it derives its value from an underlying currency pair. For example, a CME euro FX

futures contract, which represents an agreement to buy or sell €125,000 in exchange for U.S. dollars, derives its value from the price of the spot EUR/USD currency pair. Similarly, a CME Japanese yen FX futures contract, which involves an exchange of ¥12,500,000 for U.S. dollars, derives its value from the price of the spot USD/JPY.

122.    The value of each FX futures contract is determined by multiplying the quoted contract price by the underlying notional amount of currency. For example, on May 19, 2015, the daily settlement price of the September 2015 CME euro FX futures contract was $1.1159. Thus, the total value of this CME euro FX futures contract on that day was $139,487.50 or the $1.1159 contract price multiplied by the underlying €125,000 notional amount to be exchanged.

123.    The pricing relationship between an FX futures contract and the underlying currency pair is a product of how futures contract are structured. A futures contract represents a bilateral agreement between two parties, a buyer and a seller, who are commonly referred to as a "long" and a "short."

124.    A long position, or simply a long, refers to a market position in which one has bought a future contract. In currency futures, it refers to having bought a currency pair specified for the contract, meaning one bought the base currency and sold the counter currency.

125.    As an FX futures contract nears "expiration," *i.e.*, the last trading day, the long and short halves of each contract become binding obligations to exchange the underlying currency. For a CME euro FX futures contract, the longs (as the buyers of euro) are obligated to pay for and "take delivery" of that currency, while the shorts (as sellers of euro) are required to "make delivery" of that currency.

126.    Like other future contracts, FX futures are secured by performance bonds that may be posted by both buyers and sellers. These performance bonds are also referred to as margin requirements, and are designed to anticipate, and secure against, the maximum anticipated one-day price movement. As set forth below, the day-to-day price movements (which determine how much margin must be posted) are calculated based on a snapshot of trading activity at a fixed time each day.

127.    Positions in futures contract are marked-to-market on daily basis, and the corresponding profits and losses posted to, or deducted from, the trader account. For FX futures, mark-to-market amounts are banked in cash every day, meaning that gains and losses in currency futures are realized daily. The mark-to-market amount of a given futures contract is determined by taking the end-of-day settlement price of the futures contract and subtracting the previous day's end-of-day settlement price, and multiplying that figure (positive or negative) by the net position (positive for a net long position, negative for a net short position). The end of day settlement price is calculated based on volume weighted average price of trades made over the thirty-second interval ending at 2 p.m. Central time, *i.e.* the CME Daily Settlement Rate fixing period.[45]

128.    The end of day settlement price is also used to determine which expiring options contracts are in the money and which is not. At the time of expiration (typically Fridays), CME uses the CME Daily Settlement Rate to force exercise of in the money options, and to force abandonment of out of the money options, for certain currencies in order to determine which FX future contracts will be assigned to expiring option positions.

129.    The most common way for an FX futures transactions to settle is for trader to enter into an offsetting transaction in the same currency pair, amount, and maturity, leaving him with flat position, which is equivalent to having no position at all.[46] When a futures contract is closed out this way, the trader's account is credited or

---

[45]   The ICE FX futures exchange also uses prices around 2 p.m. Central time to perform similar calculations as done for futures on the CME exchange. Thus, all the allegations herein with respect to the CME Daily Settlement Rate are relevant to that exchange as well.

[46]   This differs from forwards, where each forward contract is with a separate counterparty. In such case, entering into a second, offsetting transaction leaves the party with two sets of contractual rights and obligations, one for each of the forward contract counterparties. In contrast, because futures are transacted through a central clearinghouse that acts as buyer to every seller and seller to every buyer, an offsetting transaction leaves the trader flat vis-à-vis his central clearing counterparty, effectively canceling the original trade and locking in the profit or loss of that trade at the time of second, offsetting transaction.

debited according to the value of the original contract at the time that position was closed. The final settlement price is determined by CME based on the trading prices in the relevant contract during the 30 second period between 9:15:30 a.m. and 9:16:00 a.m. Central time on the settlement date.

130.    FX futures contracts track spot market prices "near parity after adjusted for the forward differential, by adding or subtracting "forward points. As FX futures contracts near expiration, their prices actually "converge" with those in spot market, becoming equal to the current value of the underlying currency pair. The convergence between spot and futures prices only further demonstrates that the spot market value of the underlying currency pair (and the WM/Reuters spot rates) drives future prices.

131.    When FX futures contracts expire, the process of exchanging currency between buyer and seller at expiration is called "settlement."

132.    All FX futures contracts are settled following their expiration, however, in most cases, this does not result in an exchange of the physical currency. Market participants have the option to offset or "financially settle" their FX futures positions. In financial settlement, instead of taking or making delivery of euro, or whatever currency is underlying a particular FX futures contract, investors in either the long or short position can offset their obligations with contracts for an equal but opposite position. For example, the buyer of a CME euro FX futures contract, who is long, can settle his obligation to take delivery of €125,000 by selling future contracts to initiate an offsetting short position of equal size.

133.    The difference between the two contract prices, meaning the difference between the price at which the initial contract was purchased and the price at which the later offsetting contract was sold, is the profit or loss on that transaction. Given this offsetting process, investors with long positions will generally benefit as the value of the currency they are purchasing rises, because they are able to sell an offsetting short contract at a higher price, while those with short positions will generally benefit as the value of the currency they are selling decreases because they are able to buy an

offsetting long contract at a lower price. Thus, an investor with a long CME euro FX futures position wants the value of the euro to increase relative to the U.S. dollar, while the investor with a short position wants the euro to decrease in value relative to the U.S. dollar.

134.    Just as there are long and short futures contracts, there are two types of options on exchanged-traded FX futures contracts, commonly known as "call" and "put." A call option gives the holder the right, but not the obligation, to buy a certain FX futures contract at a specified price, known as the "strike price," prior to some date in the future, at which point the option to purchase that contract "expires." One may either buy a call option, paying a negotiated price or premium to the seller, writer, or grantor of the call, or sell, write, or grant a call, thereby receiving that premium.

135.    Conversely, a put option gives the holder the right, but not the obligation, to sell an FX futures contract at the strike price prior to expiration. Similarly, one may buy or sell a put option, either paying or receiving a negotiated premium or price.

136.    FX futures contracts are connected to FX benchmark rates. Because the FX futures contracts underlying these options are priced based on certain underlying currency pairs, the prices of options on these futures contracts are also directly impacted by spot market prices of currency pairs underlying FX futures contracts.

## B.    Prices of FX Futures Contracts Are Impacted by the WM/Reuters Closing Spot Rates and Prices of the Underlying Currency Pair

137.    Every FX futures contract represents an obligation to exchange an underlying notional amount of currency in the future. Thus, there is a direct relationship between currency prices in the spot market and the value of each FX futures contract, which naturally flows from the value of the underlying currency pair.

138.    The relationship between the prices of FX futures contracts and the spot market prices of the underlying currency pairs is demonstrated by the fact that FX futures prices closely track spot market currency prices. Indeed, futures prices are based on and derived arithmetically from spot prices.

The CFTC found in its settlements with Defendants and other major banks like
Barclays, Citigroup, JPMorgan, RBS, and UBS that:

> Exchange rates in many actively traded ***CME foreign exchange
> futures*** contracts, including the Euro/U.S. Dollar (EUR/USD)
> future, the U.S. Dollar/Japanese Yen(USD/JPY) futures, and
> British Pound Sterling/U.S. Dollar (GBP/USD) futures, **track
> rates in foreign exchange markets at near parity** after adjusting
> for the forward differential, or adding or subtracting "forward
> points."[47]

139.    Consistent with this pricing relationship, the CFTC also found in its
settlements with the same Defendants that FX benchmark rates, including the
WM/Reuters Spot Rates, which determine the prices of various currency pairs in the
spot market, also directly impact the prices of FX futures contract:

> FX benchmark rates, including the ***WM/Reuter Rates, are used to
> price a variety of transactions including*** foreign exchange swaps,
> cross currency swaps, spot transactions, forwards, ***options,
> futures***, and other financial derivative instruments.[48]

140.    In FX futures and options exchange trading, 2:00 p.m. CT is a critical
time (even though Globex continues trading seamlessly through this time until its

---

[47]  See Barclays CFTC Order at 5; Citibank CFTC order at 4-5; HSBC CFTC Order at 4; JP
Morgan CFTC Order at 4-5; RBS CFTC Order at 4-5; UBS CFTC Order at 5 (emphasis added).

[48]  *See, e.g., In the Matter of Citibank, N.A.* CFTC Docket No. 15-03, order Instituting
Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making
Findings, and Imposing Remedial Sanctions, at 2(Nov.11, 2014); *in the Matter of HSBC Bank plc*,
CFTC Dkt. No. 15-07 at 2 (Nov. 11, 2014); *in the Matter of JPMorgan Chase Bank, N.A.*, CFTC
Dkt. No. 15-04 at 2 (Nov. 11, 2014); *In the Matter of the Royal Bank of Scotland, plc*, CFTC Dkt.
No. 15-05 at 2 (Nov. 11, 2014); *In the Matter of UBS AG*, CFTC Dkt. No. 15-06 at 2(Nov.11,
2014)(emphasis added).

close at 4:00p.m. CT) for the following reasons: (1) daily settlement occurs at 2:00 p.m. CT; (2) required margin is benchmarked to the 2:00 p.m. CT daily settlement, therefore the settlement price becomes a determinant for traders to keep or exit position based on the margin needed; and (3) on Fridays, the 2:00 p.m. CT daily settlement is also the final settlement price weekly or serial month and quarterly options on futures.

141.    Daily settlement at 2:00 p.m. CT is generally calculated as a volume-weight average price ("VWAP") of all trades occurring between 13:59:30 and 14:00:00 CT. VWAP is calculated by adding up the total dollar amount traded for every futures transaction the period between 13:59:30 and 14:00:00 CT and then dividing by the total futures contracts traded during that same period.

142.    FX futures rates track FX spot rates, therefore, the calculation of the CME settlement rate is tied to the spot rate prevailing in the market at the time of calculation.

143.    Positive price correlation means two or more instruments move in relation to one another in the same direction, such as when the price goes up for one it goes up for the other. Since currency futures are a derivative of the spot cash currency market and are deliverable in the physical currency, their prices move in virtual lockstep to the spot price. This is known as high positive correlation. In addition, there is a positive correlation between currency pairs that share a common currency. For example, EUR/USD and CHF/USD both share USD as a common currency. If the relative value of USD declines versus EUR, the USD will be perceived as weakening and will decline versus CHF. Thus, manipulation of the EUR/USD causing suppression of the USD in this currency pair will have direct and measurable effects on other currency pairs involving the USD.

144.    The relationship between FX futures prices and FX spot market prices is also confirmed by examining the mathematical nature of how FX futures contracts are priced. The price of each FX futures contract is quoted as the future cost of buying one currency, specifically the first currency in the underlying currency pair, "in terms

of" *i.e.,* in exchange for, the other.

145.     The future cost of buying or selling currency, and thus the price of an FX futures contract, is a product of the cost and benefits associated with purchasing and carrying the underlying currency pair over the duration of that futures contract, i.e., the time until expiration. For all FX futures contracts, this cost benefit relationship is determined by adjusting the spot price of the underlying currency pair to account for the difference in interest paid or received on deposits of each currency. This relationship is represented mathematically by the formula below at Figure 1:

**FIGURE 1** [49]

$$\text{Future Price} = \text{Spot Price} \times \left( \frac{1 + [\text{Rterm} \times (d/360\quad)]}{1 + [\text{Rbase} \times (d/360\quad)]} \right)$$

146.     Figure 1 contains the CME's standard pricing formula used to determine the future cost of buying and selling a certain currency pair and, as a result, the value of related FX future contracts. Figure 1 demonstrates that the "Spot Price" of the currency pair underlying each FX futures contract is an express term in the FX futures pricing formula. The remaining variables account for the cost of carrying the specific currency pair underlying that FX futures contract until expiration. The variable "d" represents the duration of the future contract, while "Rbase" and "Rterm" represent the rate of interest paid on deposits of the "Base currency," the first currency listed in the underlying currency pair and the "Term Currency," the second currency listed in the underlying currency pair, respectively.

147.     Given the structure of this pricing formula, prices of FX future contracts should, as the CFTC found, "track rates in the foreign exchange markets at near parity," increasing and decreasing with changes in the price of the underlying

---

[49]     See John W. Labuszewski, Sandra Roh, David Gibbs, *Currencies Understanding FX Futures,* at 3, CME Group (April 22, 2013)

currency pair. To verify this relationship, expert studied the relationship between the spot market price of the EUR/USD currency pair on the prices of the CME euro FX futures contract, the most highly traded FX futures contract on the CME. The results demonstrated that the two prices are highly correlated.

148.     As an example, the following two figures 2 & 3 demonstrate the relationship between spot prices and future prices on February 15, 2012. On that date, the major banks including Defendants manipulated -------------- the 1:15p.m. ECB fix.

## FIGURE 2



**FIGURE 3**



149.     Defendants and other major banks dominated the FX market with a combined market share of over 90%. Defendants were significant participants in both OTC and exchange transactions as liquidity providers. They understood the interrelatedness of these various instruments. Given the direct relationship between FX future prices and spot market prices for the underlying currency pairs demonstrated above, Defendants knew their manipulative and/or collusive activities in spot transactions directly created artificial price movements for exchange transactions.

150.     At times, traders also increased the volume traded by them at the fix in the direction favored by the chat room traders in excess of the volume necessary to manage the risk associated with their bank's net buy or sell orders at the fix. At times, these actions were undertaken in order to attempt to manipulate the benchmark rate set during the fix period.

151.     Defendants' manipulative conduct caused FX futures contracts prices to be artificial throughout the period. Further, Defendants' collusive and manipulative conduct caused exchanged-traded FX futures and options contracts to be artificial during at least the following times: WM/Reuters fix at 4:00 p.m. London; ECB fix at 2:15 p.m. Frankfurt; the 2:00 p.m. CT CME daily settlement; and at any time they collude with respect to bid/ask spreads. This caused injury to Plaintiffs who engaged in transactions for spot, forward and swap including FX futures contracts at artificial prices directly and proximately caused by Defendants' manipulative misconduct.

152.     In November 11, 2014, according to the United States Commodity Futures Trading Commission ("CFTC") clearly shows in the order that Defendants' misconduct has violated the Commodity Exchange Act ("CEA") § 6(c)(4)(A) and 6(d), 7 U.S.C. §§ 9, 13(b) for attempt to manipulate the price of any commodity in interstate commerce, or future delivery on or subject to the rules of any registered entity…" Defendants were fined $275 million in penalty.

153.     The CFTC states that in late 2008, following the financial crisis, liquidity and volume in the FX market increased as many financial institutions and other

market participants sought to exchange currencies. The increase in volume and liquidity allowed Defendants FX traders and traders at other banks to take advantage of this trading opportunity, specifically during the benchmark rate fixing periods.[50]

154.    The CFTC also states in the order that during the Relevant Period (from 2009 through mid 2012) Defendants, by and through certain foreign exchange desk traders, at times, sought to benefit its own trading positions or those of certain FX traders at other banks by attempting to manipulate, and aiding and abetting other banks in their attempts to manipulate certain benchmark rates principally in WM/Reuters Closing Spot Rates.

155.    Defendants' traders, in London G10 trading desk had and/or developed relationships with certain FX traders at other banks, and they increasingly used private chat rooms to communicate and share information with each other. Defendants FX trader routinely participated in the chat rooms. Often, these FX traders had multiple chat rooms open simultaneously on their trading terminals, and within a chat, the trader often focused on a particular currency pair. Certain chat room participant used code words to evade detection. The traders used this information to enable one or more traders to attempt to manipulate the FX benchmark rates, particularly the 4 p.m. WM/Reuters fix, prior to and during the relevant period. This conduct at Defendants involved two traders' London G10 trading desk.

156.    For example, on one day during the Relevant Period, in a chat room in which a trader on Defendant's London G10 FX trading desk ("HSBC Trader") and three traders at other banks or investment firm participated, the traders engaged in the following series of chats:

---

[50]    CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates, Release PR 7056-14 (Nov.12,2014). (available, with links to Consent Orders, at http://cftc.gov/PressRoom/PressReleases/pr7056-14); see also Barclays to Pay $400 Million Penalty to Settle CFTC Charges of Attempted Manipulation and False Reporting of Foreign          Exchange          Benchmarks          (May          20,          2015) (www.cftc.gov/PressRoom/PressRelease/pr7181-15).

At 2.50pm, the Defendants' trader and a trader at Bank W disclose in the chat room[51] that they are net seller ("lhs") in cable[52]:

| Bank W Trader 1: | 2:50:21pm: | early days but im a seller cable at fix [...] |
|---|---|---|
| Bank S Trader: | 3:11:43pm: | here also |
| Bank R Trader: | 3:24:50pm: | u got much to do in fix [Bank Trader W] |
| Bank W Trader 1: | 3:25:07pm: | im seller 130 cable that it [...] |
| Bank W Trader 1: | 3:28:02pm: | hopefulyl a fewmore get same way and we can team whack it |
| Bank R Trader: | 3:28:17pm: | ill do some digging [...] |
| Bank W Trader 1: | 3:36:13pm: | im seller 170 gbp atmofix |
| Bank R Trader: | 3:26:26pm: | we sellers of 40 |
| HSBC Trader: | 3:38:26pm: | lhs in cable at the fix |
| HSBC Trader: | 3:38:26pm: | good amount |

As the 4 p.m. fix period closes, the participants in the chat room made the following statements:

| Bank R Trader: | 4:00:35pm: | well done gents |
|---|---|---|
| Bank W Trader 1: | 4:01:56pm: | hooray nice team work |
| HSBC Trader: | 4:02:22pm: | nice one mate |

Simultaneously, in a separate, private chat room prior to the close of the fix period, Defendant's Trader informs Bank W Trader 2 at 3:25pm that he should buy cable at the fix.

---

[51]    The communications quoted in this Order contain shorthand trader language and many typographical errors. The shorthand and errors are explained in brackets within the quotations only when deemed necessary to assist with understanding the discussion.

[52]    The GBP/USD currency pairing is routinely referred to by traders as "cable." When a FX trader has order to sell GBP, it is often referred to as being on the left- hand side or "lhs" (i.e., GBP listed on the left hand side of the GBP/USD currency pair). If a FX trader references right hand side or "rhs," it indicates that the FX trader is a buyer of GBP (seller of USD) (i.e. USD is listed on the right hand side of the GBP/USD currency pair).

Shortly, thereafter, Defendants' Trader tells Bank W Trader 2 that he has a net sell order of approximately 400 million cable at the fix, and Bank W Trader 2 says he is a seller of 150 million cable at the fix:

| HSBC Trader: | 3:25:19pm: | get lumpy cable at the fix ok |
|---|---|---|
| Bank W Trader 2: | 3:25:32pm: | ta mate |
| Bank W Trader 2: | 3:25:35pm: | 150 here |
| HSBC Trader: | 3:25:46pm: | 400 odd here |
| HSBC Trader: | 3:25:50pm: | lets go |
| Bank W Trader 2: | 3:26:00pm: | yeah baby |
| HSBC Trader: | 3:26:03pm: | [Bank W Trader 1] is too [...] |
| Bank W Trader 2: | 3:27:00pm: | sry that's the [Bank W] flow |
| Bank W Trader 2: | 3:27:23pm: | [Bank W Trader 1] gets 150 |
| HSBC Trader: | 3:28:26pm: | So its 150 all day with you guys? [...] |
| Bank W Trader 2: | 3:36:34pm: | 170 here |

As the 4 p.m. fix period closes, Defendant's Trader and the other participants in the chat room made the following statements:

| Bank W Trader 2: | 4:01:03pm: | nice job mate |
|---|---|---|
| HSBC Trader: | 4:03:34pm: | haha |
| HSBC Trader: | 4:03:40pm: | I sold a lot up there |
| HSBC Trader: | 4:03:46pm: | and over sold by 100 |
| HSBC Trader: | 4:03:48pm: | hahaha [...] |
| Bank W Trader 2: | 4:04:06pm: | sweet nice job [...] |
| Bank W Trader 2: | 4:05:04pm: | bravo |

As the same time, Defendant's Trader discloses he is selling at the fix in yet another private chat with a trader at Bank V prior to the close of the fix period, at 3:28 pm:

| HSBC Trader: | 3:28:45 pm: | lhs in about 300 quid cable for the fix |
| Bank V Trader: | 3:28:54 pm: | sweet |
| HSBC Trader: | 3:29:42 pm: | can you do some digging and seeif anyone is that way |
| Bank V Trader: | 3:29:52 pm: | ofcourse mate |
| Bank V Trader: | 3:34:49 pm: | im getting 83 at mom mate |
| HSBC Trader: | 3:34:56 pm: | Nice [...] |
| Bank V Trader: | 3:37:38 pm: | someone tells a guy here he is getting 170 cble at fix |
| Bank V Trader: | 3:43:28 pm: | See that [HSBC Trader] |
| HSBC Trader: | 3:43:57 pm: | thx |

As the 4 p.m. fix period ends, Bank V Trader and Defendant's Trader continue:

| Bank V Trader: | 4:00:51 pm: | have that my son |
| Bank V Trader: | 4:00:52 pm: | hahga |
| Bank V Trader: | 4:00:56 pm: | V nice mate |
| HSBC Trader: | 4:04:53 pm: | that worked nice mate |
| Bank V Trader: | 4:05:44 pm: | big time mate. |

In a fourth chat room, Defendant's Trader discloses his position with traders at other banks prior to the close of the fix period. The Traders starting at 3:36 pm share information about the size and direction of the net orders at the fix period:

| Bank W Trader 2: | 3:36:18 pm | see first seller now |
| Bank Z Trader: | 3:36:48 pm | you gettingt betty[53] on the mumble still [Bank W Trader2]? |
| Bank Z Trader: | 3:36:51 pm | we have nowt |
| Bank W Trader 2: | 3:36:56 pm | yep |
| Bank W Trader 2: | 3:36:59 pm | 170 |
| Bank Z Trader: | 3:37:05 pm | ta |
| Bank Z Trader: | 3:37:21 pm | get it up to 60/70 then bash the fck out of it |
| HSBC Trader: | 3:38:26 pm | His in cable at the fix |
| HSBC Trader: | 3:38:29 pm | good amount |
| Bank Z Trader: | 3:38:35 pm: | ta [...] |
| Bank Z Trader: | 4:00:28 pm: | nice work gents |

While participating in the four separate chat rooms referenced above, at 3:38 p.m., Defendant's Trader simultaneously commented in three additional chat rooms in which traders from Bank V, Bank W, and Bank N also participated in, that he was "His in cable at the fix" and "good amount."

Commencing at 3:43 pm, in another private chat, Bank W Trader 1 told Defendant's Trader that another firm, which was not a participant in the chat room, was "building" in the opposite direction to them and would be buying at the fix. At 3:43 pm, Bank W Trader 1 then reported that he has taken action to net off against this order, which would be in the opposite direction at the fix than Bank W Trader 1's and Defendant's Trader's positions:

---

[53]    Like the term "cable," "betty" is also a shorthand name for British Pound Sterling used by some FX traders.

| Bank W Trader 1: | 3:43:52 pm: | right ive taken him out |
|---|---|---|
| Bank W Trader 1: | 3:43:58 pm: | he paid me for 186 |
| HSBC Trader: | 3:44:09 pm: | ok thx |
| Bank W Trader 1: | 3:44:15 pm: | so shud have giot rid of main buyer for u |
| Bank W Trader 1: | 3:44:58 pm: | im stilla seller of 90 |
| Bank W Trader 1: | 3:45:06 pm: | give us a chance and ive paid a load of bro ha |
| Bank W Trader 1: | 4:05:03 pm: | yeah babyxx |
| Bank W Trader 1: | 4:05:11 pm: | [HSBC Trader] [Bank W Trader 1] combo boom loved that mate |
| HSBC Trader: | 4:05:22 pm: | love that mate |
| HSBC Trader: | 4:05:26 pm: | worked lovely |
| HSBC Trader: | 4:05:34 pm: | pity we couldn't get it below the the 00 |

In another chat rooms, Defendant's Trader and a different trader at Bank W discuss unloading positions just prior to the fix period commencing at 3:54 p.m.:

| Bank W Trader 3: | 3:54:32 pm | Can u let know when are Down to your last tenner |
|---|---|---|
| HSBC Trader: | 3:55:02 pm | ok |
| HSBC Trader: | 3:55:10 pm | i'm down to my last tenner |
| Bank W Trader 3: | 3:55:17 pm | ok ta |
| Bank W Trader 3: | 3:55:41 pm | just sold some more |
| HSBC Trader: | 3:55:49 pm | hahaha |
| Bank W Trader 3: | 3:55:51 pm | hehehe |
| Bank W Trader 3: | 4:00:57 pm | nice on[e] son |
| HSBC Trader: | 4:03:15 pm | learnt from good fella |
| Bank W Trader 3: | 4:15:43 pm: | there u go |
| Bank W Trader 3: | 4:16:48 pm: | go early, move it, hold it, push it |

**GOVERNMENT INVESTIGATIONS**

157.    Law enforcement and regulatory authorities in the United States, United Kingdom, European Union, Switzerland, Germany, Asia, Australia, New Zealand, and the international Financial Stability Board are actively investigating Defendants' conduct in the FX market.

### U.S. Department of Justice ("DOJ")

158.    On October 29, 2013, Acting Assistant Attorney General Mythili Raman (acting head of DOJ's Criminal Division) confirmed that DOJ's Criminal and Antitrust Divisions are actively investigating Defendants' manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates. The DOJ confirmed that several banks agreed to produce information relating to FX benchmark rates pursuant to their obligations under deferred prosecution and non-persecution agreements reached in connection with the DOJ's LIBOR investigation:

> As part of our Libor resolutions, there have been pledges by banks
> To cooperate and indeed requirements by banks to cooperate not
> just in connection with Libor but all benchmark manipulations.[54]

> That's one of the most significant benefits that law enforcement
> has been able to secure as part of this [LIBOR] investigations.[55]

159.    DOJ entered into deferred prosecution and non-persecution agreements with Barclays Bank, UBS Bank, and RBS Bank in connection with LIBOR investigations. UBS', RBS', and Barclays' non-persecution and deferred prosecution

---

[54]    FT Reporters, *Day of reckoning as European banks' bill for misconduct mounts*, FINANCIAL TIMES (Oct. 29, 2013) (available at http://on.ft.com/1kIBKG4).

[55]    M. Rochan, *FX Fixing Scandal: US Justice Department Confirms Currency Investigation*, INTERNATIONAL BUSINESS TIMES (Oct. 30, 2013) (available at http://bit.ly/OBZ7fh).

agreements with DOJ require them to provide information relating to benchmark manipulation of FX benchmark rates.

    a.  On February 5, 2013, Barclays submitted to a Non-Prosecution Agreement with DOJ relating to LIBOR and EURIBOR Manipulation.[56] Barclays admitted to submitting false figures for LIBOR and EURIBOR.   In addition, Barclays paid $451 million in penalties to U.S. and U.K. regulators in connection with LIBOR manipulation.

    b.  On December 12, 2012, UBS submitted to a Non-Prosecution Agreement with DOJ relating to UBS's manipulation of LIBOR, EURIBOR, and TIBOR.[57] UBS agreed to pay a $1.5 billion in penalties to U.S., U.K., and Swiss regulators.

    c.  On February 5, 2013, RBS submitted to a Deferred Prosecution Agreement with DOJ relating to Yen LIBOR and Swiss Franc LIBOR manipulation.[58] RBS agreed to pay $612 million in penalties to U.S. and U.K. regulators.

160.    DOJ stated that "[t]he cooperation that we have been able to secure as part of our agreements in the Libor investigation has been very helpful to us in terms of holding banks' feet to the fire."[59]DOJ further stated that these cooperation provisions have produced "tangible, real results." The cooperation "expanded our investigations into the possible manipulation of foreign exchange and other benchmark rates."[60]

---

[56]    Barclays Non-Prosecution Agreement, February 5, 2013, at 2 (available at http//www.justice.gov/iso/opa/resources/33720127101733546982822.pdf); Appendix A, Statement of Facts(available at http://www.justice.gov/iso/opa/resources/9312012710173426365941.pdf).
[57]    UBS Non-Prosecution Agreement December 12, 2012, at 3 (available at http://www.justice.gov/iso/opa/resources/1392012121911745845757.pdf); Appendix A, Statement of Facts, (available at http://www.justice.gov/iso/opa/resources/6942012121911725320624.pdf).
[58]    RBS Deferred Prosecution Agreement, February 5, 2013, at ¶6 (available at http://www.justice.gov/criminal/vns/docs/2013/02/2013-02-rbs-dpa.pdf).
[59]    Tom Schoenberg and David McLaughlin, *Banks Aid U.S. Forex Probe, Fulfilling Libor Accords*, BLOOMBERG (Jan. 23, 2014) (available at http://bloom.bg/1cYkwUB).
[60]    Moneynews, *Banks Aid US Forex Probe to Fulfill Duty in Libor Settlements* (Jan. 23, 2014) (available at http://nws.mx/1h6KY0G).

161.    A person familiar with DOJ's investigation stated that banks are providing the DOJ with witness lists, making employees available for interviews, and providing documents.[61]

162.    In November 2013, DOJ and FBI agents questioned Robert Wallden, a director in Deutsche Bank's foreign exchange trading unit, at his New York home. Agent questioned Wallden about transcripts of an electronic chat where he boasted "about his ability to influence currency markets."[62] Wallden, along with two other New York Deutsche Bank executives, Diego Moraiz and Christopher Fahy, were fired on February 14, 2014. [63]

163.    DOJ has also questioned executives at BNP Paribas as part of its investigation into FX manipulation.[64] As of March 6, 2014, BNP Paribas had suspended it head of FX spot trading, Robert De Groot.[65]

164.    United States Attorney General Eric Holder publicly commented on the DOJ's probe. In November 2013, the Attorney General stated that "the manipulation we've seen so far may just be the tip of the iceberg"; that "we've recognized that this is potentially an extremely consequential investigation"; and that the DOJ's criminal and antitrust divisions are "taking a leading role" in the truly global investigation."[66]

---

[61]    Moneynews, *Bank Aid US Forex Probe to Fulfill Duty in Libor Settlements* (Jan. 23, 2014) (available at http://nws.mx/1h6KY0G).

[62]    David Enrich, Katie Martin and Jenny Strasburg, *FBI Tries New Tactic in Currency Probe*, WALL STREET JOURNAL (Nov. 20, 2013) (available at http://on.wsj.com/OIgEmq).

[63]    Paritosh Bansal and Emily Flitter, *Exclusive: Deutsche fires three New York forex traders – source*, REUTERS (Feb. 4, 2014) (available at http://reut.rs/1dAVufP).

[64]    Katherine Rushton, BNP Paribas *faces quiz on currency rate scandal*, THE TELEGRAPH, (Nov. 10, 2013) (available at http://bit.ly/1kSG0sT).

[65]    *BNP Paribas's head of forex spot trading suspended: WSJ*, REUTERS (Mar. 6, 2014) (available at http://reut.rs/1h1K7x6).

[66]    Ben Protess, Landon Thomas Jr. and Chad Bray, *U.S. Investigates Currency Trades by Major Banks*, NEW YORK TIMES DEALB%K (Nov. 14, 2013) (available at http://nyti.ms/1fP5Atu).

165.    In November 2013, Deputy Attorney General James Cole commented further on the DOJ's investigation:

> The department's criminal and antitrust divisions along with the FBI, regulators and other law enforcement agencies around the world are aggressively investigating possible manipulation of foreign-exchange rates involving a number of financial institutions.[67]

166.    On February 7, 2014, Reuters reported that UBS approached the DOJ in September 2013 with information relating to the FX probe in hope of gaining antitrust immunity under the Antitrust Division's Leniency Program.[68] UBS uncovered incriminating chats by traders and turned over the evidence to the DOJ as part of UBS's application for amnesty.

167.    On July 13, 2014, Reuters reported that prosecutors from DOJ offered immunity deals to junior traders in London as they continued to investigate the rigging of FX rates by senior traders.[69]

168.    On May 20, 2015, Citicorp, JPMorgan Chase & Co., Barclays PLC, and The Royal Bank of Scotland PLC, agreed to plead guilty to conspiring to manipulate the price of the U.S. dollar and euro currency pair exchanged in the FX spot market. Specifically, Defendants entered into and engaged in a "conspiracy to fix, stabilize, maintain, increase, or decrease the price of and rig bids, offers for the euro/U.S. dollar ("EUR/USD") currency pair exchanged in the foreign currency spot market, as early

---

[67]    Tom Schoenberg, *U.S. 'Aggressively' Probing Possible Currency Rigging*, BLOOMBERG, (Nov. 18, 2013) (available at http://bloom.bg/1jfAaV2).

[68]    Jamie McGeever, *UBS seek first- mover Immunity in U.S. currency probe – sources*, REUTERS (Feb. 7, 2014) (available at http://reut.rs/1fBofJ1); Linsay Fortado, Keri Geiger, and David McLaoughlin, *UBS Said to seek Immunity in FX-Rigging Probes by EU, US*, BLOOMBERG, (Feb. 24, 2014) (available at http://bloom.bg/Q16aj9).

[69]    Richa Naidu,   U.S. prosecutors offer junior UK traders immunity in forex probe:   FT, July 13,2014(available                                                                              at http://www.reuters.com/article/2014/07/13/us-regulator-doj-forex-idUSKBN0FI14520140713).

as Deember 2007 and continued until at least January 2013, by agreeing to eliminate competition in the purchase and the sale of the U.S. dollar and euro currency in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1"[70]

169.    The Defendants agreed to pay criminal fines totaling more than $2.5 billion.

170.    On May 20, 2015, UBS AG pleaded guilty to a count of wire fraud for its involvement in manipulating LIBOR and other benchmark interest rates and paid a $230 million criminal penalty, after the DOJ determined UBS AG breached its December 2012 Non-Prosecution Agreement resolving the LIBOR investigation[71] According to the factual statement of breach attached to UBS AG's plea agreement, UBS AG engaged in deceptive FX trading and sales practices after it signed the LIBOR Non-Prosecution Agreement. UBS AG admitted that it conspired with other firms acting as dealers in an FX spot market by "agreeing to restrain competition in the purchase and sale of the EUR/USD currency pair in the United States and elsewhere...by, among other things: (a) coordinating the trading of the EUR/USD currency pair in connection with ECB and WM/Reuters benchmark currency 'fixes' ..., and (b) refraining from certain trading behavior, by withholding bids and offers, when one conspirator held an open risk position, so that the price of the currency traded would not move in a direction adverse to the conspirator with an open risk position.[72]Additionally, UBS AG traders tracked and executed limit orders at a level different from the customer's specified level in order to add undisclosed markup.[73]

---

[70]  *See, e.g.*, DOJ Barclays Plea Agreement at ¶2, May 20, 2015 (available at http://www.justice.gov/file/440481/download)

[71]  DOJ    UBS    AG    Plea    Agreement,    May    20,    2015 (http://www.justice.gov/file/440521/download).

[72]  *Id.* at Exhibit 1,¶15

[73]  *Id.* at ¶14.

171.     In connection with their plea agreements, all Defendants also agreed to cooperate fully in the investigation involving "the purchase and sale of the EUR/USD currency pair, or any other currency pair, in the FX Spot Market, or foreign exchange forward, foreign exchange option or other foreign exchange derivative, or other financial product..."[74]

172.     On May 20, 2015, after the plea agreements were announced. Assistant Attorney General Bill Baer stated:

> Simply put, exchange rates are prices to buy and sell currency. They should be set competitively the same way prices are set in any type of market. Instead, the members of aptly-named "Cartel" chatroom conspired to gain unlawful profit by manipulating these rates. The banks pleading guilty today are not ordinary market participants. They are "market maker," representing 25 percent or more of dollar-euro exchange rate transactions each year. As such, they were uniquely positioned to manipulate the market.And that is why they did. First, they agreed to rig the 1:15 p.m. and 4 p.m. "fixes." These fixes are designed to be snapshots of the euro-dollar exchange rates at a given point in time, reported by unbiased third parties. The snapshot rates become the price paid for billions of dollars of currency bought or sold on any given day. "The Cartel" conspirators used chat rooms communications in the minutes and seconds leading up to the snapshot moment to move the fix price in the direction that would be most profitable to them, thereby, cheating customers who relied on those fixes to fairly reflect market prices.

> Second, members of "The Cartel" also hatched plans in the chatroom to protect the conspiring banks at other times during the day by ageeing to hold off buying or selling dollars and euros. By not trading at these times, or "standing down," members if "The Cartel" minimized price movements and helped each other close out of their open positions profitably – at the expense of customers and counterparties who expected, and were entitled to receive, a competitive dollar-euro exchange rate. It

---

[74]   *See, e.g.,* DOJ Barclays PLC Plea Agreement at ¶17.

is imperative that these bank accept full responsibility for these bad acts and carry through on their commitments to change the culture that allowed this behavior to go on for years without detection.

### Commodity Futures Trading Commission ("CFTC")

173.    On November 11, 2014, the CFTC issued five Orders instituting and settling charges against Defendant HSBC and co-conspirators, Citibank, JPMorgan Chase Bank, N.A., The Royal Bank of Scotland PLC, and UBS AG for violations of the Commodity Exchange Act.[75] The CFTC instituted proceedings against these Defendants for attempted manipulation of global FX benchmark rates, including the WM/Reuters Closing Spot Rates, to benefit the positions of certain traders. The CFTC Orders collectively impose over $1.4 billion in civil monetary penalties[76] The CFTC Orders fined Citibank and JPMorgan Chase Bank, N.A. $310 million and issued fines of $290 million each for The Royal Bank of Scotland PLC and UBS AG, $275 million for HSBC Bank PLC.[77]

174.    On May 20, 2015, the CFTC issued an Order filing and settling charges against Barclays Bank PLC for violations of Section 6(c)(4)(A) and 6(d) of the CEA.[78] Barclays was fined $400 million.[79]

175.    The CFTC found that during the "Relevant Period," [80] certain traders from each of these Offenders including Defendant HSBC "coordinated their trading

---

[75]   CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates, Release PR 7056-14 (Nov.12,2014). (available, with links to Consent Orders, at http://cftc.gov/PressRoom/PressReleases/pr7056-14).

[76]   *Id.*

[77]   *Id.*

[78]   *See* In the Matter of Barclays Bank PLC, CFTC Docket 15-24 (May 20, 2015) (www.cftc.gov/ucm/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysb order052015.pdf).

[79]   *Id.* at 16.

[80]   The "Relevant Period" varied for each Defendant as follows: Citigroup (2009 through 2012); JP Morgan (2010 through 2012); HSBC (2009 through mid-2012); RBS (2009 through 2012); UBS (2009 through 2012); and Barclays (2009 through 2012).

with FX traders to attempt to manipulate certain FX benchmark rates, including the 4 p.m. WM/Reuters fix, to their benefit." [81] Some traders "used private electronic chat rooms to communicate and plan their attempts to manipulate the FX benchmark rates for certain currency pairs." These traders "disclosed confidential customer order information and trading positions, altered trading positions to accommodate the interest of the collective group, and agreed on trading strategies as part of an effort by the group to attempt to manipulate certain FX benchmark rates, in some cases downward and in some cases upward." [82']

176.    The CFTC found that Citibank, JPMorgan Chase Bank, N.A., HSBC Bank PLC, The Royal Bank of Scotland PLC, UBS AG, and Barclays Bank PLC "failed to adequately assess the risks associated with their FX traders participating in the fixing of certain FX benchmark rates and lacked adequate internal controls in order to prevent improper communications by traders.[83] These Defendants "lacked sufficient policies, procedures and training specifically governing participation in trading around the FX benchmarks rates; and had inadequate policies pertaining to, or sufficient oversight of, their FX traders' use of chat rooms or other electronic messaging."[84]

---

[81]    *See, e.g., In the Matter of Citibank, N.A.,* CFTC Docket No. 15-03, order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 2 (Nov.11, 2014)(early 2013); *In the Matter of JPMorgan Chase Bank, N.A.* CFTC Dkt. No.15-04, at 8 (Nov.11, 2014) (December 2013); *In the Matter of HSBC Bank plc,* CFTC Dkt. No. 15-07, at 10 (Nov. 11, 2014) (December 2012); *In the Matter of Royal Bank of Scotland plc,* CFTC Dkt. No. 15-05, at 7 (Nov.11, 2014)(August 2012); *In the Matter of Barclays Bank plc,* CFTC Dkt. No. 15-24, at 9 (May 20, 2015) (October 2012)..

[82]    *Id.*

[83]    CFTC Orders Five Banks to Pay over $1.4 Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates, Release PR 7056-14 (Nov.12,2014). (available, with links to Consent Orders, at http://cftc.gov/PressRoom/PressReleases/pr7056-14); see also Barclays to Pay $400 Million Penalty to Settle CFTC Charges of Attempted Manipulation and False Reporting of Foreign      Exchange      Benchmarks      (May      20,      2015) (www.cftc.gov/PressRoom/PressRelease/pr7181-15).

[84]    *Id.*

177.    The CFTC Orders noted that between August 2012 and December 2013, Citibank, JPMorgan Chase Bank, N.A., HSBC Bank PLC, The Royal Bank of Scotland PLC, UBS AG, and Barclays Bank PLC either banned or restricted the use of multi-bank chat rooms for its FX personnel.[85]

## New York State Department of Financial Services

178.    On May 20, 2015, the New York State Department of Financial Services ("NYDFS") fined Barclays Bank PLC $485 million and ordered the termination of eight employees who engaged in New York Banking Law violations in connection with manipulating spot trading in the FX market.[86] Benjamin M. Lawsky, Superintendent of Financial Services said: "Put simply, Barclays employees helped rig the foreign exchange market. They engaged in a brazen 'head I win, tails you lose' scheme to rip off their clients. While today's action concern misconduct in spot trading, there is additional work ahead."[87]

179..    NYDFS ordered Barclays to take all steps necessary to terminate four employees who played a role in the misconduct: a vice president on the Emerging Markets trading desk in New York, two directors on the FX Spot trading desk in New York and a director on the FX sales desk in New York (who previously was Co-Head of the UK FX Hedge Fund Sales in London).[88]

---

[85]    *See, e.g., In the Matter of Citibank, N.A.,* CFTC Docket No. 15-03, order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 2 (Nov.11, 2014)(early 2013); *In the Matter of JPMorgan Chase Bank, N.A.* CFTC Dkt. No.15-04, at 8 (Nov.11, 2014) (December 2013); *In the Matter of HSBC Bank plc,* CFTC Dkt. No. 15-07, at 10 (Nov. 11, 2014) (December 2012); *In the Matter of Royal Bank of Scotland plc,* CFTC Dkt. No. 15-05, at 7 (Nov.11, 2014)(August 2012); *In the Matter of Barclays Bank plc,* CFTC Dkt. No. 15-24, at 9 (May 20, 2015) (October 2012)

[86]    New York State Department of Financial Services, *In the Matter of Barclays Bank plc,* Consent Order Under New York Banking Law §§44 and 44-a (May 20, 2015)(http://www.dfs.ny.gov/about/ea/ea50520.pdf).

[87]    The New York State Department of Financial Services, *NYDFS Announces* Barclays *to Pay $2.4 Billion, Terminate Employees for Conspiring to Manipulate Spot FX Trading Market* (May 20, 2015) (http://www.dfs.ny.gov/about/press/pr1505201.htm).

[88]    *Id.*

Additional United States and States Investigation

180.     Other state and federal authorities in the United States are actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates.

      a.    The U.S. Commodities Futures Trading Commission ("CFTC") asked major currency-dealing banks, including Defendants' co-conspirator Deutsche Bank and Citigroup, to produce records as part of a probe into currency market manipulation.

      b.    The Federal Reserve Bank and Office of Comptroller of the Currency are investigating FX manipulation. Officials visited Defendant s' co-conspirator, Citigroup's Canary Wharf office in London during its preliminary stage of information gathering

      c.    The New York Department of Financial Services opened an investigation of several banks in connection with FX rate market manipulation. The New York Department of Financial Services

              subpoenaed several banks including Credit Suisse, RBS, Citigroup, Deutsche Bank, Barclays, and Goldman Sachs, requesting emails and instant messages from currency traders.[89]

      d.    The U.S. Securities and Exchange Commission ("SEC") is investigation whether currency traders distorted prices for options and exchange-traded funds by rigging benchmark FX rates.

United Kingdom Financial Conduct Authority ("UK-FCA")

181.     The UK-FCA is actively investigating manipulation of benchmark FX rates, including the WM/Reuters Closing Spot Rates. UK-FCA has investigative and enforcement powers with respect to financial services providers.

182.     On October 16, 2013, the UK-FCA issued the following statement:

          We can confirm that we are conducting investigations alongside several other agencies into a number of firms relating to trading on the foreign exchange (forex) market.

---

[89]     The New York Department of Financial Services investigation does not include banks that maintain bank charters outside of New York's purview. Those include Morgan Stanley, JPMorgan, Bank of America, and Citigroup, whose international bank charters place them under a different authority.

As part of this we are gathering information from a wide range of sources including market participants. Our investigations are at an early stage and it will be some time before we conclude whether there has been any misconduct which will lead to enforcement action. We will not comment further on our investigations.[90]

183.     On February 4, 2014, John Griffith-Jones, Chairman of the UK-FCA, and Martin Wheatley, CEO of the UK-FCA, testified before the House of Commons Treasury Committee about FX rates. In response to numerous questions about the UK-FCA's FX investigation, Wheatley stated:

> [T]he elements [of the FX investigation] that are different than LIBOR is that it's a much deeper, much more liquid market based on real trades. The elements that are similar to LIBOR, and this is purely on what's reported, is that the suggestions of collusion between individuals at a number of firms and the use of chat rooms and phones to collude to influence prices. But we're still in the investigation phase, so I can't really comment too much on any findings other than to say that the allegations are every bit as bad as they have been with LIBOR.[91]

> [G]iven what's come out, no, people will not trust the way the rates are fixed.[92]

> [A]round ten banks have themselves volunteered information that said they have been asked for information.[93]

> I don't think we will get to final conclusions within 2014, I hope that we will next year, but again the nature of these sort of investigations is that it's very hard to predict.[94]

---

[90]     Financial Conduct Authority, *Statement on foreign exchange market investigation,* (Oct. 16, 2013) (available at http://bit.ly/1oKO2FZ); *see also Financial Conduct Authority joins foreign exchange probe,* BBX 9Oct. 17, 2013) (available at http://bbc.in/1plBflx).

[91]     Videorecording, House of Common Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:13:42 – 1:14:11.

[92]     Videorecording, House of Common Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:14:20 – 1:14:24.

[93]     Videorecording, House of Common Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:15:04 – 1:15:10.

[94]     Videorecording, House of Common Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:17:13 – 1:17:22.

184.    Wheatley further noted that in addition to the FX investigation, "there are a number of other benchmarks that operate in London that we are investigating because of concerns that have been raised with us."[95]

185.    The UK-FCA's investigation is reported focused on an electronic chat room used by top traders at financial institutions. RBS produced emails and instant messages to the UK-FCA, including The Cartel chat room activities of former RBS and JPMorgan trader Richard Usher. Usher has been specifically identified in the UK-FC A's investigation of FX manipulation, as a result of instant messages he sent during his time at RBS. These messages reportedly included details of his trading positions.[96] The UK-FCA has also asked Morgan Stanley to provide details in relation to its FX operations. In addition, approximately 40 traders have individually interviewed with the UK-FCA and produced communications dating back to 2004.

European Commission ("EC")

186.    EC's Competition Commissioner, Joaquin Almunia, acknowledged its investigation of the FX market, and in particular, manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates. Almunia said EC learned of activities that "could mean violation of competition rules around the possible manipulation of types of exchange rates."[97] During a press conference in December 2013, Almunia stated that EC was "looking very carefully at Forex."[98] Alminia also stated, "We have

_____

[95]    Videorecording, House of Common Treasury Committee meeting (Feb. 4, 2014) (available at http://bit.ly/1j3Y06g), at 1:17:48 – 1:17:53.

[96]    Gavin Finch, Liam Vaughan, and Suzi Ring, *Ex-RBS Trader in U.K. Probe Said to be JPMorgan's Usher,* BLOOMBERG (Oct. 14, 2013) (available at http://bloom.bg/1ip3Yer).

[97]    Aoife White and Gaspard Sebag, *EU Regulators Start Inquiry Into Currency Rate-Manipulation,* BLOOMBERG (Oct. 7, 2013) (available at http://bloom.bg/1p1Dnji).

[98]    Graeme Wearden and Nick Fletcher, *Banks fined record €1.7 billion by EC over rate fixing cartel scandal – as it happened,* THE GUARDIAN (Dec. 4, 2013) (available at http://bit.ly/1p1DAmy).

internal information regarding possible manipulation of forex benchmarks....We are in the preliminary steps."[99] A person familiar with the EC's investigation stated that banks are queuing up to provide incriminating information "of startling quality."[100] Switzerland

Switzerland

187.    Swiss authorities are actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates. On September 30, 2013, the Swiss Competition Commission ("Swiss WEKO") opened a preliminary investigation into manipulation of FX markets after learning about discussions about FX rates between banks. Swiss WEKO stated, "Through discussions they are said to have manipulated various exchange rates."[101] On March 31, 2014, WEKO provided additional details on its investigation, noting that it is investigating included UBS, Credit Suisse, JPMorgan, Citigroup, Barclays, and RBS, among others. WEKO stated, "The possible actions include the following: the exchange of confidential information, the general co-ordination of transactions with other market participants at agreed price levels, coordinated actions to influence the WM/Reuters fix as well as the co-ordination of the sale and purchase of currencies in relation to certain third parties."[102] WEKO's statement concluded, "There are indications that these banks went into anti-competitive agreements to manipulate price rates in foreign exchange trading."[103]

---

[99]    Conor Humphries, *EU Commission looking into possible forex manipulation – Almunia*, REUTERS (Dec. 5, 2013) (available at http://reut.rs/1d1aW5n).

[100]    FT reporters, *Forex in the spotlight*, FINANCIAL TIMES (Feb. 16, 2014) (available at http://on.ft.com/1kVisGt).

[101]    Swiss antitrust watchdog probes banks over FX manipulation, REUTERS (Oct. 4, 2013) (available at http://reut.rs/1oKSbcW).

[102]    Daniel Schafer, Swiss watchdog launches forex investigation into eight banks, FINANCIAL TIMES (March 31, 2014) (available at http://on.ft.com/1dKuO1P).

[103]    Press Release, FINMA is investigating possible manipulation of foreign currency exchange rates (Oct. 4, 2013) (available at http://bit.ly/1kSJ20a).

188.     In addition, on October 4, 2013, Financial Market Supervisory Authority ("Swiss FINMA"), Switzerland's main market regulator, announced that it was "currently conducting investigations into several Swiss financial institutions in connection with possible manipulation of foreign exchange markets." Swiss FINMA indicated multiple banks around the world were potentially implicated. Swiss FINMA "is coordinating closely with authorities in other countries."[104]

### Germany

189.     Germany's top financial regulator, the Federal Financial Supervisory Authority ("BaFin"), is actively investigating manipulation of FX benchmark rates, including the WM/Reuters Closing Spot Rates. BaFin has made its FX investigation a top priority and moved it into a "special investigation" category.[105] According to a BaFin spokesperson's statement on January 16, 2014, "Bafin is presently investigating the facts and has kept an eye on the currency trading issues since the summer."[106] That same day, BaFin's President, Elke Koenig, stated the allegations of FX manipulation are "particularly serious because such reference values are based – unlike Libor and Euribor – typically on transactions in liquid markets and not on estimates of the banks."[107] BaFin representatives reportedly visited the London offices of Deutsche Bank.[108]

### Hong Kong Monetary Authority ("HK-MA")

190.     In October 2013, HK-MA confirmed it was in cooperating with other regulators about their ongoing FX investigations, stating: "The Hong Kong Monetary

---

[104]   German Watchdog to visit Deutsche in London in FX probe: source, REUTERS (Jan. 20, 2014) (available at http://reut.rs/1gJHAYP).
[105]   *German watchdog to visit Deutsche in London in FX probe: source*, REUTERS (Jan. 20, 2014) (available at http://reut.rs/1gJHAYP).
[106]   Jeff Patterson, *Forex Scandal Deepens, Deutsche Bank Moves To Suspend Latin-Based Traders*, FOREX MAGNATES (Jan. 16, 2014) (available at http://bit.ly/1f3fZT4).
[107]   Karin Matussek and Oliver Suess, *Metals, Currency Rigging Is Worse Than Libor, Bafin Says*, BLOOMBERG (Jan 17, 2014) (available at http://bloom.bg/1kSKShR).
[108]   *German watchdog to visit Deutsche in London in FX probe: source*, REUTERS (Jan. 20, 2014) (available at http://reut.rs/1gJHAYP).

Authority is aware of the allegations. We have been in communications with the relevant overseas regulators and following up with individual banks."[109]

### Monetary Authority of Singapore ("SG-MA")

191.　　Singapore is Asia's largest FX center and the world's third largest FX trading hub (behind London and New York), averaging $383 billion per day of FX turnover in April 2013.[110] SG-MA confirmed that it "has been in touch with foreign regulators on the issue of alleged manipulation in the WM/Reuters foreign exchange benchmark rates. We stand ready to assist in their investigations."[111]

### Australia Securities and Investment Commission ("ASIC")

192.　　ASIC announced it commenced a probe into rigging by banks in the FX markets. Greg Medcraft, chairman of ASIC stated, "We are commencing a review to ascertain whether any misconduct relating to foreign exchange trading may have occurred in Australia. And whether from an Australian perspective ASIC has concerns about the foreign exchange market.[112] Australia is cooperating with other regulators throughout the world.

### New Zealand

193.　　New Zealand's Commerce Commission also announced an investigation into the FX market. The Commerce Commission has an "investigation in that space," according to a spokesperson from the agency.[113]

---

[109]　Rachel Armstrong and Jamie McGeever, *Hong Kong says looking into forex manipulation allegations,* REUTERS (Oct. 16, 2013) (available at http://reut.rs/1gcjTxc).

[110]　Fed Triennial Bank Survey 2013, at 14

[111]　Anjani Trivedi, *Singapore Joins Global Currency-Market Probe, Regulators Around the World Are Looking Into Whether Traders Rigged Rates,* WALL STREET JOURNAL (Oct.24, 2013) (available at http://on.wsj.com/1dbJpmo).

[112]　Jamie Smyth, Paul Davies, and Daniel Shafer, *Australia regulators to probe forex market,* FINANCIAL TIMES (March 19, 2014) (available at http://on.ft.com/iOaTOY).

[113]　*Commerce Commision launches forex probe,* THE NEW ZEALAND HERALD (Mar. 31, 2014) (available at http://bit.ly/1rZBVaG).

<u>Financial Stability Board ("FSB")</u>

194.    The FSB is an international body that was established in April 2009 as the successor to the Financial Stability Forum ("FSF"). The FSB coordinates regulation for the Group of Twenty ("G20") leading economies, organizing the work of national financial authorities and international standard setting bodies. The FSB includes all G20 major economies, FSF members, and the EC. The FSB set up a task force in 2013 to try repair or replace tarnished financial benchmarks in the wake of LIBOR manipulation.

195.    On February 14, 2014, the FSB, led by Bank of England governor Mark Carney, said it would review the FX benchmarks. The FSB stated:

> The [FSB] was tasked by the G20 in 2013 to co-ordinate and guide work on the necessary reforms to short-term interest rate benchmarks, to ensure that widely-used benchmarks are held to appropriate standards of governance, transparency and reliability.
>
> ***
>
> Recently, a number of concerns have been raised about the integrity of foreign exchange (FX) rate benchmarks. The FSB has consequently decided to incorporate an assessment of FX benchmarks into its ongoing programme of financial benchmark analysis.
>
> To take this work forward, a new sub-group on Foreign Exchange Benchmarks has been established.  The new group will be chaired by Guy Debelle (Assistant Governor, Financial Markets, Reserve Bank of Australia) and Paul Fisher (Executive Director for Markets, Bank of England), both members of the [Official Sector Steering Group] (OSSG).
>
> The FX Benchmarks Group will undertake a review of FX benchmarks and will analyse market practices in relation to their use and the functioning of the FX market as relevant. Conclusions and recommendations will be transmitted by the FSB to the Brisbane Summit.[114]

---

[114]    Press Release: FSB to review foreign exchange benchmarks (Feb. 14, 2014) (available at http://www.financialstabilityboard.or/press/pr_140213.htm)

196.     The FSB is scheduled to report on FX benchmarks at the 2014 G20 Brisbane Summit in November 2014. Carney has indicated that the FSB's work on reforms to FX benchmarks will proceed more quickly than the conduct investigations being undertaken worldwide and that the FSB hopes to issue its recommendations sooner than November 2014.

**DEFENDANTS' PUBLIC FILINGS CONFIRM INVESTIGATIONS AND COOPERATION**

197.     Numerous public filings by major banks and Defendants confirm the existence of government investigations and the cooperation of certain Defendants with those investigations.

198.     Bank of America's Form 10-K disclosed:

> Government authorities in North America, Europe and Asia are conducting investigations and making inquiries of a significant number of FX market participants, including the Corporation, regarding conduct and practices in certain FX markets over multiple years. The Corporation is cooperating with these investigations and inquiries.[115]

199.     Barclays Bank disclosed in its full-year 2013 financial results statement:

> Various regulatory and enforcement authorities, including the FCA in the UK, the CFTC and the DOJ in the US and the Hong Kong Monetary Authority have indicated that they are investigating foreign exchange trading, including possible attempts to manipulate certain benchmark currency exchange rates or engage in other activities that would benefit their trading positions... BBPLC has received enquiries from certain of these authorities related to their particular investigations, and from other regulators interested in foreign exchange issues. The Group is reviewing its foreign exchange trading covering a several year period through October 2013 and is cooperating with the relevant authorities in their investigations.[116]

---

[115]   Bank of America, Annual Report (Form 10-K), at 228 (Feb. 25, 2014).
[116]   Barclays PLC, Results Announcement, at 120 (Dec. 31, 2013).

200.     Citigroup's Form 10-Q disclosed:

Government agencies in the U.S. and other jurisdictions are conducting investigations or making inquiries regarding trading on the foreign exchange markets. Citigroup has received requests for information and is cooperating with the investigations and inquiries and responding to the requests.[117]

201.     Deutsche Bank's quarterly earnings report disclosed:

Deutsche bank has received requests for information from certain regulatory authorities who are investigating trading in the foreign exchange market. The Bank is cooperating with those investigations, which are in early stages.[118]

202.     Goldman Sachs' Form 10-Q disclosed:

[Goldman Sachs] Group Inc. and certain of its affiliates are subject to a number of other investigations and reviews by, and in some cases have received subpoenas and requests for documents and information from, various governmental and regulatory bodies and self-regulatory organizations and litigation relating to various matters relating to the firm's businesses and operations, including: …trading activities and communications in connection with the establishment of benchmark rates.[119]

203.     Defendant HSBC's interim Management Statement for the third quarter disclosed:

The Financial Conduct Authority is conducting investigations alongside several other agencies in various countries into a number of firms, including HSBC, relating to trading on the foreign exchange market. We are cooperating with the investigations which are at an early stage.[120]

---

[117]   Citigroup Inc., Form 10-Q, at 242 (Nov. 1, 2013)
[118]   Deutsche Bank, 2013 Third Quarter Interim Report, at 108 (Sept. 30, 2013)
[119]   Goldman Sachs Group Inc., Quarterly Report (Form 10-Q), at 108 (Nov. 7, 2013)
[120]   HSBC Holding PLC, Interim Management Statement, at 10 (Nov. 4, 2013)

204.    JP Morgan's Form 10-K disclosed:

*Foreign Exchange Investigations and Litigation.* The Firm has received information requests, document production notices and related inquiries from various U.S. and non U.S. government authorities regarding the Firm's foreign exchange trading business. These investigations are in the early stages and the Firm is cooperating with the relevant authorities. [121]

205.    RBS's third-quarter interim Management Statement disclosed:

In addition, various governmental and regulatory authorities have commenced investigations into foreign exchange trading activities apparently involving multiple financial institutions. [RBS] has received enquiries from certain of these authorities including the FCA. [RBS] is reviewing communications and procedures relating to certain currency exchange benchmark rates as well as foreign exchange trading activity and is cooperating with these investigations.[122]

206.    UBS's Third Quarter 2013 Report disclosed:

Following an initial media report in June 2013 of widespread irregularities in the foreign exchange markets, we immediately commenced in internal review of our foreign exchange business. Since then, various authorities reportedly have commenced investigations concerning possible manipulation of foreign exchange markets, including FINMA, WEKO, the DOJ, the CFTC and the FCA. UBS and other financial institutions have received requests from various authorities relating to their foreign exchange businesses, and UBS is cooperating with the authorities. We have taken and will take appropriate action with respect to certain personnel as a result of our review, which is ongoing. [123]

## TERMINATIONS, SUSPENSIONS, AND DEPARTURES OF DEFENDANT EMPLOYEES

207.    Major banks and Defendants HSBC have terminated, suspended, or put on leave numerous employees with responsibility for their FX operations after the

---

[121]   JPMorgan Chase & Co., Annual Report 2013 (Form 10-K), at 326 (Feb. 20, 2014)
[122]   RBS Group, Interim Management Statement Q3 2013, at 87, (Nov.1, 2013)
[123]   UBS AG, Third Quarter 2013 Report, at 143 (Oct. 29, 2013)

investigation from authorities. Some banks have terminated or suspended over 30 employees, while a number of them were long time employees depart amidst the investigation.

## Bank of America

208.    Bank of America has suspended or terminated at least one employee. In March 2014, Bank of America suspended Joseph Landes, its head of spot FX trading in Europe, the Middle East, and Africa.

## Barclays

209.    Barclays has suspended or terminated at least six employees and has hired criminal-defense lawyers to represent some of their employees. In November 2013, Barclays suspended six traders as part of its internal inquiry into alleged rigging of the FX market, including its chief currency trader in London. The suspended individuals include London-based Chris Ashton, who oversaw Barclays' voice-spot trading, London-based FX spot trader Mark Clark, Tokyo-based FX spot trader Jack Murray, New York-based FX spot trader Russel Katz and Jerry Urwin, and at least one unknown Barclays' employee. Ashton was part of the Cartel chat room.

## BNP Paribas

210.    BNP Paribas has suspended or terminated at least one employee. In March 2014, BNP Paribas suspended its head of spot currency trading, Robert de Groot. De Groot was a member of the Bank of England's Chief Dealers' Sub Group.

## Citigroup

211.    Citigroup has suspended or terminated at least three employees. Citigroup suspended Anthony John, a sterling trader in London, and Andrew Amantia, a Canadian dollar trader in New York. Citigroup also fired Rohan Ramchanani, who was head of European spot trading, after he was put on leave in October 2013. Ramchandani was part of The Cartel chat room and was a member of the Bank of England's Chief Dealers' Sub Group. In addition to the aforementioned employees

disciplined by the bank, on February 5, 2014, Bloomberg reported that Citigroup's foreign-exchange head Anil Prasad will leave the bank to "pursue other interests."[124] On March 24, 2014, Citigroup named Richard Bibbey as head of global spot FX trading, and merged its voice and electronic trading businesses for currencies. Citigroup did not have a combined global head of spot FX trading previously.

### Credit Suisse

212.    On September 10, 2013, Todd Sandoz, head of global FX and short-term interest rate trading at Credit Suisse, left the bank after more than 17 years. Based in London, Sandoz took on the role in May 2011 and also became co-head of the new global currencies. Credit Suisse promoted David Tait, global head of FX trading in London, to succeed Sandoz.

### Deutsche Bank

213.    Deutsche Bank has suspended or terminated at least five employees. In February 2014, Deustche Bank fired three New York-based currency traders, Diego Moraiz, Robert Wallden, and Christopher Fahy, and one Argentina-based currency trader, Ezequiel Starobinsky. Moraiz was the head of Deutsche Bank's emerging markets FX trading desk and specialized in trading the Mexican peso. Wallden and Fahy were both directors in the FX trading unit. In November 2013, FBI agents questioned Wallden at his New York home about transcripts of an electronic chat in which he boasted about manipulating FX markets. On March 11, 2014, Christian Binaghi, Deutsche Bank's head of Latin America trading, left the firm. Binaghi was a New York-based managing director who oversaw all Latin America trading, including currency, debt, and equity. In addition, on March 31, 2014, London-based Kai Lew, a director of institutional FX sales, was placed on leave following an internal investigation.

---

[124]    Amberdeen Choudhury, *Citigroup Head of Currencies Prasad to Step Down in March* , BLOOMBERG (Feb. 5, 2014) (available at http://bloom.bg/1jmunIV).

Goldman Sach

214.     In February 2014, New-York based Steven Cho, global head of spot and forward foreign exchange trading for G10 currencies at Goldman Sachs left the bank. Cho was a member of the FX committee sponsored by the Federal Reserve Bank of New York. Leland Lim, another partner in Goldman Sachs' currency-trading business, also left. Lim was co-head of macro trading, which includes interest rates and currencies, for Asia ex-Japan.

HSBC

215.     HSBC has suspended or terminated at least two employees. In January 2014, HSBC suspended Serge Sarramegna, the bank's chief trader for major currencies and head of HSBC's spot FX desk in London, and Edward Pinto, a Scandinavian currency trader.

JP Morgan

216.     JP Morgan has suspended or terminated at least one employee. JP Morgan put its chief currency leader, London-based Richer Usher, on leave in October. Usher was part of The Cartel chat room and was a member of the Bank of England's Chief Dealer' Subgroup. Usher was head of spot G10 currency trading at JP Morgan. He joined JP Morgan from RBS in May 2010.

Morgan Stanley

217.     On March 21, 2014, Steve Glynn, co-head of foreign exchange and emerging markets and head of fixed income for Asia at Morgan Stanley, left the bank. Glynn had been at Morgan Stanley for 14 years, initially in London before moving to Hong Kong in 2009. Glynn's role is being taken over by Ben Fallon. Fallon joined Morgan Stanley in 2008 from Credit Suisse.

RBS

218.     RBS has suspended or terminated at least three employees. RBS suspended two London-based FX spot traders, Julian Munson and Paul Nash. In addition, RBS suspended a senior spot currency trader based in London, Ian Drysdale.

<u>UBS</u>

219.     UBS has suspended or terminated at least nine employees and has hired criminal defense lawyers to represent some of their employees. UBS suspended Roger Boehler and Niall O'Riordan. Both had been at UBS since the early 1990s. Boehler was the global head of FX trading at UBS's investment bank, based in Stamford, Connecticut. O'Riordan was the co-global head of FX G10 and emerging market spot trading at UBS, based in Zurich. O'Riordan ws part of The Cartel chat room and was a member of the Bank of England's Chief Dealers' Subgroup. On March 28, 2014, UBS suspended seven FX traders. They include New-York based emerging market spot trader Onur Sert, 20-year UBS currency trader Michael Velardi, and five more global traders.

220.     In addition, former UBS senior FX trader Matt Gardiner was placed on leave by his current employer, Standard Chartered PLC, where he is the assistant chief dealer in G10 foreign exchange. Gardiner was part of The Cartel chat room. Gardiner worked at UBS for two years prior joining Standard Chartered and prior to UBS, Gardiner worked at Barclays from June 2007 to July 2011, where he was a director in FX spot trading responsible for EUR/USD.

221.     In August 3, 2015, the first criminal conviction came for Mr. Tom Hayes, a former star trader at UBS and Citigroup has been found guilty of eight counts of conspiring to rig Libor, the manipulation of benchmark interest rates, sentenced to 14 years in prison. The sentence is the latest of a string of harsh punishment handed out to bankers convicted of fraud....Prosecutors said Hayes acted as the ringleader in manipulating yen Libor by asking rate setters and traders at UBS and several other banks who were on the panel that set the daily rate, as well as external brokers, to move the rate up or down in ways that would benefit his trading positions.[125]

---

[125]   Lindsay Fortado and Caroline Binham, *Tom Hayes found guilty of rigging benchmark rates.* FINANCIAL TIMES (August 3, 2015, 2:49 P.M.) (available at http://tinyurl.com./026y3ra) .

## ANTITRUST INJURY TO PLAINTIFFS

222.    Defendants keep more inventory of currency than any other banks in the financial system and are therefore able to act as currency dealers, facilitating trading in various currencies. Defendants are horizontal competitors in the FX market, competing for customers by supplying exchange rate quotations and FX Instruments. The relationship between Defendants and their customers is the same as the relationship between any merchant selling goods to consumers in a marketplace. In FX trading, the "good" are money, or currency. When a Defendant's customer accept a quote, the Defendant sell currency from its own inventory or seeks an off-setting order at the bargained-for price. Pricing for currency, like goods, is based on fundamental market forces of supply and demand.

223.    Defendants' manipulation of the WM/Reuters Closing Rates, as alleged herein, injures competition. WM/Reuters Closing Rates are prices determined by FX spot quotes and trades during a window of time surrounding 4:00 p.m. London time, thus reflecting actual market activity. Defendants' collusive conduct warped the interplay of supply and demand and caused the WM/Reuters Closing Spot Rate to be manipulated.

224.    Absent Collusion, Defendants would have competed to offer competitive prices by quoting bids and asks to customers at the lowest cost for a given currency. Every purchase of a quantity of currency represents demand relative to supply – forces that would, in a market free of collusion, determine the price.

225.    As alleged herein, the damage to Plaintiffs flows from the injury to price competition caused by Defendants and other major banks. Defendants' concerted manipulation of the WM/Reuters Closing Spot Rate directly impacted the prices of FX Instruments including Spot, Forward, Swap, FX futures, Options settled in whole or in part on the basis of the WM/Reuters Closing Spot Rates. Defendants' concerted trading practices in FX spot transactions at or around the time of the fixing of WM/Reuters Closing Spot Rates directly impacted the prices of FX spot transactions

entered into during that time period. Defendants' collusion with respect to FX spot transactions directly impacted the pricing of outright forwards because their prices are mathematically derived from the price of spot transactions. Defendants' collusion in the FX spot market directly impacted the pricing of FX swaps because FX swaps are simultaneous spot and outright forward transaction.

226.    Plaintiffs were participants in the market for Spot, forward, swap, FX futures, options on futures and were affected by artificial movements in the prices in the FX market, caused by Defendants and other major banks' cartel.

227.    Plaintiffs—who entered into a significant number of FX spot, forward, swap, FX futures and options transactions (Plaintiff have approximately 5,400 transactions slip at possession and Defendants admitted Plaintiffs directly deal with Defendants' trader dealing desk in day and night for spot, forward and swap including FX futures and options in future transactions.) were injured by Defendants' manipulation of benchmark spot closing rates directly created artificial prices on FX spot, forward, swap, FX futures, Option in futures.

228.    Plaintiffs suffered antitrust injury stemming from anticompetitive aspects of Defendants' misconduct to price competition caused by Defendants.

229.    Defendants' anticompetitive conduct had severe adverse consequences on competition in that Defendants artificially ensured advantageous market movements in the WM/Reuters Closing Spot Rates by exchanging confidential customer information and agreeing to concerted traded strategies, such as front running, banging the close, and painting the screen, based on aggregate customer order flow information. Under the facts alleged herein, Plaintiffs could not escape such conduct because Defendants are collectively the dominant FX dealers.

230.    For example, Plaintiffs purchased spot transaction directly, sold, settled, and/or rolled over FX futures and options on futures at the same time Defendants were manipulating prices, i.e. around the WM/Reuters Closing Rate fixing window (4 p.m. London time/10 a.m. Central time), around the CME Daily Settlement Rate fixing window (2 p.m. Central time), and /or around the quarterly rollover and final

settlement windows (9:30 a.m. Eastern time/8:30 a.m. Central time on certain days, and 9:15 a.m. Central time, respectively).

231.    No doubt, Defendants' concerted colluded to manipulation of the FX market directly impacted the price of FX instruments including FX futures and options on futures transacted around these times. Simply put, those that bought when prices were being inflated were harmed because the customers paid too much. And those that sold when prices were being suppressed were harmed because they received too little. Paying supra-competitive prices is the prototypical example of an antitrust injury, and directly stems from Defendants' collusive behavior or misconduct.

232.    And, by way of another example, for Plaintiffs were harmed by manipulation of the benchmark closing rate and CME Daily Settlement Rates directly impacted the cash flows, because of the margin (bond) requirements. Thus, even Plaintiffs who merely held FX futures on a day of manipulation were harmed, because their margin accounts were reduced by too much, or increased by too little, as a direct result of Defendants' price manipulation.

233.    No one Defendant could accomplish systematic and continuing manipulation of the WM/Reuters Closing Spot Rates without coordinating with its rivals. Absent Defendants' knowledge of one another's confidential customer information, the conduct alleged herein would be a risky strategy. Defendants benefited from coordinating their market activities.

234.    As a direct, forseeable, and proximate result of Defendants' and other major banks unlawful conspiracy and overt acts alleged herein, Plaintiffs have been injured in their business and property.

235.    The injury to Plaintiffs is the type the antitrust laws were designed to prevent and flow from that which make Defendants' acts unlawful.

**FRAUDULENT CONCEALMENT**

236.    During the Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiffs.

237.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants and other major banks conspired to manipulate the WM/Reuters Closing Spot Rates to the benefit of Defendants and to the detriment of Plaintiffs, and they further conspired to keep their collusive and manipulative conduct secret. As a result and as described herein, Plaintiffs could not, and thus did not, discover that they had suffered injury prior to BLOOMBERG's June 12, 2013 article.

238.    Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of their conspiracy. These communications occurred within non-public chat rooms, instant messages, and through email, none of which was reasonably available to Plaintiffs.

239.    The chat rooms in question were operated by the highest-ranking dealers within Defendant HSBC operations, and Defendant HSBC strictly limited access to the chat rooms. The substance of the conversations occurring within these chat rooms was unknown to Plaintiffs until June 12, 2013, at the earliest.

240.    Due to Defendants' effort to conceal their collusive conduct, and their campaign to avoid its detection, Plaintiffs could not, through the exercise of reasonable diligence, have learned of fact indicating that Defendants were colluding to prevent the entry of exchanges into the market at least until June 12, 2013, when Bloomberg first reported of the possibility that Defendants and other major banks were rigging currency rates. As a result of Defendants' fraudulent concealment, all applicable statutes of limitation affecting the Plaintiffs claims have been tolled.

241.    Defendants' conspiracy was by its nature secretive and self-concealing. Defendants used non-pubic method of communication, such as private chatrooms and text messages, to conceal their agreements to manipulate FX prices. Moreover, Defendants actively undertook trading strategies designed to conceal their collusive conduct, such as "painting the screen" or executing phony transactions.

242.    As set forth above, Defendants and other major banks have admitted to a pattern of manipulative behavior in the FX market, including by colluding to manipulate FX prices during and around the setting of multiple benchmarks, including

the WM/Reuters Closing Rate. Defendants' own employees, electronic chat transcripts, government regulators have confirmed that Defendants were often successful in those attempts---and thus *directly caused actual manipulation* of FX prices. See more newspaper report from Wall Street Journal:

**Just making sure we are rigging the same thing:**[126]

Yen Trader 4: where's young [Yen Trader 1] thinking of setting it?
Yen Trader 1: where would you like it[,] libor that is[,] same as yesterday is call
Yen Trader 4: haha, glad you clarified! mixed feelings but mostly I'd like it all lower so the world starts to make a little more sense.
Senior Yen Trader: the whole HF [hedge fund] world will be kissing you instead of calling me if libor move lower
Yen Trader 1: ok, I will move the curve down[,] 1bp[,] maybe more[,] if I can
Senior Yen Trader: maybe after tomorrow fixing hehehe

**We work in a "cartel":**

Senior Yen Trader: this libor setting is getting nuts
Bank A Trader: Im puzzled as to why 3m libor fixing not coming off after the FED action
Bank B Trader: [UBS] is lending dolls through my currencies in 3 month do u see him doing the same in urs
Senior Yen Trader: yes[,] he always led usd in my mkt[,] the jpy labor is a cartel now
Senior Yen Trader: its just amazing how libor fixing can make you that much money
Senior Yen Trader: it's a cartel now in london[.] they smack all the 1 yr irs..and fix it very high or low

**"Pure manipulation"**

Senior Yen Trader: we will say we lower every tenor..1m3m6m..we feel rbs name has very good credit..no problem getting money in
Senior Yen Trader: good way to boost share price!

**They read the New York Post?**

Yen Trader 1: can we lower our fixing today please [Primary Submitter]
Primary Submitter: make your mind up[,] haha , yes no probs
Yen Trader 1: im like a whores drawers

---

footnote

[126]      David Benoit, *The Best RBS Libor Quotes: 'It's a Cartel Now in London'*, WALL STREET JOURNAL (Feb. 6, 2013) (available at http://tinyurl.com/nr5lrfr).

**Let's not rig outside of the "acceptable"**
Yen Manager: lower generally dude
Yen Trader 2: cool
Yen Manager: within the acceptable bounds

243.    Defendant HSBC was in full control of their unlawful action for Plaintiffs were unable to avoid it. Cash Deposit in million were deducted from saving account, showing merely artificial prices reflected mostly "trading losses, fees, delivery, margin interest, ask-bid spread commission" in their bank transaction statements and give Defendants' right to take money from saving account. The "trading losses" were created by Defendants so called "wealth management account".

244.    When one of the major bank --Citigroup announced its decision to bar traders from accessing chat rooms, it offered a pretextual reason for the ban, describing the decision as a "sign of concern by banks over online security issues.[127]

245.    Other major banks and Defendants knew that they could not subject their collusive conduct to public scrutiny. In addition, Defendants actively and jointly with other major banks concealed their collusive conduct. For instance, Defendants agreed among themselves not to publicly discuss or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

246.    All of the manipulation at issue had to be the result of joint action. It would have been too risky, too costly, and too ineffective to attempt alone, day after day, year after year. For example, because of the size and trading volume of the FX market, trying to "bang the close" or "front running" with only a single Defendants' book of business would be a highly risky strategy that could easily backfire, since the market could move in the direction opposite of that taken by a Defendant. Thus, such manipulative strategies could and were only carried out jointly, when Defendants "had a high degree of knowledge of *other banks' position* and a particularly large client

---

[127]      Alice Ross, *Citi Removes Forex Traders from Bloomberg internal chat groups,* FINANCIAL TIMES (May 16, 2013) (available at http://on.ft.com/1m4mj1g).

order." That is why other conspirator/banks have admitted to "building" bundles of transactions, "giving [each other] the ammo," etc clearly explained Plaintiffs' account vice president Miss Amy Low told Plaintiffs to "treat buying and selling currency as if you are buying, selling blue chip stock, contra and profit". To our belief and information, Plaintiffs' trading transactions combined with many other portfolios gave Defendants and other major banks a tool to carry out their "fixes."

247.    None of the facts or information available to Plaintiffs, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

248.    As a result, Plaintiffs were prevented from learning of the facts needed to commence suit against Defendants for attempt to collude/colluded to manipulative and anticompetitive conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations.

249.    There are many additional reasons why these facts could not have been known. FX trades occur primarily in the private, OTC market, and Defendants' trades and trading strategies are not public information. Defendants do not publish information concerning particular trading entities, including trading between dealer entities. Defendants, acting as executing dealers, also discouraged brokers from revealing or otherwise identifying them as counterparties on the brokers' customers' transactions. Reasonable due diligence could not have uncovered Defendants' attempt to collude/colluded to conspiracy because of non-exchange, closed, and private nature of the trades helped to conceal Defendants' misconduct.

250.    To Plaintiffs' knowledge, the first report of possible manipulation in the FX market was published by Bloomberg on June 12, 2013.[128] Even that report, however, was premised on "five dealers with knowledge of the practice" who were

---

[128]    Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (Jun 12, 2013) (available at http://bloom.bg/1qGQ3oy).

not identified in article.[129] The dealers specifically "declined to identify which banks engaged in manipulative practices."[130]

251.     The facts necessary for Plaintiffs to formulate the basis of a complaint and satisfy applicable pleading standards remained within the exclusive control of Defendants, other major banks' conspirators, and the regulatory authorities investigating the activity alleged herein.

252.     Even after the Bloomberg article indicated possible manipulation in the FX market, Defendants did not address the allegations. It was not until October 2013 that the first traders alleged to be involved in the FX-rigging were put on leave.

253.     Nor did the Bloomberg article identify the currency pairs involved in the rigging, the parties to the rigging, or provide substantial detail as to how the rigging occurred.

254.     Defendants' success in concealing their collusion was facilitated by their tremendous control over the global financial markets. Defendants wield substantial power over market participants. Market participants who suggest Defendants have engaged in anticompetitive behavior risk losing access to financial instruments. It is thus unsurprising that the first reports of collusion came from bankers themselves, not market participants.

255.     Plaintiffs first filed on July 10, 2013 in an action Plaintiffs could not explain what was happening and have acted diligently in seeking to bring their claim promptly.

256.     Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiffs from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably stopped from asserting that any otherwise applicable limitations period has run.

---

[129]   Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (Jun 12, 2013) (available at http://bloom.bg/1qGQ3oy).

[130]   Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (Jun 12, 2013) (available at http://bloom.bg/1qGQ3oy).

257.    Plaintiffs also wrote letters to Defendants and asked for arbitration with National Future Association ("NFA") in New York with Defendant through Malecki law Firm on July 5, 2013 and Defendants did not reply. Defendants also violated Commodity Exchange Act, 7 U.S.C.§25 (c).

258.    Defendants know all conditions for Defendant and other major banks entered into and engaged in a combination and conspiracy to fix, stabilize, maintain, increase or decrease the price of, and rig bids and offers for, the currency pairs exchanged in the FX Spot Market, creating artificial price for customers.

259.    In July 2010, Defendant sent balance check of $200,000.00 U.S. dollar from saving account to Plaintiffs' home without Plaintiff agreed to their actions.

260.    As a direct result of Defendant's wrongful conduct, Plaintiffs has suffered the injuries alleged herein.

## CLAIM FOR RELIEF

**A. Violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3**

261.    Plaintiffs incorporate by reference and re-allege the preceding allegations as though fully set forth herein.

262.    Beginning at least as early as January 1, 2003, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

263.    Section 3 of the Sherman Act, 15 U.S.C. §3, makes Section 1 applicable to "any Territory of the United States, [and] the District of Columbia, [or] with Foreign nations."

264.    The conspiracy consisted of a continuing agreement, understanding, or concerted action between and among Defendants and their co-conspirators in

furtherance of which Defendants fixed, maintained, or made artificial prices, as alleged herein.

265.    Defendants' unlawful conduct was through mutual understandings, combinations, or agreements by, between, and among Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly, in furtherance of the unlawful restraint of trade alleged herein.

266.    Defendants' conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

267.    There is no legitimate business justification for, or precompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible precompetitive benefit was pretextual or could have been achieved by less restrictive means.

268.    Defendants' conspiracy, and the resulting impact on the WM/Reuters Closing Spot Rates and FX instruments, occurred in and affected interstate commerce and commerce in and between the Territories of the United States.

269.    The contract, combination, or conspiracy had anticompetitive effects, as alleged herein.

270.    As a direct, intended, foreseeable, and proximate result of Defendants' conspiracy and overt acts taken in furtherance thereof, Plaintiffs have suffered injury to their business and property.

271.    The injury to Plaintiffs are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

272.    Plaintiffs are entitled to treble damages, attorney fee, reasonable expenses, and cost of suit for the violations of the Sherman Act alleged herein.

**B.  Manipulation in Violation of the Commodity Exchange Act, 7 U.S.C.§1, et seq.**

273.    Because the commodity underlying all FX futures contracts is a particular spot market, had the ability to (and did) influence the prices of FX futures

contracts and options.

274.    When a factor that affects a futures contract price is artificial or illegitimate, then the resulting futures contract price is necessarily artificial. Defendants' manipulative of spot rates and coordinated manipulative trading activity , the prices of futures contract based on that currency pair were also artificial. Options were similarly affected. So, Defendants' manipulative conduct in the FX market directly caused artificial FX future prices.

275.    As a direct consequence of Defendants' knowingly unlawful conduct, the prices of FX futures contracts and FX derivative instruments, and/or the price of the commodity underlying such contracts were manipulated to artificial levels by the Defendants and their co-conspirators throughout the Period.

276.    Each Defendants' action violated the CEA, 7 U.S.C. §1, et seq.

277.    The Defendants' manipulative conduct and trading activity alleged herein constituted both a manipulation of the prices of FX futures contracts and the currency pairs underlying those contracts in violation of Section 4b(a), 4c(a), 9(a) and 22(a) of the CEA, 7 U.S.C. §§6b(a), 6c(a), 13(a)(2), and 25(a). So, Plaintiffs suffered actual damages and injury in fact due to artificial prices for FX futures and currency pairs to which they would not have been subject but for the unlawful conduct of Defendants' co-conspirator as alleged herein.

278.    Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C.§2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

279.    Under section 13c(a) of the CEA, 7 U.S.C.§13, Defendants are liable for willfully intending to assist the manipulation. Defendant did so knowing of other co-conspirators' manipulation of the prices of spot market currency pairs underlying FX future contracts. Their traders used chat room messaging, bragged to each other about their ability to manipulate the FX market, congratulating each other when their manipulation of spot market prices for currency pairs underlying FX futures contracts succeeded. These actions demonstrate that Defendants and co-conspirators

(84)

substantially and willfully intended to assist these manipulations to cause the price of FX futures contracts to be artificial during the Period, <u>in violation of Section 22(a)(1) of the CEA, 7 U.S.C.§25(a)(1)</u>.

280.    Under Section 6c(1) of the CEA, as amended, codified at 7 U.S.C. §9, and Section 22 of the CEA, as amended, 7 U.S.C. §25, it is unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the CFTC shall promulgate. Unlawful manipulation under the CEA, as amended, and Rule 180.1 includes delivering, or causing to be delivered for transmission through mail or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concern market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate. Defendant used or employed manipulative or deceptive devices or contrivances, in connection with a contract of sale or purchase of FX futures and options contracts in interstate commerce. This conduct included the making of untrue, inaccurate or misleading statements of material facts, or omitting material facts necessary to make the statements made not misleading such as:

(i)  making untrue, inaccurate or misleading statements to influence FX prices, including benchmark rates, such as WM/Reuters Closing Spot Rates;

(ii)  failing to disclose that Defendants entered pre-arranged transactions to move the spot market prices for various currency pairs in a direction to benefit their own trading books;

(iii) failing to disclose that Defendants were unlawfully conspiring between and among themselves to manipulative, inter alia, the WN/Reuters Fix, as well as FX spot market prices; and

(iv) failing to disclose that Defendants were reporting bids, offers and transactions during the WM/Reuters fix to move the spot market prices of currency pairs and resulting WM/Reuters benchmark to benefit their FX trading positions.

281.    Plaintiffs are entitled to damages for the violations of the CEA alleged herein.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request relief as follows:

(a)     That the Court enters an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

(b)     That the Court award Plaintiffs in an amount according to proof against Defendants for Defendants' violation of the federal antitrust laws to be trebled in accordance with those laws;

(c)     That the Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all persons acting or claiming to act on their behalf or in concert with them, from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

(d)     That the Court award Plaintiffs pre- and post-judgment interest;

(e)     That the Court award Plaintiffs their costs of suit, including reasonable attorney's fees and expenses; and

(f)     That the Court award such other equitable and further relief as the Court may Deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demands a trial by jury, of all claims and issues so triable.

Dated:   New York, New York
         November 16, 2015

                                        _Lim Cheok Kee Willy_(*Pro Se*)
                                        115 East Street
                                        New Hyde Park, New York 11040
                            (86)        Home Telephone:516-248-1728

Cell phone: 917-868-5213
Chanjac5@aol.com

Chan Ah Wah (*Pro Se*)
115 East Street
New Hyde Park, New York 11040
Home Telephone: 516-248-1728
Cell phone: 917-868-5218
Chanjac5@aol.com

Plaintiffs make these allegations based on personal knowledge as to their own actions and on information and beliefs as to other matters.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
CHAN AH WAH & LIM CHEOK KEE WILLY


                                          Civil Action:_____

vs                        Plaintiffs

                                          **AFFIRMATION OF SERVICE**

HSBC NORTH AMERICA HOLDINGS INC;
HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC BANK USA N.A.;
HSBC SECURITIES (USA) INC., HSBC PRIVATE
BANK
                          Defendants
------------------------------------------------------x

I, Lim Cheok Kee Willy, declare under penalty of perjury that I served a copy of the
attached: Complaint upon all other parties in this case to the following persons:

<u>Via United States Postal Service Priority Mail:</u>
1).  HSBC Bank PLC/ HSBC Holding PLC
     8 Canada Square
     London, E14H5Q

2).  HSBC Bank USA National Association
     1800 Tysons Blvd., McLean, VA 22102

3).  HSBC North America Holding Inc./HSBC Private Bank
     452 Fifth Avenue,
     New York, NY 10018

4).  HSBC Securities (USA) Inc
     452 Fifth Avenue,
     New York, NY 10018

On November 16, 2015.


Dated: November 16, 2015          _____
                                  115 East Street
                                  New Hyde Park, NY 11040
                                  Cell: 917-868-5213
                                  Chanjac5@aol.com