UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2017 JUN -8  AM 11: 29

S.D. OF N.Y.

-------------------------------------------------------------x

CHAN AH WAH & LIM CHEOK KEE WILLY

                                Plaintiffs

Against

HSBC NORTH AMERICA HOLDINGS INC;
HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC BANK USA N.A.;
HSBC SECURITIES (USA) INC.;

                                Defendants

-------------------------------------------------------------x

THE HONG KONG AND SHANGHAI BANKING CORPORATION
LIMITED, SINGAPORE BRANCH.

                                Defendants

-------------------------------------------------------------x

Civil Action:15-CV-8974-LGS

THIRD
**AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/8/17

## TABLE OF CONTENTS

Page:

NATURE OF THE ACTION……………………………………………….....1

JURISDICTION, VENUE, AND COMMERCE……………………………….5

PARTIES………………………………………………………………………14

    Plaintiffs……………………………………………………………14
    Defendants…………………………………………………….....15

FACT…………………………………………………………………….......20

I.   THE FX MARKET………………………………………………47

   A.   Background……………………………………………47

   B.   Spot Transactions…………………………………..…...51

   C.   Benchmark Rates and Uses……………………………..53

      1.   WM/Reuters………………………………..…....55

      2.   ECB Rates……………………………………..…..56

      3.   Other Benchmark Rates……………………….....57

   D.   The FX Market Is Concentrated and Dominated by Defendants………........58

   E.   The FX Market Is Unregulated and Opaque…………………………..61

II.   DEFENDANTS CONSPIRED TO FIX PRICES IN THE FX MARKET………………….62

   A.   Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire………..……………………….63

   B.   Defendants Conspired to Fix Bid/Ask Spreads Quoted in the Spot Market………………………………………………….67

      1.   Chat Room Transcripts Demonstrate Spread Fixing……………..68

C. Defendants Conspired to Fix the Benchmark Rates...................................69

    1. The Fixes are Susceptible to Collusive Manipulation...........................69

    2. Defendants Shared Confidential Customer Order Information to Manipulate the WM/Reuters Closing Spot Rates................................71

    3. Methods of Fixing the Fixes…...….....................................................74

    4. Manipulation of the WM/Reuters Closing Spot Rates...........................79

    5. The ECB Fixing Rate...................................................................90

    6. The CME/EMTA Rates................................................................. 96

D. Other Collusive Conduct Demonstrates Defendants' Conscious Commitment to Fix FX Prices........................................................97

III   DEFENDANTS' CONSPIRACY RESULTED IN ARTIFICIAL PRICING FOR EXCHANGE-TRADED INSTRUMENTS.............................….................100

    A. The FX Futures and Options Market................................….........100

    B. Prices of FX Futures Contracts Are Impacted by the WM/Reuters Closing Spot Rates and Prices of the Underlying Currency Pairs.....................105

IV.   GOVERNMENT INVESTIGATION…......................….....................111

    A. U.S. Department of Justice ("DOJ").............................…...........111

    B. The Federal Reserve..................................................................116

    C. Commodity Future Trading Commission ("CFTC").........................118

    D. Office of the Comptroller of the Currency.....................................120

    E. New York Department of Financial Services...................................121

    F. United Kingdom Financial Conduct Authority ("UK-FCA")..............123

    G. Serious Fraud Office ("SFO")....................................................126

    H. Bank of England.......................................................................127

    I. European Commission ("EC")....................................................128

    J. Switzerland.............................................................................129

    K. Financial Stability Board ("FSB")...............................................131

    L.   Other Countries................................................................133

V.      DEFENDANTS' PUBLIC FILINGS CONFIRM INVESTIGATIONS
         AND COOPERATION.........................................................134

VI.    TERMINATIONS, SUSPENSIONS,AND DEPARTURES OF DEFENDANT
        EMPLOYEES.....................................................................134

    A.   Bank of America...............................................................134

    B.   Barclays...........................................................................134

    C.   BNP Paribas.....................................................................135

    D.   Citigroup.........................................................................135

    E.   Credit Suisse....................................................................136

    F.   Deutsche Bank.................................................................136

    G.   Goldman Sachs................................................................137

    H.   HSBC..............................................................................137

    I.    JP Morgan.......................................................................138

    J.    Morgan Stanley................................................................138

    K.   RBS................................................................................139

    L.   Standard Chartered..........................................................139

    M.  UBS................................................................................140

ANTITRUST INJURY TO PLAINTIFFS........................................................141

FRAUDULENT CONCEALMENT.............................................................144

CLAIM FOR RELIEF.............................................................................148

I.      CLAIMS OF PLAINTIFFS PARTICIPATED IN FX.......................................148
        OVER-THE-COUNTER MARKET

        A.    Violation of Section 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

              of the Plaintiffs participated in FX OTC Market.....................................148


II.     CLAIMS OF THE PLAINTIFFS PARTICIPATED IN THE CME......................149
        & ICE EXCHANGE IN THE UNITED STATES

        A.    Conspiracy to Restrain Trade in Violation of §1 of Sherman Act..................151

        B.    Manipulation in Violation of the Commodity Exchange Act,
              7 U.S. C. §§1, *et seq*................................................................152

        C.    Principal-Agent Liability in Violation of the Commodity Exchange Act,
              7 U.S. C. §§1, *et seq*................................................................155

        D.    Aiding and Abetting Manipulation in Violation of the Commodity
              Exchange Act, 7 U.S. C. §§1, *et seq*................................................155

        E.    Manipulation by False Reporting and Fraud and Deceit in Violation of
              the Commodity Exchange Act, amended,
              7 U.S. C. §§1, *et seq* and CFTC Rule 180.1(a).......................................157


III     CLAIMS OF PLAINTIFFS' CASH DEPOSIT SAVING ACCOUNT.................159

        1).   First Cause of Action (Breach of Contract)...........................................159

        2).   Second Cause of Action (Fraud).......................................................160

        3).   Third Cause of Action (Breach of Fiduciary Duty).................................160

        4).   Fourth Cause of Action (Gross Negligence)..........................................160

        5).   Fifth Cause of Action (Negligence Supervision, Respondent Superior)...........161


REQUEST FOR RELIEF...................................................................162


DEMAND FOR JURY TRIAL............................................................162

Plaintiffs, Chan Ah Wah, Lim Cheok Kee Willy, husband and wife ( "Chans")   alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for injuries suffered from seventeen large international banks and their affiliates for Defendants' alleged involvement in a conspiracy to manipulate benchmark rates in foreign exchange ("FX") or foreign exchange market, violated Sections 1 and 3 of the Sherman Antitrust Act, 15 U.S.C.§§ 1, *et seq.*, Section 1, 3 of Clayton Act, violated Commodity Exchange Act, 7 U.S.C. § 1 *et.seq.* and for overcharges Plaintiffs paid in transaction fees, interest and commission from the cash deposit saving account of Defendant HSBC.

**BACKGROUND**

2.      The foreign Exchange ("FX") market is the world largest and most actively traded financial market. In April 2013, trading in the global market averaged $5.3 trillion per day[1], and, in the domestic market, FX trading averaged $1.263 trillion per day. [2]

3.      Defendants are the dominant dealers in the FX market, having a combined global market share of over 90%.[3] The Over-The-Counter ("OTC") Plaintiffs are Defendants' direct customers for FX instruments[4] The Plaintiffs are persons who transacted in FX instruments through an exchange ("Exchange"). The OTC Plaintiffs and Exchange Plaintiffs are persons who transacted in FX instruments through an exchange.

---

[1]     Bank for International Settlements, Triennial Central Bank Survey, Global foreign exchange market turnover in 2013 (February 2014) (https://www.bis.org/_publ/rpfxf13fxt.pdf), at Table 1[hereinafter BIS Triennial Bank Survey 2013].

[2]     Federal Reserve Bank of New York, The Foreign Exchange and Interest Rate Derivatives Markets: Turnover in the United States, April 2013 (available at http://nyfed.org/1dnmT1x), at 3 [hereinafter Fed Triennial Bank Survey 2013].

[3] Euromoney FX survey 2013: Overall Results.

[4]     "FX Instruments" include FX spot transactions, outright forwards, FX swaps, FX options, FX futures contracts, options on FX futures contracts, and other instruments traded in the FX market. *Acronyms, abbreviations, terms, and slang expressions are defined in Appendix 1, Glossary of Foreign Exchange terms.*

(1)

4.      A FX market revolves around spot transactions. These transactions involves the exchange of currencies between two counterparties on a value date that is within two bank business days' time. Not only do spot transactions account for approximately half of daily FX turnover in the United States, roughly $620 billion,[5] but they affect other instruments Defendants sell to their customers, such as outright forwards and FX swap. Collectively, FX spot transactions, outright forwards, and FX swaps are referred to herein as "FX Instruments."

5.      Spot transactions determine the pricing of and affect other FX instruments. In OTC trading, spot prices impact the pricing of outright forwards, FX swaps, and FX options. These instruments Defendants sell directly to their customers. Spot transactions also directly impact the pricing of FX instruments traded on exchanges, including futures contracts and options on future contracts. The link between spot prices and FX instruments traded on exchange is clear and well known.

6.      Beginning at least as early as 2003 and continuing through 2013, Defendants conspired with each other to fix prices in the FX market. Through the daily use of multiple chat rooms with incriminating names such as "The Cartel," "The Bandits' Club," and "The Mafia," Defendants communicated directly with each other to coordinate their: (i) fixing of spot prices; (ii) manipulating FX benchmark rates; (iii) exchanging key confidential customer information in an effort to trigger client stop loss orders and limit orders. Defendants' conspiracy effected dozens of currency pairs, including the seven pairs with the highest market volume. And due to the importance of spot prices, Defendants' conspiracy impacted all manner of FX instruments, including those trading both OTC and on exchanges.

7.      Customers can order spot transactions for immediate execution, in which case Defendants quote them the current market price. Customers can also order spot transactions

---

[5]     Fed Triennial Bank Survey 2013, at 3.

to be settled at a fixing rate, which is the exchange rate for a currency pair calculated at a single point of time. Defendants guarantee the transactions will be settled at the fixing rate, as means of valuing global currency holdings and indexes that span multiple currencies. In spot transaction, a Defendant quotes its customer a "bid" (the price it will buy currency) and an "ask' (the price it will sell currency). The difference between the bid and the ask is called the bid/ask spread or simply the spread.

8.      The spread is one way in which a Defendant is compensated as a market maker for spot transactions. Defendants want to buy low and sell high. Defendants want wider spreads. Customers, however, want narrower spreads. Narrower spreads mean customers pay lower prices when buying currency and receive higher prices when selling currency. Thus, collusively widening the spread directly injuries customers by forcing them to pay more or receive less in a given spot transaction.

9.      Defendants conspired to fix spot prices by agreeing to artificially widen spreads quoted to customers. There are thousands of communications involving multiple Defendants reflecting discussions about FX spreads. These communications demonstrate that Defendants coordinated the spreads they quoted to customers.

10.      Defendants also conspired to fix key FX benchmark rates, known generally as "Fixes." The most widely used fixed rates are the "WM/Reuters Closing Spot Rates" and the European Central Bank's Fixing Rates. Chat room communications demonstrate Defendants exchanged confidential customer information and coordinated their trading to manipulate these key rates.

11.      Defendants engaged in additional collusive conduct. Defendants exchanged information about the prices at which their respective customers had stop-loss orders and limit orders for the purpose of coordinating their trading to trigger these pricing thresholds. Defendants exploited these orders by manipulating prices to swing to the price at which the stop-loss or limit order is triggered.

12.      The existence of a cartel to fix the prices in the FX market is now beyond dispute.

The United States Department of Justice ("DOJ") has an active and ongoing criminal investigation into Defendants' conduct. Four Defendants: Barclays Bank PLC, Citicorp. JPMorgan Chase & Co., and RBS have already pled guilty to conspiring to violate the antitrust laws. Defendant UBS sought amnesty and has provided the DOJ and FX Plaintiffs ("FOREX") with evidence of Defendants' conspiracy.[6]   The Commodity Futures Trading Commission ("CFTC") is investigating Defendants' conduct. Some of these investigations have resulted in settlements and penalties. On November 12, 2014, the Commodity Trading Futures Commissions levied civil penalties of $310 million each on Citibank and JPMorgan, $290 million each on RBS and UBS, and $275 million on HSBC, the Officer of the Comptroller of Currency assessed civil penalties of $250 million against bank of America, and $350 million each against Citibank and JPMorgan; the UK-Financial Conduct Authority fined Citibank $358 million, HSBC $343 million, JPMorgan $352 million, RBS $344 million; and UBS $371 million; and Switzerland's FINMA fined UBS (approximately) $139 million. Other investigations remain ongoing.

13.     Law enforcement and regulatory authorities around the world, including in the United States, Europe, Asia, Australia, and New Zealand are engaged in open and active investigations into Defendants' conduct in the FX market. A number of Defendants are seeking immunity, or otherwise cooperating with authorities in these investigations, by producing voluminous documents, including chat room transcripts and other conspiratorial communications. As a direct result of these global investigations, Defendants have terminated and suspended numerous personnel with supervisory authority over their FX operations.

14.     Defendants' longstanding conspiracy reflected a culture of increasing profits at the

---

[6]     Defendant UBS AG entered a guilty plea to one count of wire fraud for its conduct in the submissions of benchmark interest rates, including LIBOR, EURIBOR, and TIBOR. This plea was entered because the DOJ found that UBS' conduct in the FX market violated its pre-existing non-prosecution agreement for its LIBOR-related conduct. DOJ UBS Plea Agreement, May 20, 2015 (http://www.justice.gov/file/440521/download).

expense of the very integrity of the FX market. As one Barclay employee bluntly wrote "*if you aint cheating, you aint trying.*"[7]   Defendants' conspiracy to fix prices in the FX market[8] impacted the pricing of all FX Instruments, inflicting severe financial harm on Plaintiffs, occurred in and affected interstate commerce and commerce in and between the territories of the United States.

<u>**JURISDICTION, VENUE AND COMMERCE**</u>

15.     This Court has subject matter jurisdiction under Section 4, and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 and 26(a), and under 28 U.S.C. §§ 1331 and 1337, Section 22 of Commodity Exchange Act, 7 U.S,C. §25.

16.     Plaintiffs assert claims under the Sherman Antitrust Act, 15 U.S.C. § 1, et.seq and the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1, et seq. because the alleged FX instruments has U.S. connection and state a cognizable claims under either statue; and Plaintiffs have been injured by Defendants' conspiracy to manipulate benchmark rates in the FX market and to have suffered from overcharges in transaction fees, interest and commission: (with the exception)

> Section 1 to 7 of the Sherman Act shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –(1) <u>such conduct has a direct , substantial , and reasonably forseeable effect</u> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import with foreign nations; or (B)<u> on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.</u>

15 U.S.C. § 6a

This statue "lay down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach" but then bring back certain conduct so long as it "direct, substantial, reasonably forseeable effect' on American domestic, import or (certain export commerce)"give rise to a Sherman Act claim. In *FOREX* claims brought by plaintiffs to apply American antitrust laws to Defendants' foreign conduct for harm suffered in the

United States, the Complaint expressed "United States persons and transactions occurring in the United States" or confined its claims to those arising out of foreign exchange transactions. Plaintiff here who claims in the Complaint does allege transaction on a U.S. exchange or with a U.S. desk of a Defendant, the details of the FX instruments and transactions over which Plaintiff are sueing, its allegations suggest that Plaintiffs transacted entirely during the relevant period. Plaintiffs currently reside in New York and that their oldest son was born in New York in 2000, a United States citizen. Plaintiffs decided to bring their children "back to New York" after Defendants deducted from their account in August 2010.

17.     Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District, Manhattan, Southern District of New York. During all "Relevant" Period (from 2003 through mid 2012), Defendants used the instrumentalities of interstate commerce, including interstate wires, international electronic signal and the U.S. mail, to effectuate their illegal scheme.

18.     This court has personal jurisdiction over Defendant, because Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically, Manhattan, Southern District of New York and in the United States generally. And under the New York Statue long-arm §302 (a) (1); see *Deutsche Bank Securities. Inc. v. Montana Board of Investment_N.E.2d_7 N.Y.3.*

19.     Defendant is subject to personal jurisdiction in this forum because they are either

---

[7]     N.Y. Dept. Of Fin. Services, In the Matter of Barclays Bank PLC , Consent Order Under New York Banking Law §§44 and 44-a, ¶47 (May 20, 2015) (http://www.dfs.ny.gov/about/ea/ea150520.pdf) (emphasis added).

[8]     The factual allegations in the Complaint concerning the alleged conspiracy to manipulate FX benchmark rates and related consolidation action are set forth: See *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F.Supp.3d 581 (S.D.N.Y. 2015)("FOREX"); *also see* No. 13 Civ. 7789, 2016 WL 1268267(S.D.N.Y. Mar 31, 2016)

incorporated or have their principal place of business here, in the New York District, Manhattan, Southern District of New York New York Banking Law § 200-b (1)[9] provides that a New York resident may maintain "cause of action" against a foreign banking corporation, the statue is applicable as the Plaintiffs in this case alleged to be a resident of New York, finally the New York Court of Appeals has interpreted § 200-b to confer subject matter jurisdiction and Defendants conducted substantial operations in business in the United States, is "essentially at home" in this country [United States], as required for the exercise of General Jurisdiction. [10]

20.     Defendant is also subject to personal jurisdiction in this forum because Defendant has substantial FX instrument business and contractually consented to jurisdiction in at least two International Swaps and Derivatives Association Agreement. ("ISDA") The agreements include a consent "to the non-exclusive jurisdiction of the courts of the States of New York and the United States District Court located in the Borough of Manhattan in New York City" expressly limited to "any suit, action or proceedings relating to th[e] Agreement[s]." This consent is applicable to Plaintiffs here even because the ISDA agreements confer to a contractual right to the counterparties[11] to those agreements, the counterparties is Plaintiffs in this action. Therefore, Plaintiffs satisfy the due process requirements for exercise of personal jurisdiction in this case.

21.     Defendant is subject to specific jurisdiction because of defendants' FX operations in

---

9       "The New York Court of Appeals has interpreted '§ 200-b' to confer subject matter jurisdiction and not personal jurisdiction;" also see *Indosuez Int'l Fin. B.V. v. National Reserve Bank,* 744 N.E.2d 696, 98 N.Y.2d 238, 248 (2002), *also see* FOREX consolidated Action's Court opinion: *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 74 F. Supp. 3d 581 (S.D.N.Y. 2015); *also see* No. 13 Civ 7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016)

10      "[T]he Supreme Court of United States has make clear…that general jurisdiction may only constitutionally be exercised over a defendant who is "essentially at home" in the relevant forum."; also see *Wilder v. News Corp.,* No. 11 Civ.4947, 2015 WL 5853763, at *5(S.D.N.Y Oct.7, 2015)

the United States, give rise to the reasonable inference that they participated in the alleged conspiracy in the United States or participated elsewhere with the aim to cause harm in theUnited States and even operate or maintain office[11] here. "The [s]pecific or conduct-linked jurisdiction...'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that take place in the forum state and is therefore subject to the State's regulation.[12]

22.     Defendants' with consolidated assets of $50 billion or more is subject to the regulatory and supervisory requirements for large bank holding companies and non-bank financial companies that pose risk to the United States' financial stability under Dodd-Frank Act; created a framework for enhanced prudential regulation and supervision of financial institutions that are deem to be "systemically important" to the U.S. financial system, including U.S. banks holding companies with consolidated assets of $50 billion or more. It is also because the Federal Reserve Bank in the United States has authority to take certain actions including to preclude merger, restrict financial product offered, restrict, terminate or impose conditions on activities or require the sale or transfer of assets against any systemically important bank holding company with assets greater than $50 billion that is found **to pose a grave threat to financial stability in the United States.** In addition to the increased capital, liquidity, stress testing and other enhanced prudential and structural

---

[11]     "All payments are exchanged through the aforementioned nostro accounts. These accounts are denominated in the currency of the country where they were located. When a FX Dealer enter into contract to buy dollars and sell yen, for example, it will credit its yen nostro account and debit its dollar nostra account in U.S. The counterparty credits its dollar nostro account and debits its yen nostro account in Japan. Both FX Dealers initiate a money transfer to pay their respective counterparties, which is done by a funs movement between the two FX Dealers using the local payment system." (See *Foreign Currency Committee, "Settlement and Settlement Netting,"* May 29, 2013 at Pg. 29)

[12]     *See* FOREX Consolidated Action's Court opinion: *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581 (S.D.N.Y. 2015); *also see* No. 13 Civ 7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016)

requirements, large international banks like Defendants has to file resolution plans identifying material subsidiaries and core business lines and strategy to resolve institution in case of financial distress, including identifying how insured bank subsidiaries would be adequately protected from risk created by other affiliates.[13]

23.    Dodd-Frank also requires that single counterparty[14] lending limits applicable to Defendants' National Bank in the United States, take into account credit exposure arising from derivative transactions, securities borrowing and lending transactions; and repurchase and reverse repurchase agreements with counterparties. There are also provisions in Dodd-Frank that relate to governance of executive compensation, including disclosures evidencing the relationship between compensation and performance and a requirement that some executive incentive compensation is forfeitable in the event of an accounting restatement. In relation to requirements for bank transactions with affiliates, beginning in July 2012 the current quantitative and qualitative limits on bank credit transactions with affiliates also include credit exposure related to repurchase agreements, derivatives and securities lending/borrowing transactions. This provision may limit the use of intercompany transactions between us [HSBC] and our affiliates, which may impact our current funding, hedging and overall internal risk management strategies.

24.    Title VII of the Dodd-Frank Act imposes a comprehensive regulation of over-the-counter ("OTC") derivatives markets, including credit default, equity, foreign exchanges and interest rate swaps[15]. Implementation of Title VII is the responsibility of the CFTC(for swaps based non-securities underliers or broad-based security indies), the SEC (for swaps based on individual securities and narrow-based security indies) and, to lesser extent, the U.S. banking regulators (for certain rules applicable to banks). The CFTC has

---

[13]      *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 14 ¶12 for stricter enhanced governance applicable to important bank holding company.

[14]      *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 14 ¶12 for stricter enhanced governance applicable to important bank holding company.

[15]      *Id.*

adopted many significant provisions, in particular, certain swap dealers, including Defendants have provisionally registered with the CFTC and become members of the National Futures Association, subjecting them to an extensive array of corporate governance requirements, business conduct standards, reporting requirements, mandatory clearing of certain swaps and other regulatory standard effecting their derivatives businesses. In addition to these rules, as a provisionally registered swap dealer that is a national bank like Defendants; will become subject to capital and margin requirement established by OCC.

25.     In September 2014, The CFTC re-proposed margin rules for non-cleared swaps and security-based participant, would limit categories of eligible collateral for cash, for variation margin, and cash and certain asset types (subject to standardized haircuts) for initial margin. The two re-proposal would follow a phased implementation schedule, with variation margin requirements[16] coming into effect on December 1, 2015, and initial margin requirements phasing in annually for different counterparties from December 1, 2015 until December 1, 2019, depending on the transactional volume of the parties and their affiliates. Defendants' National Bank engaged in equity and credit derivatives businesses that are subject to the SEC's jurisdiction under Title VII of the Dodd-Frank Act. In 2014, the SEC finalized rules regarding the cross-border application of the security-based swap dealer and major security-based swap participant definitions. These definitions share many similarities with parallel guidance finalized by the CFTC in July 2013.

26.     It is expected that the SEC will finalize many of its OTC derivatives rules during 2015, including compliance dates for certain provisions of its security-based swap transaction data reporting rules. Because Defendant National Bank's equity and credit derivatives businesses are also subject to the CFTC's jurisdiction[17] under Title VII, material

---

[16]     *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 14 ¶12 for stricter enhanced governance applicable to important bank holding company.

[17]     *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 14 ¶12 for stricter enhanced governance applicable to important bank holding company.

differences between the final SEC rules and existing CFTC rules could materially increase our cost of compliance with Title VII...Id. Section 716 of the Dodd-Frank Act included a 'swaps push out' provision that would have effectively limited the range of OTC derivatives activities in which an FDIC-insured bank, including Defendant's National Bank could engage.

27.      Section 716 of the Dodd-Frank Act included "swap push out" provision that would have effectively limited the range of OTC derivatives activities in [United States] which an Federal Deposit Insurance Corporation ("FDIC") including Defendants' national bank could engage. In December 2014, the Federal Reserve Bank ("FRB") further extended by in place the conformance period to July 21, 2016 for investments in and relationships with covered funds and foreign funds that were in place prior to December 31, 2013 ("legacy covered funds"). The FRB also indicated that it intend to act next year to grant an additional one-year extension, until July 21, 2017,  for the same legacy covered fund investment and relationship. [18]

28.      The final Volcker Rule restricts proprietary trading as principal[19] within a "trading account" in financial instruments", each as defined in the final Volcker Rule, subject to various exemptions. Certain exemptions apply to the types of financial instruments that are covered by the final Volcker Rule. Generally, securities, derivatives, futures and options on all such instruments are covered, while loans, currencies and commodities are not covered. In addition, there are exemptions for activities, among others, that constitute market making, underwriting, hedging, and trading of U.S. government, agency or municipal securities and certain foreign sovereign debt securities, Each of these exemptions,

---

[18]      *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 14 ¶12 for stricter enhanced governance applicable to important bank holding company.

[19]      *Id.*

however, is generally subject to its own set of compliance requirements and conditions.[20] "*The Federal Reserve, under intense pressure from members of Congress (on both sides of the aisle), said in s short statement Monday that it was extending the deadline for banks to comply with keys aspects of the so-called "Volcker Rule," the new government regulation that aims to curb excess risk-taking by financial institutions. **This delay will allow banks to continue supporting what has become a frothy corporate debt market, increasing the risk of another 2008-like cataclysmic financial event.***"[21]

29.     Several activities engaged by Defendants will be subject to restrictions designed to ensure compliance with the final Volcker Rule also restricts acquiring or retaining an ownership interest in, or sponsoring or having certain relationships with, "covered funds." Covered funds generally include entities that would be an investment company[4dd] under the Investment Company Act of 1940 (the "1940 Act"), but for the exemptions provided in Section 3(c)(1) or Section 3(c)(7) of the 1940 Act, as well as certain commodity pool. The final Volcker Rule includes exemption, among others, for certain limited investments in conjunction with asset management activities for customers, for loan securitizations, for asset-backed commercial paper conduits, and for underwriting and market making in covered funds. As with the proprietary trading restriction, the exemptions are generally subject to a variety of compliance requirements and conditions. Any limited, yet permissible, investments in covered funds are required to be deducted from the Tier 1 capital of banking entities.

---

[20]     *Id.*

[21]     Cyrus Sanati, *Collateralized Loan Obligations: Our next financial nightmare*, FORTUNE               (April                                                10, 2014)(http://fortune.com/2014/04/10/collateralized-loan-obligations-our-next-financial-nightmare/ ).

30.     New York Donnelly Antitrust Act

31.     USC Article III Section 2 U.S.C.

32.     The Edge Act, 12 U.S.C. § 632 Corporacion Venezolana de Formento v. Vintero Sales Corp. (2nd Cir. 1980) (citation omitted)

33.     New York Banking Law § 200-b(1)

34.     New York General Business Law § 349(a)

35.     New York General Business Law § 349(h)

36.     New York General Business Law § 350

37.     New York General Business Law § 359-e

38.     New York U.C.C. § 2-105

39.     New York U.C.C. § 2-725(1)

40.     New York U.C.C. § 2-725(2)

41.     Venue is proper under pursuant to Section 4, 12, and 16 of the Clayton Act. 15 U.S.C. §§ 15 and 22 and 28 U.S.C. 1391 (b), (c) and (d) because one or more of the Defendant resided, transacted business, was found, or had agents in this New York District, Manhattan, Southern District of New York, a substantial part of the events giving rise to Plaintiffs' claims rose in New York District, Manhattan, Southern District of New York District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in New York District, Manhattan, Southern District of New York . 28 U.S.C. §1367 in New York State because there is an ongoing case.

42.     Defendants' collusive and manipulative acts took place in substantial part, in the New York specifically and in the United States generally. These acts were conducted by persons and entities subject to the laws of the United States, including New York, as well as other states and territories. Each Defendant has continuously and systematically entered into FX transactions, including spot transactions, forward contracts, future contracts, and option contracts in this District, New York and other states, throughout the United States.

Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the District and throughout the United States. These connection between the alleged conduct and the United States is demonstrated herein.

## PARTIES

**PLAINTIFFS**

43.      Plaintiffs are residing at 115 East Street, New Hyde Park, New York 11040 USA with their United States Citizen son and his sibling. Plaintiffs participated in FX over-the-counter market and also participated in the United States Chicago Mercantile exchange ("CME") and Intercontinental Exchange ("ICE") with Defendant HSBC by telephone directly to the traders in the United States desk who quoted Plaintiffs a 'bid' (the price it will buy currency) and 'ask' (the price it will sell currency) on all 5,400 pieces of FX spot transactions of FX Instruments [21A](See Exhibit A for transaction confirmations) involve the outright exchange of currencies between two counterparties on a value date that is within two bank business days' time so those FX spot that did not sell out instantly or within two days were "rolled over" to many days or months for a reason to charge extra, super high "loan" interest, commission, fees and huge trading loss on every second, minutes, days against the active benchmark rate until sell out date from Plaintiffs and because of this action of "FX spot" to "Futures/options" Defendant HSBC set up a performance bond (Margin requirement by CFTC)(See Exhibit B for loan letters) to facilitate FX future trading as per United States regulation and supervision of financial institution that are deem to be "systemically important" to the United States financial system including U.S. bank holding companies with consolidated assets of $50 billion or more such as Defendant HSBC and given relationship between the prices move in virtual lockstep to the spot price (currency futures is a derivative of the spot cash currency market and are deliverable in the physical currency) at which futures contract are priced, benchmarked, and settled based on the spot

markets price of the underlying currency pair, including coordinated submittals directly to the CME which "skewed bids and offers in a manner intended to move the CME/EMTA rates in a direction more favorable to Defendant HSBC and co-conspirators was to obtain ill-gotten trading profits from Plaintiffs' transactions from 2007 to 2010. After Defendant HSBC directly deducted "Indebtedness" (See Exhibit C for HSBC letter of Indebtedness) from cash deposit saving account (See Exhibit D for cash deposit monthly statement), there are joint and several liabilities including cash deposit saving account liability from Plaintiffs' FX transactions in the United States.

## **DEFENDANTS**

United States Registered Entity

44.     Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company headquartered in London, England. HSBC Holdings and its subsidiaries provides services in HSBC Holdings' network covering 73 countries and territories organized into geographic regions, with thousands of employees in the U.S. For the year ended December 31, 2013, HSBC disclosed $8.8 billion in revenue and $1.221 billion in profit before tax in North America alone. HSBC's ADRs are traded in the NYSE. Defendant HSBC Bank plc ("HSBC") is a United Kingdom public limited company headquartered in London, England and is wholly owned subsidiary of HSBC Holding PLC. HSBC's Global Banking and Markets business houses its Global FX and Commodities business. HSBC's core business lines in the United States included Global Markets FX, which provides service in FX spot, forwards, swaps and other relative derivatives. HSBC's London G10 FX trading desk is part of Global FX and Commodities business. New York serves as a hub for HSBC's

---

21A     An "FX Instrument" is defined as any FX spot transaction, outright forward, FX swap, FX option, FX futures contract, an option on an FX futures contract, or other instrument traded in the FX market.

Global Markets in the United States, delivering international products to U.S. clients. HSBC's affiliate, <u>Defendant HSBC Securities (USA) Inc.</u> ("HSBC Securities") is a registered **broker-dealer** with SEC and a registered Futures Commission Merchant with the CFTC and engages in trading debt and equity securities, including a primary dealer of US government and government agency securities, and futures contract. HSBC Securities is also a clearing member of the CME. <u>Defendant HSBC North America Holdings Inc.</u> ("HSBC Holdings N.A.") is a Delaware corporation headquartered in New York, and is a wholly owned subsidiary of HSBC Holdings plc. HSBC Holdings N.A. is the holding company for HSBC Holding's operations in the United States. <u>Defendant HSBC Bank USA N.A.</u>("HSBC US") is a National banking Association with its principal place of business in 452 Fifth Avenue, New York, New York, and is an indirect wholly owned subsidiary of HSBC Holdings N.A. HSBC US is HSBC Holdings' principal US banking subsidiary, with 230 branches in the United States, including 145 branches in the States of New York. HSBC US is an international dealer in FX products and derivative instrument denominated in U.S. Dollar and other currencies. HSBC US reported for its single New York branch gross notional outstanding spot FX contracts of $52,193 billion and FX derivatives of $971,931 billion, for total of $1,024,123 billion.[22] In its submission of a Resolution Plan in July 2014, HSBC identified HSBC Holding N.A. HSBC US, and HSBC Securities as material entities to HSBC's US operations, and identified HSBC as a non material entity because of its connections with HSBC's US operation.

45.    <u>Defendant The Hong Kong and Shanghai Banking Corporation Limited, Singapore Branch</u>[23] ("HSBC SB"); as part of HSBC Group; is a branch/banking subsidiary. HSBC SB

---

[22]    *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 184.

[23]    "The private banking core business line ("CBL") is conducted as part of HSBC..business available throughout HSBC Group.." See HSBC US Resolution Plan (2013) at Pg.7 ¶ 5.

is a wholly owned indirect subsidiary of HSBC Holdings;[24] is also identified as a non-US material entity because of their connections to HSBC US's operations[25]. By order dated March 16, 2016, (ECF 54), the Court granted the motion to join 'The Hong Kong and Shanghai Corporation Limited, Singapore Branch' as Defendants. HSBC SB should be imputed on its parent company for there is no basis to distinguishing between the business of these two entities. 'HSBC Private Bank' is not a legal entity but rather an informal trade name, used for primarily marketing purpose, for one of the core business strategy of private banking subsidiaries of HSBC Groups. The private banking offers a wide range of products and services including investment banking[26] and fiduciary deposit service etc and is a central bank used to effect money settlements for financial market utilities ("FMU")[27] members. Plaintiffs refer herein to Defendants HSBC Holdings, HSBC, HSBC Securities, HSBC Holdings N.A., HSBC US and HSBC SB collectively as "HSBC."

---

[24]     Bank Holding Company – "A company that owns and/or controls one or more U.S. Banks or one that owns, or has controlling interest in, one or more banks. A bank holding Company may also own another bank holding company, which in turn owns or control a bank; the company at the top of the ownership chain is called the top holder. The Board of Governors is responsible for regulating and supervising bank holding companies, even if the bank owned by the holding company is under the primary supervision of a different federal agency (Office of the Comptroller of the Currency ("OCC") or Federal Deposit Insurance Corporation ("FDIC")). (See US Federal Reserve System, National information Center-under "All Institution Types Defined")

[25]     In February 2014, the Federal Reserve Board ("FRB") adopted a final rule* requiring enhanced supervision of the United States operations of non-U.S. banks such as HSBC. The rule requires certain large non-U.S. bank with significant operations in the United States, such as HSBC, to establish a single intermediate holding company ("IHC"), to hold all of their U.S. bank and non-bank subsidiaries. The HSBC Group currently operates in the United States through such an IHC structure (i.e. HSBC North America), therefore, the implementation of this requirement will not have a significant impact on our U.S. operations.(See *HSBC Form 10-K for year 2013,* Pg. 95 ¶ 2.) "As defined by the "SIFI" Rule [FRB final rule*], a covered company must identify any subsidiary or foreign office that is significant to the activities of a critical operation ("CO") or core business lines ("CBL") of HSBC Group in the US." (See *2015 US Resolution Plan (HSBC)* at Pg. 11¶ 1.)

46.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

47.     "Defendant" or "Defendants" as used herein, includes, in addition to those named specifically above, all of the named Defendants' predecessors, including those merged with or acquired by the named Defendants and each named Defendant's wholly owned or controlled subsidiaries or affiliates that played a material role in the unlawful acts alleged in this Complaint.

48.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

49.     Each of the Defendants named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

50.     Various other persons, firms, and corporations, that are unknown and not named as Defendants, have participated as co-conspirators with Defendants and have performed acts and/or made statements in furtherance of the conspiracy. Defendants are jointly and severally

---

[26]     Investment bank/company – Acts as underwriter or agent that serves as intermediary between issuer of securities and the investing public. (See *US Federal Reserve System*, National information Center-under "All Institution Types Defined")

[27]     "Membership" means that an HSBC Group legal entity has direct access to a financial market utilities ("FMUs") to serve HSBC's customers and client around the globe…" (See US Resolution Plan 2013 (HSBC) at pg. 13 ¶ 3.)

liable for the acts of their co-conspirators whether named or not named as Defendants in this Complaint.

51.    By order dated March 31, 2016, the Court granted the motion to join the consolidated action with FOREX. *See In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 74 F.Supp.3d 581 (S.D.N.Y. 2015) ("*FOREX*"); see also No. 13 Civ 7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016), **it is stated that**: "

**CLASS ACTION ALLEGATIONS**

Pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, OTC Plaintiffs

bring this action on behalf of themselves, and on behalf of the following "OTC Class":

> **OTC Class**: All persons who, between January 1, 2003 and December 31, 2013 (inclusive) entered into an FX instrument directly with a Defendant, where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted one or more FX instruments in the United States or its territories.

52.    Pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Exchange Plaintiffs bring this action on behalf of themselves and on behalf of the following "Exchange Class":

> **Exchange Class**: All persons who, between January 1, 2003 and December 31, 2013 (inclusive) entered into a FX instrument on exchange where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or it territories, entered into one or more FX instruments on a U.S. exchange.

53.    Both the OTC Class and the Exchange Class have following exclusions:

> **Exclusions from both Classes**: Specifically excluded from the Classes are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator, and any person acting on their behalf. Also excluded from these Classes are any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action."

54.     Due to the nature of the trade and commerce involved, Plaintiffs believe that Plaintiffs' participation in the FX Over-The-Counter market with Defendant HSBC and participation in the Chicago Mercantile Exchange and Intercontinental Exchanges with Defendant HSBC thus sustained damages arising out of Defendants' common course of conduct in violation of federal antitrust laws and the Commodity Exchange Act as alleged herein. The damages and injuries of Plaintiffs were directly caused by Defendants' wrongful conduct in violation of federal law, including, but not limited to, questions of law and fact:

   a).   whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize foreign currency bid/ask spreads in interstate commerce in the United States;
   b).   whether Defendants and their co-conspirators engaged in manipulation of the Fixes and other FX benchmark rates in interstate commerce in the United States;
   c).   the identity of the participants of the conspiracy or manipulative scheme;
   d).   the duration of the conspiracy or manipulative scheme alleged herein and the acts performed by Defendants and their co-conspirators in furtherance thereof;
   e).   whether the alleged conspiracy violated Sections 1 and 3 of Sherman Act, 15U.S.C. §§ 1 and 3
   f).   whether Defendants' conduct violated Section 22 of the Commodity Exchange Act; 7 U.S.C. §25.
   g).   whether Defendants acted to aid and abet in violation of the Commodity Exchange Act;
   h).   whether Defendants' unlawful conduct caused cognizable legal injury under the Commodity Exchange Act;
   i).   whether the conduct of Defendants and their co-conspirators, as alleged in this complaint, caused injury to Plaintiffs and
   j).   the appropriate measures of damages for Plaintiffs.

## FACT

55.     Plaintiff Mr. Chan is a 6th grade educated man and Plaintiff Mrs. Chan is a 10th grade educated woman. Plaintiffs worked for 3 decades and save enough money to provide for the health and education of their three children.

56.     Plaintiffs worked hard and also solely pay for their parent and sibling's daily care and expenses.

Plaintiffs' Pains and Sufferings

57.     In mid January 2000, Plaintiff Mrs. Chan gave birth to their oldest son in New York City who is a U.S. Citizen and subsequently two younger children in Malaysia.

58.     Since Plaintiffs' oldest son, J. Chan at that time aged two almost died because he suffered three times of Anaphylactic allergic reaction while in business trip with parent, Plaintiffs had to enroll him to medical facilitated international school- Mon't Kiara International School, Kuala Lumpur Malaysia and Singapore American School for a proper school nurse is available in case of another attack.

59.     At the last day of the FX trading with Defendants' trader in July 1, 2010, Defendants' trader told Plaintiffs that "you have lost everything, no money left in your account." Plaintiffs were devastated that night , Plaintiffs Mr. Chan came to tell Plaintiffs Mrs. Chan, **"We don't have to jump off the building to kill ourselves; we are not going to throw our children off the building and jump with them to die. We will find out the truth with good people."** In August 2010, Plaintiff 's children Master J. Chan was 10 years old- a 5th grader; V. Chan, his sister was 9 years old-4th grader and J. Chan; his youngest brother was 7years old- 1st grader.

60.     So Plaintiffs could not afford their children's private school fee after Defendant deducted most of their cash deposit, the children has to stop schooling. Plaintiffs strived for schooling and proper medical needs for them. Plaintiffs then decided to bring them back to New York. Plaintiffs' children, including Plaintiff J. Chan; is also disturbed emotionally and socially[28] by Defendant's misconduct and ill-intention. J. Chan feel insecure with the surrounding and became inferior for real life. He would says, "wait till we take the money

---

[28]     See generally, *Chan Ah Wah v. HSBC Bank, No. 13 Civ. 4789 (S.D.N.Y.)* (for children's letters to Judge Oetkan for their expression of pain '*emotionally and socially*')

back from HSBC, we will…" "we want to keep the house (we are staying in the United States), we no need to sell it for our college fees." They are definitely the main victims for the lost money is education and college fund for them.

61.     Plaintiff Mrs. Chan suffered and was treated with PTSD ("Post Trauma Stress Disorder") so she always stress out easily with upset stomach followed by pain all over body and listless. Her psychiatrist always told her to "sleep more," went for a trip," "do planting," etc. Most of the session with the doctor, Plaintiff Mrs. Chan would cry and cry. At one time, Plaintiff Mrs. Chan had to take a lot, a lot of pain killer to stop the pain and still feel pain every part of her body. Whenever Plaintiff Mrs. Chan felt very hopelessness, she would spend time with her children that put her and Plaintiff Mr. Chan together in one piece and live on.

62.     At the time, Plaintiff has to sell all his mortgaged supported investment in real estate properties at a great loss to realize his cash flow to pay debts. They were all "panic selling."

63.     Plaintiff Mrs. Chan also could not pay for the foreign housekeeper to care for her 90 years olds dementia mother who was living with her then in Singapore. She was sent to public hospital housed for dementia patient with her relative's help. In the hospital, Plaintiff Mrs. Chan could see in her mother's eye she understands Plaintiffs Mrs. Chan at that moment "bid *final* farewell to her." At that time, her mother could not talk. Until today, Plaintiffs Mrs. Chan missed her and always weeps for her. According to her relative, her mother passed away two years ago without Plaintiff Mrs. Chan by her side. Plaintiff Mrs. Chan's adoptive parent adopted her six days after birth, her adoptive father passed away in 1989 after a stroke paralyzed him for eight years. Plaintiffs Mrs. Chan went through a lot with her adoptive parent is very important to her.

64.     Back in Malaysia, Plaintiff Mr. Chan also has to stop supporting his old aged parent for his mother was paralyzed from stroke and his younger brother's addiction rehabilitation fee and their daily expenses.

Directly dealt with Defendants' U.S. Trader Dealing Desk

65.    In 2007, Plaintiffs were trading foreign exchange currency excessively like; 5,400

transactions[29] were settled on the basis of WM/Reuter rates with Defendant HSBC and came

to FX trading grand amount total of US$1,238,747,882.00 from 2007 to 2010. (See Exhibit

E for last two pages of Account Analysis from P. Koeting & Associates in United States)

Plaintiffs participated in FX over-the-counter market and also participated in Chicago

Mercantile exchange in United States ("CME") and Intercontinental Exchange in the United

States ("ICE") with Defendant HSBC by telephone directly to the HSBC traders in the

United States desk [30] who quoted Plaintiffs a 'bid' (the price it will buy currency) and 'ask'

(the price it will sell currency) on all 5,400 pieces of FX spot transactions whereas Plaintiff

Mr. Chan dealt with the Defendant HSBC's U.S. dealing desk many times in day and night,

like 4:00 o'clock in morning

---

[29]    'The confirmation, which should be produced promptly after trade execution, will constitute legal evidence of the term of the FX transaction. It should identify the economic terms of the trade and any other relevant information and dispatched to the counterparty at the earliest possible opportunity." (See *Foreign Exchange Committee Announcement, 'Process Description,'* May 29, 2013 at Pg. 20.); *also see* International Swaps and Derivative Association (ISDA) 2002 Master Agreement, "...have entered and/or anticipate entering into one or more transactions (each a "transaction") that are or will be governed by this 2002 agreement, which includes the schedule (the "schedule"), and the documents and other confirming evidence (each a "confirmation") exchanged between the parties or otherwise effective for the purpose of confirming or evidencing those Transactions. This 2002 Master Agreement and the Schedule are together referred to as this "Master                                                                    Agreement".) (https://www.sec.gov/Archives/edgar/data/1065696/000119312511118050/dex101.htm)

[30]    See Opinion and Order from FOREX TAC (ECF 661), *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* No. 13 Civ. 7789, 2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016 & Sept. 20, 2016) "who is "domiciled" in the United States may conduct transactions both in the United States and abroad" whereas "the United States desk trades FX with a foreign desk of Defendant HSBC."

(Singapore time), some days to 5:00 o'clock in the morning (Singapore time) whereas the dealers also told Plaintiff Mr. Chan that they are doing some calculations because the New York trading market is closing whereas the dealer told Plaintiff Mr. Chan that they followed New York holidays for closing confirming the transactions were 'call-forward' to the United States. Like Defendant HSBC told Plaintiff, "like buying and selling blue chip stock, contra and profit." In a letter (See Exhibit F for letter to Plaintiffs direct trading with Defendant's trader) from Defendant HSBC to Plaintiffs confirmed their "dealt directly with Defendants' trader dealing desk," that "*in the matter of forex trading that we allowed for you to have direct access to our forex trading day and night desks at your request so that you can keep in touch with forex market market pricings and conditions. We are aware that you have been regularly discussing trading strategies with and perform forex trades directly with our traders.*" By then, to trade in "spot transactions that did not sell out instantly or within two days time were carry forward to many days or months. To facilitate FX trading, Defendant HSBC set up a performance bond (Margin requirement by CFTC) and sending paper document to Plaintiffs. This action of "FX spot" to "Futures/Options" allows Defendant HSBC a reason to charge us extra, super high "loan" interest, commission, fees and huge trading loss on every second, minutes, days against the active benchmark rate until sell out date. This is very hurting to Plaintiffs because Plaintiffs' cash deposit saving account, with Defendant in the other hand; has given Defendants' direct access to deduct all applicable fees, losses, interest etc at the Banks' discretion. Plaintiffs have no control of Defendant HSBC's internal network and office management or any paper document Defendant HSBC gave Plaintiffs including place of issuance and types of trading account. Defendant HSBC *did* send margin "loan" paper documents to Plaintiffs; time to

time replace and supersede: (Plaintiffs complied the letter information: See chart below):

| LETTER DATE: | LOAN AMOUNT: (USD) | RATE CHARGED: |
|---|---|---|
| July 4, 2007 | $1.5 million    (MC) | Prime rate or cost of fund + 1.0% p.a |
| March 5, 2008 | $3.5 million    (MC) | Prime rate or cost of fund + 1.0% p.a |
| August 5, 2008 | $4 million      (MC) | Prime rate or cost of fund + 1.0% p.a |
| November 14, 2008 | $4.3 million    (MC) | Prime rate or cost of fund + 1.0% p.a |
| January 16, 2009 | $4.6 million    (MC) | Prime rate or cost of fund + 1.25% p.a |
| May 28, 2009 | $4.5 million    (MC)  $100,000 (ITL) | Prime rate or cost of fund +1.25% p.a |
| September 17, 2009 | $4.6 million    (MC) | Prime rate or cost of fund + 1.25% p.a |
| September 25, 2009 | $4.7 million    (MC) | Prime rate or cost of fund + 1.25% p.a |

Abbreviation in chart:

"MC" – Multi-currency credit line

"ITL"- Investment Trading Line (for trading in derivative/structured products)

The "loan" document (Margin loan/performance bond) stated:

> "*The abovementioned Facility is subject to the Bank's overriding right to demand repayment at any time.* (for It is written as: 'Security: Memorandum of Charge in the Bank's standard form duly executed by you' or your attention is drawn to the Bank's right to demand for additional collateral and security at any time and to determine in its discretion the collateral value of each item of collateral furnished to it, as set out in the Bank's Standard Terms and Conditions. The factors the Bank may take into account in determining the collateral value of an item of collateral include, without limitation, the nature and substance of the relevant item of collateral and, in order to restrict concentration risk with regard to any such item, its value relative to the collateral value of all the collateral held by the Bank )

66.     The terms and conditions of the deposit saving account that Defendant signed with Plaintiffs; the Defendants at all times maintained actual and /or *de facto* discretion over their saving account, i.e., they always contacted Plaintiffs before making a trade and they were contacted were told there was no way they could 'lose money,' 'everyone else was doing it,' 'the investment was principal protected.'

67.     The cash deposit saving accounts was held pursuant to the Bank's Standard Terms

and Conditions, which also set forth that:

> The Bank shall provide a discretionary management service in
> respect of the [Customer Account] and in doing so, the Bank shall
> have absolute discretion on behalf of the Customer (and without prior reference,
> notification or consent of the Customer)to buy, sell...and generally to exercise
> complete control and all powers in relation to the management of the
> [Customer Account].

68.     The cash deposit saving account's Terms and Conditions also designated that

Plaintiff authorizing all banks with the HSBC Europe branch to act on Plaintiffs' behalf in its

specialized area, which for Defendants is forex trading and also authorized Defendants to

deal with their property "taking into account any applicable law, regulation, order, directive,

market practice, notice or request of any regulator, government body or agency (whether or

not having the force of law)" of all applicable jurisdictions, and to, among other things,

> "deposit the underlying Trading Assets (or any part thereof) with the Bank's"
> nominees, agents, brokers, Custodians or the relevant Exchanges or clearing houses
> (the "**Intermediaries**"), an/or to create (whether in the name of the Bank or on
> behalf of the Customer) or to cause to be created security interests (whether by way
> of mortgage, charge or otherwise) over such underlying Trading assets (or any part
> thereof) in favor of the Intermediaries on such terms and conditions as the Bank may
> think fit.."

69.     Additionally, annexed to the cash deposit Saving Account are the United States Tax

Forms W-8BEN, fully filled out and executed, signed by Plaintiffs.

70.     Finally, Defendants disclosed that it would be collecting certain fees for transactions

occurring over commodities and/or equities exchanges located in the United States.

71.     During FX market volatility, Plaintiffs Mr. Chan was deprived of sleep and became

very temperamental in daily life. When the "margin call" by Defendant to ask for more cash

into saving account to "continue FX trading and save yourself out of the loss, told by Amy,"

Plaintiffs were in the mental turmoil of virtually "die now or fight again."

To Open a Cash Deposit Account with Defendant

72.     In 1990's, Plaintiffs came to the United States to earn a living. Plaintiff Mr. Chan

learned the dry cleaning skill and worked in a dry cleaner factory in Brooklyn, New York

while Plaintiffs Mrs. Chan worked as a secretary and translator.

73.     Plaintiffs sent all of their saving back to Malaysia's Commercial HSBC Bank

("Malaysia HSBC") (See Exhibit G for cash in saving account) and Public Bank Berhad

Malaysia ("Public Bank") to earn 4% interest per annum. At the same time, Plaintiffs also

invested in real estate. Plaintiffs returned to the United States to work in 1998 again and sent

saving to Malaysia HSBC and United Overseas Bank Malaysia ("UOB") and regularly

deposited cash with these banks. For 7 to 9 years, Plaintiffs' account merely earned interest

in a saving account. The balance yield interest and took out the interest to live on. Their

saving account represented the entirety of the proceeds of the jobs they worked.

74.     After returning to Malaysia, Plaintiffs owned three dry cleaning businesses in

Malaysia, bought and sold real estate and did a small amount of trading of blue chip stocks.

75.     At all times, Plaintiffs considered themselves conservative investors who ultimately

wanted to maintain their assets to educate and ultimately pass on to their children.

Defendants Gain Plaintiffs' Trust

76.     UOB has a relationship manager for Plaintiffs, her name is Joey. In about 2005, she

left at UOB and began working at a newly opened branch of HSBC Private Bank Malaysia

("HSBC Private Malaysia") and were told that theirs was the "first account" at the branch.

At that time, Joey led Plaintiffs to meet the head of HSBC Private Malaysia, Mr. Andy Yong,

who was Joey's supervisor at the branch, and also meet Amy Low of HSBC Private Bank

Singapore ("HSBC Singapore") for the first time. Joey coaxed Plaintiffs to invest and *did*

invested in financial derivative structured products as "principal protected" and earned

"interest faster". Upon information and belief, Mr. Yong is now employed by Nomura Bank

based in Singapore.

Also invest in Derivative Product

77.    Joey told Plaintiffs that the investment would earn interest if a "strike price" was not met and will refer to FX market benchmark rates at USD/NZD for the indicated time or "expiry date" in the investment at observation date**. The investment would earn interest if a "strike price" is not reached at the same rate if appeared at the FX market rates for USD/NZD at the indicated time as written in the agreement and if the "strike price" is the same rates as appeared at the FX market rates, there would be no earning, the investment amount in U.S. dollar would be exchanged to New Zealand dollar at the rates met resulting in a loss in actual U.S. dollar value. Plaintiffs at the time suffered a loss of approximately 250,000 to 280,000 in Malaysia ringgits calculation from converted New Zealand dollar at hand (as if to convert to Malaysia ringgit value). Joey told Plaintiffs that the investment strike at a very low exchange rate in New Zealand's currency because she could not secure the original proposed "strike price" written in the agreement on time (she entered one day late) and has struck.

78.    Plaintiffs were very upset with the specific U.S. dollars were exchanged to New Zealand dollar in Joeys' negligence act. Plaintiffs met the head at HSBC Malaysia, Mr. Camar to help. So Plaintiffs accepted Mr. Camar's recommendation and transferred cash deposit in HSBC Private Malaysia to HSBC Singapore in 2007 or 2008 because HSBC Private Malaysia has to cease the private banking department business at once for some reasons. And, also to wait for the exchange rate of NZD/USD to come back to Plaintiffs prior converted rates to earn back the losses in value as promise by HSBC Singapore's Senior Vice President, Jeffrey. The NZD/USD finally reaches the rates to recoup previous loss in HSBC Singapore at a later date.

Trust Given and Abused

79.     At HSBC Singapore, Plaintiffs has a relationship manager (Vice President in HSBC private banking department), her name is Amy Low. With Defendant, "…HSBC Private Bank is the marketing name for the private banking business conducted by the principal private banking subsidiaries of the HSBC Group worldwide" advertised in year 2006 calendar book, and "we have four distinct business segments that are utilized for management reporting and analysis purposes which are aligned with HSBC's global business and business strategy: (1). Retail banking and wealth management (2). Commercial banking (3). Global banking (4). Private banking."[31] Plaintiffs' account of USD2.3 million was invested in a saving account for Amy represented that they could earn 8% to 10% interest return. The money sat in the saving account for over one year. Amy understands Plaintiffs' wanted to earn more interest rate in their cash saving account and she told Plaintiffs that she could generate 8% to 10% interest rate for them. Since 2005, Plaintiffs have gradually remit cash money to the cash saving account with Defendant HSBC SB and accumulated to USD2.3 million.

80.     Amy told Plaintiffs that they would obtain various interest rates that would be greater than what they could earn in a typical Malaysian saving account, which at that time was earning between 3% to 4% per annum, when in reality, the cash deposit account was exchanged to different foreign currency shown on the saving account statement.

81.     At first, Amy asked Plaintiffs to participate in financial derivatives investment like "Alpha Plus" structured product with "strike price" and if "strike price" is not met then award with high interest, similar with Joey from HSBC Private Malaysia's investment.

---

[31]        *See* Defendant HSBC Bank USA: SEC Form -10K filing for year 2013 Page 70 ¶1.

<u>Most of the financial investment proposed by Amy and were placed by Amy; and Plaintiffs always earned profit so Plaintiffs could withdraw and live on it.</u> After a while, Amy would call Plaintiffs regularly a day to advise them to take advantage of various movements in assorted currencies, including U.S. dollar in FX market. (Then, Plaintiff dealt directly with Defendants' trader dealing desk day and night for FX instruments like spot.)

82.   Plaintiffs did not understand what was occurring in their cash deposit saving accounts, and always followed the advice of Amy Low's advice. Amy Low always told Plaintiffs that "the money (cash deposit) still there," "losses not real, only paper loss," "very safe practice," comforted the Plaintiffs. Plaintiffs were told by Defendants that it was the market they were dealing with, not the bank. Throughout their time with Defendants, Plaintiffs would regularly receive phone calls from Amy telling them to take advantage of various movements in assorted currencies.

83.   Throughout their time with Defendant, Defendant "was in charge" of the saving account, and Amy told Plaintiffs they used USD$200,000 from saving account to secure a "loan from Japan central bank's Japanese Yen currency" to give Plaintiffs' 14 time leverage in FX market trading . And also told Plaintiffs that in this way, there would be an automatic stop for further losses reached $200,000 the amount which was deposited to buffer the "loan". Defendant did not explaining the margin requirement purpose, or any downsides of margin, or the dramatic manner in which margin widely expanded both gains and losses, other than apparent reason to earn commission, fees, interest from Plaintiffs.

84.   Defendant did not tell Plaintiffs if they experienced a loss, that loss would also be magnified 14 times. Plaintiffs were told that there would be an automatic stop for further losses if the loss reached $200,000 of the amount deposited to buffer the "Japanese yen loan."

Amy many times refused to tell Plaintiffs the actual nature of the loan account; without explaining the reality of what was happening with their cash deposit saving account.

85.     In 2008, the U.S. subprime economic crisis came, Amy told Plaintiffs that the Japanese Yen currency were strong against U.S. dollar so the "loan" debt Plaintiffs owed increased more and more. Plaintiffs' cash deposit became less and less, as told by Amy and started to "margin call" Plaintiffs.

86.     By then, Japanese Yen currency became sudden weak, Plaintiffs' cash money in their saving account appeared slight gained so Plaintiffs told Amy that they wanted to close cash deposit saving account with Defendant including all investment and "loan." Amy told Plaintiffs, "Japanese Yen currency will never grew strong anymore because Japan government will make Japanese Yen weak for their economy's sake; their car industry need weaker yen to repatriate and show profits in their book." Amy also told Plaintiff, "in this way, no more margin call." Plaintiffs wanted Defendant to use Plaintiffs' own cash deposit of USD2.3 million to facilitate their FX market trading and Amy promised them so Plaintiffs did not close saving account. Plaintiffs' usual amount of each trading was USD500,000 to USD1 million in FX market; at the end of Defendants' scheme, Plaintiffs were not given any choice but were compel to trade in amount reached USD$4 million for once or twice.

87.     Not long later, the FX currencies were very volatile and again, USD/JPY became very strong and Defendant "margin calls" and "margin calls" Plaintiffs many times. Defendant pressed for more cash to "top up" the saving account. In mid 2009, there was a meetings with Amy and Defendants' top executives in their office, Defendant, at the time, offer to give back approximately USD$700,000 if Plaintiffs close their saving account; after deduction of all trading losses, repay "loan" and transaction fees, interest, commission but Amy somehow persuaded Plaintiffs to stay on to recoup their losses.

Why did Defendant use scheme to hurt Plaintiffs?

88.     It really puzzled Plaintiffs that of how Defendant handled their cash deposit saving account to "loan account". No one could explain to Plaintiffs what was happening in their cash deposit saving account until in March 2016, Plaintiffs searched under "Reuters Dealing" came up with explanation it could be "CDO cubed" or Defendant could explain to Plaintiffs the answer about their ill-intention and scheme resulted in "2008 year subprime crisis with CDO" or Defendant did not engage any FX instruments business in the United States at all.

89.     CDO cubed is "**those swaps**, not loans, were put into a special-purpose vehicle –kind of bank account held separately from their book, often in an offshore bank...They tranched (sliced) that vehicle into securities and sold them to investors." [37] "The top-tranche investors are happy. They put the money into your account and got a decent rate of return from your premiums. But they are the last to lose their money if you tap into the account to cover defaults" "..The bottom-tranche investors who put money into your account are happy too, but in a different way...They know the money they invested could be lost...should the housing market go sour, but they are getting a very high rate of return right now." "..And of course, you, the banker who dreamed it all up, get a nice bonus. You get hefty fees from the money that goes into the account for putting the deal together, for setting up the account, for selling the investments, and for managing the whole shebang." [38]

---

[37]     Les Leopold, The Looting of America: How Wall Street's Game of Fantasy Finance Destroyed our Jobs, Pensions, and Prosperity, And What Can We Do About It. (June 2, 2009)(https://books.google.com/books?isbn=1603582223)(See Chapter 7, Page 94)
[38]     *Id.* at Pg 97.

90.     "CDO is "remember all those "complex" financial instruments that exploded in 2008 – the one that brought the economy to its knees? I am talking about the securitized alphabet soup of debt instruments, like MBS, ABS, CDO, CDS, etc." [39] Collateralized Debt Obligation ("CDO") is "a structured financial product that pools together cash flow-generating assets and repackages this asset pool into discrete tranches [slice] that can be sold to investors. "Financial investment products such as stock, options, bonds and derivatives carry counterparty risk.[40]

91.     "One in particular, …collateralized loan obligation, or CLOs…is a type of debt security made up of several high-risk commercial loans, which have been bundled together and sliced into tiny, bite-size pieces for sale to investors. Some of the pieces carry more of the loans' investment risk than others. Investors who choose to buy a higher risk (lower rated) piece enjoy a larger return on their investment than those who choose to buy a lower risk (higher rated) piece. But if some loans start to default, the lower rated pieces absorb the brunt of the losses while the higher rated pieces enjoy a consistent return."[41] "The bankers were acting in their self-interest, after all."[42]

92.     "Securitization (in CDO) helped <u>many banks to free up their balance sheets,</u> **allowing them to pool and tranche a bundle of loans and either sell the tranches to outside investors or put them in off-balance sheet vehicles.** <u>By removing loans from their</u>

---

[39]     Cyrus Sanati, Collateralized Loan Obligations: Our next financial nightmare, FORTUNE(April                                                                                              10, 2014)(http://fortune.com/2014/04/10/collateralized-loan-obligations-our-next-financial-nightmare/).

[40]     *Id.*

[41]     *Id.*

[42]     David Leonhardt, *The Looting of America 's Coffers, THE NEW YORK TIMES*, (March 10, 2009)(http://www.nytimes.com/2009/03/11/business/economy/11leonhardt.html)

<u>books,</u> underwriters of CDOs could decrease the capital charges imposed by the Basel Accords[43] (the FRB) and their own internal risk requirement (like capital increased, liquidity, stress testing and other enhanced prudential and structural requirement imposed in the United States for "systematically important" bank holding company like Defendants with assets greater than $50 billion, that is found to pose a grave threat to financial stability; also Title VII of Dobb-Frank Act imposes a comprehensive regulation of over-the-counter ("OTC") derivatives market, including credit default, equity, foreign exchanges and interest rate swaps and thereby <u>free up cash to make new loans.</u>[44]

93.     CDOs involved the pooling and re-allocation of risk. In pooling imperfectly assets is possible to use diversification to decrease risk. Furthermore, tranching the cash flows made it possible to create securities with different risk profiles appropriate to specific investors.

---

[43]     Basel I required that banks hold capital of at least 8% of their loans. Basel II modified this slightly by imposing, by imposing different charges based on the riskiness of the asset, often determined by the assets' credit ratings. See Garcia et.al. (2008) for more detailed explanation of capital requirement calculations.

[44]     Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19, 2009)(*See* Page 7 ¶1)(http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

94.     Institutional investors can purchase only investment-grade securities (defined as those with a credit rating of BBB-or higher). CDOs allowed these investors to gain exposure to asset that, on their own, had been too risky, while investors looking to take more risk and receive potentially higher returns could buy the most junior or "equity" CDO tranches. Initially, it seemed that every player was benefiting from CDOs and issuance exploded, reaching $50 billion in 2006.[45] The rating agencies were making record profits as the demand for rated structured products skyrocketed[46] Institutional investors loved the high-yielding AAA securities recreated from asset-back securities (" ABS CDOs"), CDO underwriters collected fees and achieved regulatory capital relief by off-loading their assets, and CDO collateral managers earned hefty returns by retaining the equity tranches, benefiting from the low cost of funding senior tranches.

95.     First, the collateral composition of CDOs changed as collateral managers looked for way to earn higher yields. There are two main factors that made pooling and tranching of loans so attractive to the investors and investment banks that created CDOs-regulatory capital relief and risk allocation.[47] The managers began investing more heavily in structured finance securities, most notably subprime RMBS, as opposed to corporate bonds. Furthermore, they invested in the mezzanine tranches of these securities, moves designed to create higher-yielding collateral pools.

---

[45]     *Id.*(Source, Securities Industry and Financial Markets Association)

[46]     *Id.* (According to a PBS special report, structured finance represented at least 40% of the revenues at the CRAs since 2000. Over that time, Moody's went public, saw its stock increase six fold, and its earnings grow by 900%.)

[47]     *Id.* (Bluhm (2003) analyzes the different factors that have contributed to the success of CDO trading: spread arbitrage opportunities, regulatory relief , funding, and economic risk transfer. Mitchell (2004) argues that tranching only creates value in the presence of market impactions, such as asymmetric information and adverse selection, and that originators can only profit from underwriting if they "possess some sort of comparative advantage…to the extent that other intermediaries can acquire identical assets, any potential profit form tranching may be quickly driven to zero" (Mitchell 11)).

96.     In response to the explosion in CDO issuance, the increased demand for subprime mezzanine bonds began to outpace their supply.[48] This surge in demand for subprime mezzanine bonds helped to push spread down-so much that the bond insurers and real estate[49] investors that had traditionally held this risk were priced out of the market. The CDO managers that now purchased these mortgage bonds were often less stringent in their risk analysis than the previous investors, and willingly purchased bonds backed by ever more exotic mortgage loans.[50]

97.     In addition to the increased investment in risky mortgage collateral, the next development was the creation of the notorious "CDO squared," (and the occasional "CDO cubed"), which repackaged the hard-to-sell mezzanine CDO tranches to create more AAA bonds for institutional investors.[51] The CDO tranches that were repackaged into new CDOs, creating CDO squareds; gives the tranche category by waterfall priority (i.e. seniority, 1 =first paid, last loss), as expected, the highest percent of repackaging occurred with lower seniority CDO tranches, with a few of the most senior tranches being resecuritized. Taken together, these observations *(two changes in CDO investments since 1999: the decrease in collateral backed by fixed rate assets and the*

---

[48]     *Id.* (Deng et. al. (2008) find that the demand for subprime mezzanine bonds for CDOs was so great that it was a significant factor in causing a tightening in the subprime ABS-treasury spread prior to 2007.)

[49]     Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19,                    2009)(*See*                    Page                    10) (http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

[50]     *Id.* (A recent note by Adelson and Jacob (2008) argues that CDOs' increasing demand for subprime bonds was the key event that fundamentally changed the market.)

[51]     Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19,                    2009)(*See*                    Page                    12) (http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

*increased use of synthetic assets (i.e. CDS))* indicate that CDOs began to invest in more risky assets over time, especially in subprime floating rate assets. Essentially, CDOs became a dumping ground for bonds that could not be sold on their own-bonds now referred to as "toxic waste." As former Goldman Sachs CMBS surveillance expert Mike Blum explains: Wall Street reaped huge profits from "creating filet mignon AAAs out of BB manure."[52]

98.     Lastly, the advent of synthetic CDOs significantly altered the evolution of the CDO market. Rather than investing in cash bonds, synthetic CDOs were created from pools of credit-default swap contracts ("CDS"), essentially insurance contracts protecting against default of specific asset-backed securities.[53] The use of CDS could give the same payoff profile as cash bonds, but did not require the upfront funding of buying a cash bond. Furthermore, using CDS as opposed to cash bonds gave CDO managers the freedom to securitize any bond without the need to locate, purchase, or own it prior to issuance. [54]

---

[52]     Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19,                              2009)(*See*                    Page                    14) (http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

[53]     *Id.* (The advent of certain CDS indices with reference to pools of asset-backed securities encouraged this trend. The ABX Index is a series of credit-default swaps based on 20 bonds that consist of subprime mortgages. ABS contracts are commonly used by investors to speculate on or to hedge against the risk that the underlying mortgage securities are not repaid as expected. The ABX swaps offer protection if the securities are not repaid as expected, in return for regular insurance-like premiums. The CMBX is a similar index referencing a basket of commercial mortgage-backed securities.)

[54]     *Id.* (The demand for ABS bonds for CDOs was so high, that underwriters and managers often had trouble securing enough bonds for a CDO. Several former CDO managers described this situation as "extremely frustrating," as they would often spend significant amounts of time analyzing new bond issues, only to find out that they were oversold or that they could purchase just a small amount. Using CDS guaranteed that CDO managers could take "bets" on any bond they found desirable, regardless of its limited supply.)

Credit Rating for CDO ("CRAs")

99.       The credit rating agencies were formed nearly a century ago to help investors gauge

the risk of fixed-income securities. Credit ratings have been vital to the development of the

CDO market, as investors felt more confident purchasing the new structures if they were

rated according to scales that were comparable to those for more familiar corporate bonds.

Credit ratings from agencies deemed to be "nationally recognized statistical organizations

("NRSRO") were used for regulatory purposes by the SEC. While there are five credit rating

agencies with the NRSRO qualification, only three were major players in the U.S. structured

finance market: Moody's, Fitch, and Standard and Poor's ("S&P").While S&P and Moody's

rated almost all CDO deals, Fitch's market share declined to less than 10% by 2007. The

rating agencies earned high fees from the CDO underwriters for rating structured finance

deals, generating record profits. [55]

CDO and The Investment Banks

100.      Wall Street quickly pounced on CDOs, seeing an opportunity to offload unwanted

risks and make a fortune in the process [56] (From 2002 to 2007), Merrill Lynch was by far the

biggest underwriter of ABS CDOs, with a total of 107 deals, and Citigroup came in second

with 80 deals. The data were obtained from S&P's CDO Interface. As the CDO wave

continued, Wall Street banks tired of relying on mortgage banks and other loan originators to

provide them with CDO collateral acquired mortgage subsidiaries and began repackaging

their own collateral into CDOs.

---

[55]       Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19,                    2009)(*See*                    Page                    17) (http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

[56]       *Id.* (Merrill was rumored to have made between $400-$500 million in fees from its CDO business in 2006, according to a former employee.

101.     While the investment banks earned what they thought to be "riskless" profit from CDOs, they were actually loading up on more CDO risk than they realized thank to so-called "super senior" tranches, created part to generate even higher-yielding AAA tranches for CDO investors. To manufacture a super senior tranches, the AAA portion of a CDO was chopped up into smaller AAA tiers, enabling the "subordinate" AAA tranche to yield more and the "super senior" AAA tranches to carry an extremely low level of credit risk. Many banks found it convenient to simply retain the super senior tranches, as the Basel Accords imposed only a small capital charge for AAA securities. In addition, a significant amount of super senior exposure was retained not by choice, but rather because underwriters had difficulty selling these bonds.

102.     While certainly not all CDO underwriters held super senior tranches, a JP Morgan report released in 2007 estimated that banks alone held around $216 billion worth of super senior ("SS") tranches of ABS CDOs issued in 2006 and 2007. Many of these banks were untroubled by the increasing amount of SS exposure on their books, assuming that the risk of default was almost zero. Some banks simply chose to "forget" certain super senior tranches for the purposes of risk-management-assuming that the risk of default was so insignificant they could be treated as if they were perfectly hedged.

103.     Other SS tranches were only partially hedged- usually by way of credit –default swaps.[57] However, this method of hedging left the banks exposed to counter-party risk from other financial institutions.[58]

---

[57]     *Id.*(Many banks actually obtained this protection by issuing its own CDS contracts through off-balance sheet conduit, which sold the bank CDS contracts and pooled the obligations into an 'vehicle', issuing asset-backed commercial paper ("ABCP") against them. These ABCP conduits had to be taken back on-balance sheet when the market for commercial paper dried up.)

[58]     Anna Katherine Barnett-Hart, *The Story of the CDO Market Meltdown: An Empirical Analysis*, Presented by the Department of Economics in partial fulfillment of the requirements for a Bachelor of Arts Degree with Honors, Harvard College, Cambridge, Massachusetts (March 19,                         2009)(*See*                         Page                         31) (http://www.hks.harvard.edu/m-rcbg/students/dunlop/2009-CDOmeltdown.pdf)

104.     Terminating transactions are structured such that, in case of an early termination due to the swap counterparty's default, all available assets can be liquidated and used to repay principal and interest due to the noteholders. The assets are available to repay the noteholders consist of collateral purchased with the notes' initial sale's proceeds (initial principal collateral) and any other collateral that the swap counterparty posts to mitigate its credit risk (counterparty –posted collateral).[59]

105.     Structured finance vehicles routinely use derivatives as hedges for interest rate and foreign exchange risk[60] as synthetic investments and as credit enhancement. The documentation for structured finance transactions and for derivatives transactions are notoriously complex, and unexpected results can occur when they interoperate or even "clash"[61] "… as part of a collateralized debt obligation transaction to issue…, the issuer also entered into a "Cashflow Swap Agreement" (Swap) with a financial institution (Provider) under which the Provider agreed to top up any shortfalls of…"[62]

106.     In July 5, 2013, Plaintiffs wrote letters to Defendant HSBC and asked for arbitrations with National Futures Association ("NFA") in New York and Defendant did not reply.

---

[59]     *See* Standard and Poor's Rating Service, *"Counterparty Risk In Terminating Transactions,"* (Aug. 14, 2015)(https//www.standardandpoors.com/ja_JP/delegate/getPDF?articleId=1492371&type=COMMENTS&subType=CRITERIA)

[60]     "A well established and maintained internal control structure is vital to the success of all operations. All management within the HSBC Group, including our management, is accountable for identifying, assessing and managing the broad spectrum of risks to which the HSBC Group is subject and the related controls to mitigate the risk." (See *HSBC Form 10-K (2014),* at Pg.104. ¶ 3.)

[61]     Locke R. McMurray and Jones Day, *"Shedding Light on the Intersection Between CDO and Derivatives Document in the Solstice Case,"* (https://www.jonesday.com/files/Publication/8814ef2c-1c8a-4f87-afff-a3255b6926/Presentation/PublicationAttachment/f8649693-2667-4420-90b3-a77e383ba661/Locke%20McMurray%20Article.pdf) at ¶1.

[62]     *Id.* at ¶3.

107.    In August 2010, Defendants directly deducted Plaintiffs' FX losses and inflated transaction fees, interest and commissions from Plaintiffs' <u>cash deposit</u> saving account <u>of US$2.3 million</u> and mailed Plaintiffs <u>balance of US$200,000.00 in form of checks</u> (<u>See Exhibit H for copy of balance amount of checks sent</u>) to their house without Plaintiffs agreeing or not.

108.    Plaintiffs deposited the remaining balance amount of the cash deposit from Defendant in New York City, Citibank account in Flushing, New York branch (Defendant used and issued a check "HSBC, New York, NY 10005" denominated in U.S. dollar $158,881.92 to Plaintiffs. Plaintiffs then deposited these checks, including Australian dollar in Australia HSBC in AUD$69,686.16 and Singapore dollar in Singapore "The Hong Kong and Shanghai Banking Corporation Limited in S$8,953.50 with the New York check).

109.    <u>Simple understanding of Defendants' scheme resulted in global 2008's crisis:</u>(**or** Defendant can tell Plaintiffs: what's happening? )



CDO and U.S. Dollars LIBOR (USD LIBOR)Submittal for financial Product

1).   The London Interbank Offered Rate ("LIBOR") was a benchmark interest rate overseen

by the British Banker's Association ("BBA"), a trade association based in London,

United Kingdom, representing approximately 200 banks from more than 60 countries.

2). LIBOR was calculated every London business day by averaging the interest rate at which

designated banks ("Contributor Panel" banks) estimated that they could borrow unsecured

funds from other banks across ten currencies, including U.S. dollar ("USD"). Contributor

Panel banks for each currency submitted their estimated borrowing rates for fifteen different

borrowing periods ("maturities" or "tenors"), ranging in length from oversight to one year,

including maturities of one month, three months, and six months (commonly referred to on

paper as "1m," "3m," "6m"). Thomson Reuters, acting as an agent for the BBA, received

electronically the Contributor Panel banks' estimated interest rate submissions at or before

approximately 11:10 a.m. in London. Among other currencies, Thomson Reuters received

estimated interest rate submissions for the USD LIBOR from sixteen designated Contributor

Panel banks. Each Contributor Panel banks' submission was prepared by bank employees

referred to as "submitters" or "setters." Upon receipt of the sixteen Contributor Panel banks'

USD LIBOR submissions, Thomson Reuters: (a) ranked the submissions from highest to

lowest; (b) excluded the four highest and four lowest submissions; and (c) averaged the

remaining middle eight submissions to determine the official USD LIBOR setting (also

referred to as the "fix")[62A] used to settle trades and as a reference rate for various financial

---

[62A]      Ben Protess, *Libor Prosecution Snares Two Former Deutsche Traders,* DEALBOOK
(June                                                                                                 2,
2016)(https://www.nytimes.com/2016/06/03/business/dealbook/former-deutsche-bank-traders-char
ged-in-libor-case.html)

products. This process was repeated for each different maturity or tenor. Contributor Panel

banks' USD LIBOR submissions were between two and five decimal places , and the

published USD LIBOR fix was rounded, if necessary, to five decimal places. In the context

of measuring interest rates, one "basis point" (or "bp") was one-hundredth of one percent

(0.01 percent).


3). By 12:00 p.m. London time, <u>Thomson Reuters published the averaged rate-or LIBORs-to,</u>

<u>among others, Bloomberg LP network equipment, which thereafter transmitted the LIBORs</u>

<u>to servers located in New York, New York and</u> elsewhere. <u>Thomson Reuters</u> as a general

matter, pursuant to service agreements with various clients, <u>transmitted the rates to servers</u>

<u>and traders of LIBOR-based financial products around the world, including to those located</u>

<u>in New York, New York</u> and elsewhere.


4). The published LIBORS were used as the basis for the pricing of fixed-income futures,

options, swaps, forward rate agreements, and other derivative instruments. Interest rate

swaps involved an agreement between counterparties to exchange payments in the future:

one counterparty paid a fixed rate while the other paid a variable rate. Generally, the fixed

rate was agreed upon at the outset by the counterparties and the variable rate was set at some

point in the future. Often times, the variable rate was based on a reference rate such a USD

LIBOR. The actual value of the contract could not be determined until the date on which the

variable rate was set. At that point, payment amounts were determined, and depending on the

value of the variable rate, one party made money and the other lost money.


5). Traders made predictions on where LIBORs would set in the future. Traders, on behalf of

their respective financial institutions, often entered into multiple derivatives contracts

containing LIBORs as a rate based on those views. Therefore, the profit and loss that flowed

from those contracts was directly affected by the relevant LIBORs on certain dates. If the relevant LIBORs moved in the direction favorable to the traders' position, the financial institution and the trader stood to benefit at the expense of their counterparties. When the traders' predictions were wrong and LIBOR moved in an unfavorable direction, the traders and the financial institutions stood to lose money to their counterparties.

6).   Because traders often took large derivative positions, even small movements in the LIBOR fix could result in large swings in profits or losses from trades.

7). USD LIBOR globally impacted transactions and financial products tied to USD LIBOR. In addition to being used to price derivative products, financial institutions and other lenders in the United States and elsewhere frequently used LIBOR to set their own reference interest rates for financial instruments and consumer lending products.

8). A Contributor Panel banks' submission was to be an unbiased and honest estimate of that bank's borrowing costs, and not altered to reflect trading positions that stood to gain or lose based on LIBORs.

## THE FX MARKET

### A. Background

110.    The Foreign Exchange ("FX") market, in which traders are able to buy, sell, exchange, and speculate on currencies. It is the largest and most actively traded financial market in the world. According to the most recent BIS Triennial Central Bank Survey, [63] global trading in FX averaged $5.3 trillion per day in April 2013, up from $4.0 trillion in April 2010. [64] U.S trading in FX averaged $1.263 trillion per day in April 2013, up from $864 billion in April 2010. [65]

111.    There are numerous participants in the FX market including dealers (such as Defendants), smaller or regional commercial and investment banks, securities houses, mutual funds, pension funds, hedge funds, proprietary trading firms, currency funds, money market funds, other investment funds, building societies, leasing companies, insurance companies, reinsurance companies, endowments, central banks, sovereign wealth funds, international financial institution of the public sector, retail aggregators, non-financial corporations, non-financial government entities, and private individuals. [66]

---

[63]    The BIS Triennial Central Bank Survey describes itself as "the most comprehensive source of information on the size and structure of global foreign exchange (FX) and OTC derivatives markets." Bank for International Settlements, Triennial Central Bank Survey, Foreign exchange turnover in April 2013: preliminary global results (available at https://www.bis.org/publ/rpfx13fx.pdf) [hereinafter BIS, Triennial Bank Survey, Preliminary Results 2013], at 3. Central banks, including the Federal Reserve Bank of New York, and other authorities in 53 jurisdictions participated in the survey, collecting data from 1,300 banks and other financial institutions throughout the world. *Id.*

[64]    BIS, Triennial Bank Survey, Preliminary Results 2013, at 3.

[65]    Fed Triennial Bank Survey 2013, at 1. This growth in FX trading was largely driven by growth in market participation by "other financial institutions," which include pension funds, mutual funds. See Id. at 3.

[66]    *Id.* at 19

112.     Trading in the FX market is done either over-the-counter ("OTC") directly with a counterparty, such as Defendant, or on a centralized exchange. During and before the relevant period, approximately 98% of FX trading occurred OTC. [67] The remaining trades are executed on exchanges, the most important of which is the Chicago Mercantile Exchange ("CME").

113.     Trading in the OTC FX market occurs 24 hours a day. The market opens on Monday at 7:00 a.m. in New Zealand. One hour later, Sydney, Australia opens. Trading continues throughout Asia as Tokyo, Hong Kong, and Singapore begin trading. Trading then shifts to Europe. One hour later, London opens. At midday London time, New York opens for trading. New York and London (the two largest FX trading centers) are open simultaneously for several hours, including at 4:00 p.m. London time (11:00 a.m. New York time) when the WM/Reuters Closing Spot Rates are determined. The FX trading day ends at 5:00 p.m. in New York for booking purposes. As New York's day ends, a new trading day reopens in New Zealand. The FX trading week closes on Friday at 5:00 p.m. in New York. With the advent of electronic trading, it is possible do some trading over the weekends.

114     Similarly, FX trading on exchanges is available virtually 24 hours a day.[68]

115.     Currencies are traded in pairs.[69] The prices to buy or sell a given currency pair reflected by its exchange rate. The term "currency pair" highlights the fact that all foreign exchange transactions are simultaneously the purchase of one currency and the sale of another.[70] In April 2013, the top three currency pairs accounted for over half of all FX market turnover globally: EUR/USD (24.a%), USD/JPY (18.3%), and GBP/USD (8.8%)[71]

---

[67]     *Id.* at Table 1.

[68]     *See. e.g.,* CME Group, FX Trading Hours (http://www.cmegroup.com/trading _hours/fx-hours.html).

[69]     Currency abbreviations are described in Appendix 2.

[70]     David F. DeRosa, *FOREIGN EXCHANGE OPERATIONS: SPOT FX TRANSACTIONS*, at 25 (DeRosa Research 2013).

[71]     BIS, Triennial Bank Survey, Preliminary Results 2013 at 3.

In April 2013, the U.S. dollar was on one side of 87% of all FX transactions globally[72] and on 98% of all FX transactions in the United States [73]

116.     Participants in the FX market engage in several types of transactions. In OTC trading, three types of FX instruments account for approximately 95% of transactions in the FX market in the United States.[74]

> Spot – An agreement to exchange sums of currency at an agreed-on exchange rate on a value date that is within two bank business days' time.
>
> Outright Forward – An agreement to exchange sums of currency at an agreed-on exchange rate on a value date that will be in more than two bank business days' time. The exchange rate for a forward transaction is called the forward outright.
>
> FX Swap – A combination of a spot transaction plus an outright forward done simultaneously, but in the opposite direction.

Two types of transactions are entered into exchange:

> FX Futures – Standardized contracts trading on an exchange and calling for delivery of a specified quantity of a specified currency, or a cash settlement, on a specified date.
>
> Options on FX Futures – Standardized contracts trading on an exchange, and upon exercise, calling for the establishment of an FX futures position.

117.     The FX market revolves around spot transactions because spot rates are the foundation for pricing *all* FX Instruments. For example, both the price of outright forwards and FX swaps are derived from the underlying spot price. Every time the spot price moves, outright forward and FX swap price move. An outright forward is the spot price plus the interest differential or "cost of carry." The cost of carry is determined mathematically from the overall cost involved when lending one currency and borrowing

---

[72]     BIS, Triennial Bank Survey, Preliminary Results 2013, at Table 2.

[73]     Fed Triennial Bank Survey 2013, at 4.

[74]     Fed Triennial Bank Survey 2013, 3-4.

another during the time period stretching from the spot date until the forward date. Outright rates are quoted in swap points, also called forward points. By adding (premium) or subtracting (discount) these swap points from the spot rate, the full outright forward rate is calculated. Similarly, an FX swap is determined by the spot price because it is a simultaneous spot transaction and a reverse outright forward – a spot forward swap. An FX swap is a contract to buy a amount of the base currency at an agreed rate (spot), and simultaneously resell the same amount of the base currency for a later value date to the same counterparty (outright forward), also at an agreed rate (vice versa).

118.     Likewise, FX futures and options contracts traded on the CME and the other exchanges track rates in the spot market at near parity after adjusting for the forward differential, or adding or subtracting "forward points."[75] In this regard, they are comparable to outright forwards.

119.     The following chart graphically illustrates the 24-hour nature of the OTC market:

| FX MARKET HOURS | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| New Zealand | | | | | | | | | | | | | | | | | | | | | | | |
| | Sydney | | | | | | | | | | | | | | | | | | | | | | |
| | | Tokyo | | | | | | | | | | | | | | | | | | | | | |
| | | | Hong Kong | | | | | | | | | | | | | | | | | | | | |
| | | | | | Frankfurt | | | | | | | | | | | | | | | | | | |
| | | | | | | London | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | New York | | | | | | | |

---

[75]     *See, e.g., In the Matter of Citibank, N.A.* CFTC Docket No. 15-03, order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 2(Nov.11, 2014)

120.    The importance of spot FX transactions and the widespread use of spot prices throughout the financial system means that Defendants' misconduct with respect to spot transaction pricing had far-reaching consequences affecting other types of FX Instruments and financial markets generally[76]

## B.    Spot Transactions

121.    Spot transactions are simple exchange of one currency for another. Spot transactions occur OTC, rather than through a central exchange. As a result, spot transactions depend on financial institutions, such as Defendants, to act as dealers willing to continuously buy and sell currencies. These dealers are known as "market makers" or "liquidity providers."

122.    A dealer in the FX spot market quotes prices at which the dealer stands ready to buy or sell the currency. A quote consists of a bid and an ask on a designated quantity of currency. The bid is the price at which the dealer is willing to buy the indicated quantity of currency. At the same time, the dealer quotes an "ask." The ask is the price at which the dealer is willing to sell indicated quantity of currency. Dealers generally provide price quotes to four decimal points, with the final digit known as a "percentage in point" or "pip." The customer then buys, sells, or passes. The difference between the bid and ask is the "bid-ask spread" and is how the dealer is compensated.

123.    Customers execute FX trades either by a telephone call to a salesperson at a dealer bank or through an electronic communication network ("ECN"). An ECN is a computer system that a customer can use to place orders with dealer banks over a network. ECN platforms include single-bank proprietary platforms and multibank dealer systems. Multibank dealer systems include platforms such as Reuters, Bloomberg, EBS, KCG Hotspot, and Currenex.

---

[76]    FCA, Final notice to Citibank, N.A. Number 124704, ¶2.3 (Nov. 11, 2014) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na).

124.     This rise of ECNs also contributed to the concentration of the FX market. To maintain their market position, Defendants made heavy investments in software and hardware that smaller banks could not afford. Defendants are the best-informed participants in the FX market and have created an information barrier to entry.

125.     The following is a sample conversation between a dealer and customer placing an FX spot trade for immediate execution via an ECN. This conversation would take place in a brief span of time, perhaps less than one minute.[77]

| Sample Dealing Conversation (Spot) | | *Explanation* |
|---|---|---|
| Customer | HIHI FRIENDS | |
| Dealer | HIHI | |
| Customer | EUR on 50 PLS? | *Customer request a quote from dealer on 50 million euros. Customer does not reveal whether it is a buyer or seller.* |
| Dealer | 50/55 | *Dealer quotes its bid-ask spread. This spread equals 1.2350/1.2355, as 1.23 is understood by both parties.* |
| Customer | I SELL | *Customer agrees to sell 50 euros at the bid price of 1.2350.* |
| Dealer | VALUE 03 AUG2012<br><br>TO CONFIRM 50 MIO EUR AGREED AT 1.2350 BUY EUR<br>MY EUR TO BANK LDN<br>THANKS AND BIBI | *Dealer confirms the trade and instructs customer to deliver the euros to its bank in London* |
| Customer | TO CONFIRM 50 MIO EUR I SELL EUR @1.2350<br>VALUE 03 AUG 2012<br>MY USD TO BANK NY<br>THANKS AND BIBI | *Customer confirms trade and instructs dealer to deliver the dollars to its bank in New York.* |

---

[77]     David F. DeRoss, FOREIGN EXCHANGE OPERATION: MASTER TRADING AGREEMENTS, SETTLEMENT, AND COLLATERAL (Wiley 2014), at 103

126.     In above example, the dealer buys euros from the customer at 1.2350. The dealer would also selling 50 million euros to another customer or group of customers at 1.2355. The dealer buys at 1.2350 and sells at 1.2355, earning the bid-ask spread of .0005 as its compensation as a market-maker. Dealers record and analyze their customers' trading histories, such as in the example above. As a result, dealers can often predict a customer's trading patterns, even before a customer place an order. This is particularly sensitive information.

127.     Dealers' salespeople and traders are in regular communication. Salespeople inform the traders of incoming potential orders, confirm bid and ask prices, and ultimately convey placed orders to the trading desk. Traders are aware of all potential and pending trades that could be processed through their desks.

## C.   Benchmark Rates and Uses

128.     While an FX spot trade may be entered into and executed at any time, customers often use what are called daily fixing rates. A fixing rate is a published exchange rate at a moment in time or over a short interval of time. To place an order at a fixing rate, a customer gives the dealer instructions to buy or sell a quantity of currency at a fixing rate. The dealer guarantees execution at the fixing rate.

129.     Prior to the Fixes, Defendants' customers will place orders to buy or sell a specific currency at one of the Fixes. The Defendant agrees to transact with its customers at that Fix. Because this order is for a future time, Defendants are exposed to unexpected interim movements in the price of that currency.

130.  Defendants will go into market and attempt to purchase or sell currency before the Fixes to fulfill their customers' order. If a Defendant is able to buy the currency it needs to sell to its customer at an average price that is less than the Fix, the Defendant will profit off the loses money on the transaction.

131.  While there are a number of Fixes used by FX market participants, in OTC trading, the major Fixes are the WM/Reuters Closing Spot Rates and the ECB Fixing Rates. These Fixes are used in the valuation and performance management of investment portfolios held by pension funds and asset manager globally.[78] The rates established at these Fixes are also used as reference rates in financial derivatives.[79] The WM/Reuters Closing Spot Rates are more widely used than the ECB Fixing Rates.

132.    The Fixes are particularly useful to major participants in the FX market, such as pension funds, mutual funds, insurance companies, and hedge funds. These entities are the most rapidly growing segment of FX market participants. Because many of these entities participate in the FX market in a way that is ancillary to their investing activities, rather than as primary source of profits, the Fixes take on a more critical role for them. These customers are generally not seeking to speculate on currency movements, but rather, to repatriate payments, such as dividends, interest, and redemptions on foreign entity and debt instruments that are paid in foreign currencies to U.S. dollars. Accordingly, these entities are continually re-balancing their portfolio to adjust their proportions of domestic and foreign holdings in response to shifting economic conditions.

133.    In addition, the Fixes are also customarily used to mark –to-market FX exposures. Before the Fixes became the standard benchmark, portfolio managers used different method to mark-to-market, some of which were dependent on a single dealer's quote. The Fixes were adopted to mark FX exposures to market because the Fixes had the perceived advantages of universality and independence from any specific dealer.

134.    Trading at the Fixes is popular because the Fixes allow non-speculating entities to achieve their goals while removing tracking error when comparing fund performance to indexed benchmarks, such as those created by FTSE Group and MSCI Inc., which track

---

[78]     FCA, Final notice to Citibank, N.A. Number 124704, ¶4.3 (Nov. 11, 2014) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na).
[79]     *Id.*

stocks and bonds in multiple countries, or to other portfolio.

135.    The widespread use and acceptance of the Fixes as pricing mechanism and as the primary benchmark for currency trading globally has caused the Fixes to occupy a crucial role in the operation of financial markets.

    **1.   WM/Reuters**

136.    The WM/Reuters rates are the most important fixing rates in the FX markets. WM/Reuters publishes fixing rates for spot rates and forwards.[80] WM/Reuters calculates fixing rates for Trade Currencies every half hour from 6:00 a.m. in Hong Kong/Singapore to 10:00 p.m. in the U.K. WM/Reuters defines Trade Currencies to include, among others, the major currencies traded against the U.S. dollar and the euro.[81]

137.    The most widely used WM/Reuters rates are the WM/Reuters Closing Spot Rates for Trade Currencies, which are calculated around 4:00 p.m. London time (11:00 a.m. new York time). The WM/Reuters Closing Spot Rates are popular, in part, because they are set at the end of the trading day in London when the market is most liquid.

138.    For Trade Currencies, the 4:00 p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window ("fixed period").[82] The WM/Reuters Closing Rates are calculated using the median of a snapshot of bid and ask order rates and actual spot transactions in the 30 seconds before and the 30 seconds after 4:00 p.m. London time (11:00 a.m. in New York). Trades and rates from Currenex, Reuter Dealing 3000, and EBS are used in the validation and calculation.[83]

---

[80]      The WM Company, WM/Reuters Spot & Forward Rates Methodology Guide (available at http://www.wmcompany.com/pdfs/026808.pdf), at 3 [hereinafter WM/Reuters Guide].

[81]      *See* WM/Reuters Guide, at 3.

[82]      *See, e.g., In the Matter of Citibank, N.A.* CFTC Docket No. 15-03, order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 4 (Nov.11, 2014)

[83]      The WM/Reuters Spot Rates for the "Non-trade Currencies" are set by a methodology similar to that of Trade Currencies. Non-trade currency are those that have less market liquidity. Non-trade currencies are only calculated on an hourly basis. WM/Reuters relies on indicative

139.     The process for capturing the information used to calculate the WM/Reuters Closing Rates is automated and anonymous. Because these rates are based on the median value of the transactions, the WM/Reuters Closing Rates do not take the notional size of the quotes and transaction into account; all quotes and transactions are weight equally.

140.     WM/Reuters also provides fix rates for forward and non-deliverable forward contracts which are published as premiums or discounts to the WM/Reuters spot rates.[84] Thus, manipulation of the WM/Reuters spot rates (as alleged herein) will necessarily impact the WM/Reuters forward rates and future rates

### 2.   The ECB Rates

141.     Like the WM/Reuters rates, the ECB reference rate provides spot FX rates throughout the day for euro –denominated currency pairs. The European Central Bank owns and administers euro foreign exchange reference rates for 32 different currencies on a daily basis.[85] The rates are published for currency pairs that are actively traded against the euro.[86] The ECB reference rate is the second most frequently used global FX benchmark[87]

142.     The ECB fix is the exchange rate for various spot FX currency pairs as determined by the European Central Bank at 1:15p.m. GMT, or 2:15 p.m. CET. For G10 currency pairs, the ECB fix is based upon spot FX trading activity by market participants at or around the times of the 1:15 ECB fix. Only one reference exchange rate (the mid-rate) is published for

---

Cont/..quotes (submission) derived from a Reuters computer feed that solicits "indications of interest" from market participants as part of its fixing methodology. WM/Reuters captures snapshots of indicative quotes for bids and offers, and selects the median rate from these quotes as the "WM/R 4 p.m. London fix." WM/Reuters Guide, at 6.

[84]     *Id.*

[85]     Financial Stability Board, Final Report on Foreign Exchange Benchmarks (Sept. 30, 2014) ("FSB Report") at 11 (http://www.financialstabilityboard.org/2014/09/4_1409301).

[86]     FSB Report at 11.

[87]     *Id.* at 7.

each currency. [88] "The rate is "based on the regular daily concertation procedure between central banks within and outside the European System of Central Banks.""[89] This process is referred to as the "ECB fix" and reflects the rate at that particular moment in time.

143.     The ECB reference exchange rates are published both by electronic market information providers and on the ECB's website shortly after the concertation procedure has been completed. [90]

144.     The ECB fix is used in global financial markets by various market participants, including banks, asset managers, pension funds, and corporations. Like the WM/Reuters Closing Spot Rates, the ECB fix rates are used to value foreign currency-denominated assets and liabilities, and in the valuation and performance management of investment portfolios held by pension funds and asset managers. The rates established at the ECB fix are also used as a reference rate in financial derivatives.[91]

### 3.    Other Benchmark Rates

145.     Other FX benchmark rates are priced through actual market transactions or through the use of indicative rates. For instance, the Russian ruble/U.S. dollar. CME/Emerging Markets Trader Association benchmark rates are based on indicative rates submitted by market participants to the CME are a component of the final settlement rate of the CME's RUB/USD future contract.[92] This rate is supposed to be based on a bank's honest assessment of the current prevailing market rate at which it could execute $100,000 RUB/USD spot transaction for next-day value in the Moscow marketplace.[93]

---

[88]      Id. at 11

[89]      FCA, Final Notice to Citibank, N.A. Number 124704, Annex B, ¶2.2 (Nov. 11, 2014) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na).

[90]      FSB Report at 11.

[91]      FCA, Final Notice to Citibank, N.A. Number 124704, Annex B, ¶4.3 (Nov. 11, 2014) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na).

[92]      *In the Matter of Barclays Bank PLC*, CFTC Docket No. 15-24, at 5 (May 20, 2015).

[93]      *Id.*

146.     The Association of Banks in Singapore publishes a range of daily spot rate fixing for deliverable and non-deliverable currency markets. Those rates stem from 11:00 a.m. submissions by a panel of banks selected by ABS to represent each panel bank's current bid and offer spot rates for Indonesian rupiah, Indian rupee, Singapore dollar, and Thai baht against the U.S. dollar, among others.

147.     Most major banks in Tokyo publish their own fixing rates at 9:55 a.m. Japan Standard Time for a variety of Japanese yen currency pairs. Defendant BOTM's rates are often considered the most significant rate, and are used for approximately 90% of fixing orders across Tokyo.

148.     The Treasury Markets Association ("TMA") in Hong Kong publishes FX rates, which consist of spot fixings for the USD/Hong Kong dollar (HKD) and USD/Chinese yuan (CNY) currency pairs. These fixing rates are calculated by averaging the middle quotes after excluding a number of the highest and lowest quotes from the contributing banks appointed by the TMA.

**D. The FX Market Is Concentrated and Dominated by Defendants**

149.     Beginning in the late 1990s, the FX market experienced a substantial increase in concentration, with the number of banks covering 75% market share declining:



Defendants now dominate the FX market. According to the 2012 and 2013 FX Surveys by Euromoney, an industry publication, Defendants' individual and aggregate shares of the global FX market for 2012 and 2013 are:[94]

---

[94]      Defendants' market shares for 2003-2013 are available at Appendix 3.

(59)

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| **Deutsche Bank** | 14.57% (1) | 15.18% (1) |
| **Citigroup** | 12.26% (2) | 14.90% (2) |
| **Barclays** | 10.95% (3) | 10.24% (3) |
| **UBS** | 10.48% (4) | 10.11% (4) |
| **HSBC** | 6.72% (5) | 6.93% (5) |
| **JPMorgan** | 6.60% (6) | 6.07% (6) |
| **RBS** | 5.86% (7) | 5.62% (7) |
| **Credit Suisse** | 4.68% (8) | 3.70% (8) |
| **Morgan Stanley** | 3.52% (9) | 3.15% (9) |
| **Goldman Sachs** | 3.12% (10) | 2.75% (11) |
| **BNP Paribas** | 2.63% (11) | 2.52% (12) |
| **Bank of America** | 2.41% (12) | 3.08% (10) |
| **Defendants' Aggregate Market Share:** | **83.8%** | **84.25%** |

150.    Defendants also dominate the U.S. spot market. The Federal Reserve Bank of New York reported that as of April 2013, the top ten banks engaged in 98% of all spot volume in the FX market, up from 91% in April 2010. Moreover, the five largest banks by volume accounted for 80% of spot transactions in the United States in April 2013.[95]The FX market has other high barrier to entry. A large amount of capital is required to provide liquidity to customers. FX dealers must provide immediate liquidity to customer based on the assumption that inventory can be offloaded within the day.

151.    A small and close-knit group of traders employed by Defendants dominate FX trading. These traders have strong ties formed by working with one another in prior trading

---

[95]    Fed Triennial Bank Survey 2016, at 6.

positions. Many of these traders also live near each other, many living in the same neighborhoods in the Essex countryside just northeast of London's financial district. They belong to the same social clubs, golf together, dine together, and sit on many of the same charity boards. As Andre Spicer, a professor at the Cass Business School in London, said, "The foreign-exchange market has a very strong culture, in which practitioners feel more attached to each other than they do their banks. It is also dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past."[96] These social and professional ties in the FX trading community create incentives and opportunities for collusion. As one former Citigroup banker noted, "This is a market in which price fixing and collusion could actually work.[97]

### E.    The FX Market Is Unregulated and Opaque

152.    Notwithstanding its size, importance, and concentration, the FX market is one of the world's least regulated financial markets, with most trading taking place OTC, away from exchanges. The United States does not have any specific rules or agencies governing FX spot, outright forward, or FX swap transactions, and such transactions are exempt from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 11-203, 124 Stat 1376 (2010)

153.    There is no centralized exchange or institution that collects and posts real-time trade information on OTC market. While Defendants' dealing proprietary platforms allow them to match buyers with sellers, Defendants' real-time order flow and volume data is not available to the market, such as it would be on an exchange, where the entire market knows who is buying and selling at a given moment. Defendants closely guard their real-time order flow and volume data and do not make it commercially available for purchase.

---

[96]    Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 19, 2013) (available at http://bloom.bg/1hA9KXj).

[97]    Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big Fix*, FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl)

This substantially limits knowledge of traders' conduct inside these dealing platforms and on the voice trading desk. Absent an agreement to collude, each bank would not share this information with one another; however, as explained here, Defendants *did* share this information with one another.

154.    Defendants enjoy informational advantages over Plaintiffs and other investors as a result of this market opacity. Knowledge of a customer's identity, trading patterns, and orders allows Defendants to predict the direction of market movements.

155.    Defendants' ability to predict-and manipulate-market movements grows when they share this information with one another.

156.    With relatively few firms having a large share of the FX market protected by high barriers to entry, and with the lack of regulation and limited customer access to real-time pricing and volume information, the FX market exhibits characteristics that antitrust law and economics have identified as making a market susceptible to collusion and manipulation.

## II.    DEFENDANTS CONSPIRED TO FIX PRICES IN THE FX MARKET

157.    As alleged below, beginning at a time unknown, but at least as early January 1, 2003, Defendants conspired to manipulate the WM/Reuters Closing Spot Rates in the FX market on a daily basis. Defendants' conspiracy targeted the pricing of over two dozen currencies, including the most heavily traded currency pairs, throughout each trading day. Defendants' conspiracy encompassed: (1) price fixing of bid/ask spread; (2) price fixing various benchmark rates, including, but not limited to, WM/Reuters benchmark rates and the ECB reference rate; and (3) other collusive conduct, such as triggering client stop-loss orders and limit orders. UBS traders interrogated by FINMA officials agreed that the anti-competitive conduct alleged herein was "common practice."[98]

---

[98]    FINMA, Foreign exchange trading at UBS AG: investigation conducted by FINMA, at ¶3.3 (Nov. 12, 2014) (http://www.finma.ch/e/aktuell/Documents/ubs-fx-bericht-20141112-e.pdf).

158.     Defendants' conduct in furtherance of their conspiracy included: (1) creating and participating in exclusive interbank chat rooms; (2) improperly sharing confidential client and proprietary trading information; (3) coordinating trading to influence the FX rates; (4) monitoring the conduct of co-conspirators to ensure secrecy and compliance with the conspiracy; (5) using code names and misspelled words in interbank communications to evade detection; and (6) agreeing to "stand down" by holding off buying and selling currency to benefit co-conspirators.

159.     As a result of Defendants' conspiracy allowed them to eliminate their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs. Plaintiffs were harmed.

## A.     Defendants Used Electronic Communications, Including Chat Rooms, Instant Messages, and Emails, to Conspire

160.     Defendants' top-level traders used electronic communications, including chat rooms, to meet and conspire for more than a decade. Class Plaintiffs in FOREX consolidated action, are aware of thousands of communications showing traders at more than two dozen banks, including each Defendant, participating in chats where traders coordinated and exchanged information about spreads, currency pairs, and fixes.

161.     Defendants brazenly named their chat rooms "The Cartel," "The Bandits' Club," "The Mafia," "One Team, One Dream." so on. Other chat rooms described themselves as "The Sterling Lads," "the Players," "The 3 Musketeers," "A Co-operative," and "The A-team."[99]   Being a member of certain chat rooms was by invitation only, indicating the secret nature of this conduct.[100] These electronic chat rooms replaced the classic

---

[99]     *FCA fines five banks   1.1 billion for FX failings and announces industry-wide remediation                        programme*                 (Nov.                 12, 2014)(http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings).

[100]     *In the Matter of Citibank, N.A.* CFTC Docket No. 15-03, order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 5 (Nov.11, 2014)

smoke-filled backrooms of the past. The transcripts of these chat rooms are reportedly "peppered with allusions to drinks, drugs and women."[101]

162.     Entry into chat rooms, such as The Cartel, was coveted among traders because of the influence its members exerted in the FX market. For example, in one chat room transcript, traders from JPM, UBS, and Citigroup welcome a trader from Barclays into The Cartel chat room:

| TIME (UTC) | TRADER | MESSAGE |
|---|---|---|
| 08:02:22 | JP Morgan | You have been given access for a 1 month trial |
| 08:02:24 | UBS | Congratulation |
| 08:02:29 | JPMorgan | This trial will automatically extend |
| 08:02:31 | Barclays | I am honored[…] |

163.     During investigations by FINMA, UBS foreign exchange traders testified that they had been encouraged by their superior to actively participate in chat rooms with clients and traders at third-party banks in order to exchange information. [102] The FCA noted the value in these chat rooms to traders:

> A "persistent" chat room allows participants to have ongoing discussions with other participants from different firms and in different time zones for extended timeframes. Participants can communicate through electronic messaging over a period of multiple days, weeks or months. There can be multiple participants in a particular persistent chat and once invited an individual will be able to view a continuous record of the entire discussion thread and participate from then on. [103]

---

[101]     Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix,* FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OllUfl).

[102]     *Foreign exchange trading at UBS AG: investigation conducted by FINMA* at ¶3.1.3 (Nov.12, 20140(http://www.finma.ch/e/aktuell/Documents/ubs-fx-bericht-20141112-e.pdf).

[103]     FCA Final Notice to Barclays Bank, PLC No. 122702, Annex B, ¶6.2 (May 20, 2015) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na)(http://www.fca.org.uk/your-fca/documents/final-notice/2015/barclays-bank-plc)

164.     Defendants' top-level traders ran the chat rooms. For example, Richard Usher ran The Cartel while he was JPMorgan's chief currency dealer in London and head of spot trading for G10 currencies from 2010-2013 and as a trader at RBS before then. The Cartel's membership numbered a half-dozen or more of Defendants' top traders. Other members of The Cartel included:

> Rohan Ramchandani, Citigroup's head of spot trading in London;\
>
> Matt Gardiner, Barclays' director of spot trading for EUR/USD from 2007 to 2011;
>
> Chris Ashton, former head of Barclays voice spot trading globally; and
>
> Niall O'Riordan, UBS's co-global head of G-10 and emerging market spot trading.

Usher, Ramchandani, Gardiner, Ashton, and O'Riordan each have been suspended or fired from their respective institutions.

165.     Like playing multiple bingo cards, Defendants' FX traders participated in multiple chat rooms, allowing them to simultaneously communicate with numerous other Defendants on a global basis. Defendants' participation in chat rooms demonstrates the widespread reach of their anticompetitive conduct.

166.     Over time, various chat rooms, in furtherance of the conspiracy, evolved to discuss numerous currency pairs beyond those for which they were originally established. The chat rooms often focused on manipulating a particular currency pair. For instance, Defendants formed "The Sterling Lads" to manipulate the exchange rate between British pounds sterling and U.S. dollars (GBP/USD or "cable") – the world's third most-traded currency pair.

167.     Chat room transcripts demonstrate that the traders intended to coordinate their effort to move the market in a direction that favored Defendants. States reflecting coordinated conduct, such as "lets double team em" and "team effort" are replete throughout the chats. This language evidences an agreement to execute joint behavior in furtherance of the conspiracy.

168.     Chats also reflect the success of Defendants' coordinated effort to fix prices in the

FX market. After the traders had coordinated trades and fixed spreads and spot rates, they

would often congratulate each other on accomplishing a fix on the market with comments

like, "[t]hat's how its done" and 'that's how to do a fix" and "won't find that in any

textbook." Often, after manipulating the WM/Reuters Closing Spot Rates, The Cartel

members "would send written slaps on the back for a job well done.[104]

169.     Chat room transcript s also show that Defendants monitored each other's activity to

ensure compliance with the overarching conspiracy and threatened to punish traders whose

conduct didn't conform to the agreement.

170.     Defendants used code words to avoid detection from authorities. One such code was

Defendants' use of the words "pick" and "pickun" as code for the WM/Reuters London

fix.[105]

Defendants also used codes names to identity customers to each other. The FCA noted that

"[t]he value of the information exchanged between the traders and the importance of keeping

it confidential between recipients was clear to participants."[106]

171.     As a direct result of the numerous government investigations, Defendants Barclays,

Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, and UBS

now ban their traders from participating in multibank chat rooms. Moreover, as a result of

the conduct that occurred in chat rooms, Defendants have terminated or otherwise overseen

the departure of more than 50 individuals with trading or supervisory authority over FX

trading.

---

[104]     Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates,* BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibWUxj).

[105]     See *FOREX consolidated action* at pg 46 at footnote 58.

[106]     FCA, Final Notice to Citibank, N.A. Number 124704, ¶4.33 (Nov. 11, 2014) (http://www.fca.org.uk/your-fca/documents/final-notices/2014/citibank-na)..

**B.      Defendants Conspired to Fix Bid/Ask Spreads Quoted in the Spot Market**

172.      Beginning at a time unknown, but at least as early as January 1, 2003, as part of their conspiracy to fix prices in the FX market, Defendants conspired to fix the bid/ask spreads paid by customers for various currency pairs. As alleged above, there are thousands of communications involving one or more Defendants reflecting discussions about FX spreads. These communications show traders at more than 30 banks, including Defendants, participated in interbank chats where traders coordinated and exchanged information about spreads or customer orders. The conspiracy to fix prices in the FX market affected dozens of currency pairs, including the seven pairs with the highest market volume.

173.      Spreads are the most visible and immediate way in which banks compete against each other for customers. In the FX market, spreads are indicative of price. The bid/ask spread represents the price a dealer is willing to buy and sell a given volume of currency. Trader use the terms "spread" and "price" interchangeably.

174.      Because currency is fungible (there is no difference between one dollar and another), spread are therefore a key competitive issue for securing customers. Customers want narrower spreads, i.e. they want to buy currency for less and sell it for more. Thus, the width of a spread will impact a Defendant's competitiveness in the FX market. By quoting narrower spread than their competitors, Defendants can gain customers and market share. On the other hand, a decision to widen spreads (or decline to tighten spreads) would result in loss of customers and market share. Only through collusion could a dealer quote wider spreads without losing market share and still reap supra-competitive profits.

175.      Defendants quote bid/ask spreads to their customers in a couple of ways. First, Defendants provide spread matrices to certain customers on a periodic (usually quarterly) basis. These matrices list the bid/ask spreads for various volumes and currencies. These matrices are like a price list, and represent the price that the bank anticipates offering in competition with other banks. The banks with the tightest spreads are most likely to secure

customer business. Beyond being a list provided to customers, the spread matrices tended to inform Defendants' views as to what current pricing was in the market.

176.    Defendants also simply quoted bid/ask spreads to customers throughout the trading day.

### 1. Chat Room Transcripts Demonstrate Spread Fixing

177    Chat room transcripts confirm that Defendants' FX spot trader agreed on spreads they quoted to clients in the FX spot market. When the traders discussed their spreads with each other, they have an explicit understanding that the spread discussed would be the spreads quoted to customers. A trader would artificially adjust his spreads based on the information gained from other traders in the group. Spreads quoted by Defendants in the FX spot market were wider than they would have been absent collusion and Plaintiffs paid these supra-competitive prices.

178.    Defendants continued their conspiracy on a regular basis, colluding to fix daily spreads quoted to customer in the FX spot market.[107]

179.    Defendants did not limit their collusion to major currency pairs; rather, they colluded with respect even to emerging market currencies.

180.    For instance, in its order fining Barclays, the New York Department of Financial Services highlighted a series of examples. In one such example, a "Barclays FX trader explicitly discussed with a JP Morgan trader coordinating the price offered for USB/South African Rand to a particular customer, stating, in a November 4, 2010 chat, 'if you win this we should coordinate you can show a real low one and will still mark it little lower haha.' After the JP Morgan trader suggested that they 'prolly shdnt put this on perma chat,' the Barclays trader responded *'if this is the chat that puts me over the edge than oh well. Much worse out there.'"* [108]

---

[107]    See *FOREX* consolidated action at pg. 49 to 62 for "Chat room transcript" information

[108]    New York State Department of Financial Services, In the Matter of Barclays Bank PLC, Consent   Order   Under   New   York   Banking   Law   ¶34   (May   20, 2015)(http://www.dfs.ny.gov/about/ea/ea150520.pdf)(emphasis added).

181.     Several months later, this Barclays trader was "still instructing traders at other banks to follow his lead. On February 25, 2011, a Standard Chartered FX trader asked 'what bid you want me to show if somwone calls' and the Barclays trader responded 'up to 02.' The [Standard Chartered] trader said 'okok' and 'ill let you know if we get asked.'"[109]

182.     By order, *FOREX consolidated action* dated March 31, 2016,[110] Defendants routinely agreed on the spreads for numerous currency pairs.

## C. Defendants Conspired to Fix the Benchmark Rates.

183.     Beginning at least as early as January 1, 2003, Defendants conspired to manipulate the Fixes. Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the Fixes. Exploiting shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the Fixes.

184.     Defendants' collusive actions allowed them to substantially reduce their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs. Defendants faced less risk in their market making activity recorded in the Defendants' front book. Additionally, Defendants' traders could reap even greater profits for their proprietary (prop) trades made on behalf of their bank and recorded in their individual back books.

## 1. The Fixes Are Susceptible to Collusive Manipulation

185.     Defendants understood the methodology used to calculate the WM/Reuters

---

[109]    New York State Department of Financial Services, In the Matter of Barclays Bank PLC, Consent Order Under New York Banking Law ¶36 (May 20, 2015)(http://www.dfs.ny.gov/about/ea/ea150520.pdf)(emphasis added).

[110]    See *In re Foreign Exch. Benchmark Rates Antitrust Litig.,* 74 F. Supp 3d 581 (S.D.N.Y. 2015) ("FOREX"); *see also* No. 13 Civ. 7789, 2016 WL 1268267(S.D.N.Y. Mar. 31, 2016)

Closing Spot Rates is vulnerable to manipulation. For example, in a July 4, 2008 meeting of the Bank of England's Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group, the WM Company gave a presentation on the median calculation of the WM/Reuters rates to chief currency traders from RBS, HSBC, Deutsche Bank, Morgan Stanley, JPMorgan, and Citigroup. In response to this presentation, the chief dealers in attendance admitted that the methodology was susceptible to manipulation:

> It was noted that WM/Reuters do not use traded volumes data in the calculation of the spot rates. While they have access to Reuters volume data, the same is not the case for EBS data. The Chief Dealer group agreed that actual traded volumes is a key consideration in the calculation of accurate fixings and suggested
>
> that this would be a useful next step in the development of WM/Reuters' model. Furthermore it was suggested that using a snapshot of the market may be problematic, as it could be subject to manipulation. Perhaps WM could use a window of observations, and determine at what point to fix using volume data.[111]

---

[111]     The Chief Dealers Sub Group of the Bank of England's Foreign Exchange Joint Standing Committee was established in 2005 for the purpose of facilitating discussions between chief dealers at major dealer banks and Bank of England staff concerning developments in the foreign exchange markets. The Chief Dealers Sub Group consists of 11 chief traders active in the London FX market and top Bank of England officials. The Chief Dealers Sub Group meets three to four times per year. Between 2005 and 2013, representatives from Defendants' co-conspirator Barclays (2005-2012), Merrill Lynch (Bank of America) (2006-2007), Defendant HSBC (2007-2013), JPMorgan (2007-2009, 2011-2013), Morgan Stanley (2005-2008, 2010-2011), Goldman Sachs (2009-2013), BNP Paribas (2009-2013), Deutsche Bank (2005-2012), RBS (2005-2013), UBS (2005-2013), Credit Suisse (2005-2008), and Citigroup (2005-2013), participated in the Chief Dealers Sub Group. Foreign Exchange Joint Standing Committee Chief Dealers' Sub Group Meeting Minutes, 2005-2013 (available at http://bi.ly/lcMBcAq and http://bit.ly/1kDSdSj) Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Draft Minutes nof the 4 July 2008 Meeting at HSBC, 8 Canada Square, London E14 5HQ (available at http://bit.ly/1eMBcAq), at 71.

186.     As explained below, Defendant seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates.

187.     As explained below, Defendants seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates.

188.     The ECB Fix is essentially a snapshot of the market rate at exactly 1:15 p.m. GMT or 2:15 p.m. CET. The ECB publishes rates for its 32 currencies by averaging the buying and selling prices of each currency against the euro at 1:15 GMT.

189.     Because the ECB Fix represents a "flash" fix, a fixing that reflects a rate at a particular moment in time, Defendants have repeatedly targeted their trades for that precise moment in time in an attempt to substantially skew the rates.

   **2. Defendants Shared Confidential Customer Order Information to Manipulate Benchmark Rates, Including the WM/Reuters Closing Spot Rates**

190.     Through electronic means, Defendants shared their confidential customer order information with one another. Each Defendant aggregated its client orders to determine what its individual net position in a specific currency was going to be at London fix. Defendants then shared this information with one another to determine their aggregate net position in a specific currency at the fix. By sharing and aggregating their confidential customer order flows, Defendants could more precisely predict how the market would move than would have been possible acting alone.

191.     Defendants' sharing of their confidential customer information violates the Federal Reserve Bank of New York's Guidelines for Foreign Exchange Trading Activities," which have been in place for decades. Specifically, Guidelines note:

> Confidentially and customer anonymity are essential to the operation of a professional foreign exchange market. Market participants and their customer expect that their interests and activity will be known only by the other party to the transaction... and an intermediary, if one used.

*It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction.*[112]

\*         \*         \*

Customer anonymity should not be circumvented with the use of slang or pseudonyms. If confidentiality is broken, management must act promptly to correct the conditions that allowed the event

to occur... ***Staff should not pass on confidential and nonpublic information outside of their institution. Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.*** It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction..... ***Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information.*** [113]

192.    Defendants have already produced evidence to government investigators confirming that their traders "inappropriately share[d] market-sensitive information with rivals."[114] Defendants acknowledged in their respective plea agreements that the Department of Justice would have been able to prove that the pleading Defendants "engaged in communications, including near daily conversations, some of which were in code, in an exclusive electronic chat room, which chat room participants, as well as others in the FX Spot Market, referred the 'The Cartel' or 'The Mafia.'"" [115]

---

[112]    Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 11 (emphasis added).

[113]    Federal Reserve Bank of New York, Guidelines for Foreign Exchange Trading Activities, Foreign Exchange Committee (May 2008) (available at http://bit.ly/1o5okiz), at 26 (emphasis added).

[114]    Chiara Albanese, Katie Martin and David Enrich, *Banks Fix on Sales in Probe,* WALL STREET JOURNAL (Nov 19, 2013) (available at http://on.wsj.com/P2iHS8)

[115]    *See, e.g., U.S.A. v. Barclays plc,* Plea Agreement, ¶4(h)(D.Conn. May 19, 2015).

193.     Evidence obtained by government investigations confirms that "[s]hortly before the fix…it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place.[116] A transcript provided by RBS to the UK-FCA revealed that JPMorgan's Richard Usher wrote "messages to trader at other firms [that] included details of his trading positions.[117] Defendants' traders confirmed that "chatroom discussions between rival traders … allowed them to share information about pricing and order books."[118]

194.     A number of Defendants have admitted to the Bank of England that they shared their confidential customer information. On April 23, 2012, the Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group met at BNP Paribas' London office. Citigroup's Rohan Ramchandani, who was one of The Cartel members, was present. James Pearson (RBS), and Martin Millet (Bank of England) were also present.[119]A person familiar with the UK-FCA's investigation disclosed to the media that a senior trader present at the meeting turned over his meeting notes. According to the notes, the traders told Bank of England officials that they shared information about customer orders before currency benchmarks were set.[120] The official meeting minutes concealed the admissions made at the meeting [121]

---

[116]     Katie Martin and David Enrich, *Forex Probe Uncovers Collusion Attempts, Global Investigation Has Reportedly Found London-Based Trader Worked Together in Trying to Manipulate Currencies,* WALL STREET JOURNAL (Dec. 19, 2013) (available at http://on.wsj.com/101YOWr).

[117]     Gavin Finch, Liam Vaughan, and Suzi ring, *Ex-RBS Trader in UK. Probe Said to Be JPMorgan's Usher,* BLOOMBERG (Oct 14, 2013) (available at http://bloom.bg/1ip3Yer).

[118]     Daniel Schafer, Alice Ross, and Delphine Strauss, *Foreign exchange: The big fix,* FINANCIAL TIMES (Nov. 12, 2013) (available at http://on.ft.com/OIyUfl).

[119]     Foreign Exchange Joint Standing Committee Chief Dealers Sub Group, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdsj) .

[120]     Suzi Ring, Gavin Finch and Liam Vaughan, *BOE Staff Said to Have Condoned Currency Traders' Conduct,* BLOOMBERG (Feb. 7, 2014) (available at http://bloom.bg/1d5bQmn).

[121]     Foreign Exchange Joint Standing Committee Chief Dealers, Minutes of the 23 April 2012 12pm Meeting at BNP Paribas, 10 Hareware Avenue, London, NW1 6AA (available at http://bit.ly/1kDSdSj)                    (73)

195.     In March 2014, the Bank of England suspended a staff member as it launched an internal investigation into whether employees knew about or condoned manipulation of the WM/Reuters Closing Spot Rates. The Bank of England's investigation included the search and review of 15,000 emails, 21,000 Bloomberg and Reuters chat room transcripts, and more than 40 hours of telephone records. At least four chief traders who participated in the Bank of England's Chief Dealers Sub Group have been suspended or terminated by their institutions.

### 3.     Methods of Fixing the Fixes

196.     On May 20, 2015, four Defendants (Barclays, Citigroup, JPMorgan, and RBS) pleaded guilty to violations of Section 1 of the Sherman Act in the United States District Court for the District of Connecticut. In each of the plea agreements, the banks acknowledges that "[h]ad this case gone to trial, the United States would have presented evidence sufficient to prove the following facts:...The defendant and its co-conspirators carried out the conspiracy to eliminate competitive in the purchase and sale of the EUR/USD currency pair by various means and methods including, in certain instance, "by...coordinating the trading of the EUR/USD currency pair in connection with European Central Bank and Worlds/Reuters benchmark currency' fixes' which occurred at 2:15 PM (CET) and 4:00 PM (GMT) each trading day..." [122]

197.     In executing their coordinated trading, Defendants employed a number of trading tactics to fix the Fixes, including "front-running," "banging the close," "painting the screen," "netting off," "building," "giving the ammo," "taking the ammo," "taking out the filth, " and "clearing the decks." Defendants undertook these activities together in order to minimize

---

[122]     *See, e.g., U.S.A. v. Barclays plc,* Plea Agreement, ¶6 (*http://1.usa.gov/1Hzn6mf).United States v. Citicorp,* Plea Agreement (May 19, 2015)(http://www.justice.gov/file/440486/download); *United States v. JPMorgan Chase & Co.,* Plea Agreement (May 19, 2015)(http://www.justices.gov/file/440491/download); *United States v. The Royal Bank of Scotland, plc,* Plea Agreement (May 19, 2015)(http://www.justices.gov/file/440496/download).

their risks and maximize the impact of their scheme.

198.    Each of these manipulative strategies was accomplished through the sharing of confidential customer information and trading positions. By sharing their individual trading positions, Defendants gained an understanding of the overall order flows across the FX market. According to traders, banks "would share details of orders with brokers and counterparts at banks through instant messages to align their strategies" and "improve their chances of getting the desired move in the benchmark." [123]

### a.    "Front-Running"/"Trading Ahead"

199.    Traders "front run" on customer information when they receive customer orders that could move the market and then trade their own proprietary positions prior to executing their customers' market-moving trades. Large client orders come from, for example, tracker funds, which typically place orders as much as an hour before the WM/Reuters Closing Spot Rates are set. Such an order gives traders information about the direction the market will move, and traders from the largest dealer banks have admitted that they use the information to take positions that benefit the bank – to their customers' detriment.

200.    According to a former trader, even one large transaction can move the market. The trader stated:

> [I]f he received an order at 3:30 p.m. to sell 1 billion Euros ($1.37 billion) in exchange for Swiss francs at the 4 p.m. fix, he would have two objectives: to sell his own euros at the highest price and also move the rate lower so that at 4 p.m. he could buy the currency from his client at a lower price.
>
> He would profit from the difference between the reference rate and the higher price at which he sold his own euros. A move in the benchmark rate

---

[123]    Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy).

of 2 basis points [0.02 percent], would be worth 200,000 franc ($216,000).[124]

201.    Nevertheless, absent collusion, a Defendant "front running" market would still face risk that another Defendant with a larger position could take in the opposite direction at the same time. If this were to happen, the Defendant's strategy would backfire, and the Defendant would, in industry parlance, get "run over." For instance, if in the above example, the trader decided to sell 1 billion euros in exchange for Swiss francs, but another market participant traded the opposite direction and sold Swiss francs for 2 billion euros, the market price would move higher, not lower, as the trader had anticipated based on his client's order. If, as a consequence, the market moved 2 basis points higher, the trader would lose 200,000 francs ($216,000) on the transaction.

202.    Absent collusion and manipulation, executing trades at the Fixes would pose more risk for Defendants than other order types. It pose more risk because, by agreeing to trade at a rate determined sometime in the future (even the relatively near future), there is a greater time period for market movements. By agreeing to execute at a Fix occurs, the bank faces a risk not present in trades executed immediately, that the market will have moved against its position in the interim. In addition, the Fix price represents midpoint price. Buy and sell orders are filled at the same price as opposed to ordinary orders where banks fill bid or buy orders at a price less than they fill ask or sell orders. Despite this increase in risk, Defendants commonly incentivized their sales forces, through items such as increased "sales credits," to execute transactions at the WM/Reuters Closing Spot Rates.

203.    To limit this risk of being 'run over," Defendants agreed to "front run" together by "improperly working as a pack" and agreeing "to a sequence for placing their own trades to

_____

[124]    Liam Vaughan, Gavin Finch and Ambereen Choudhury, *Traders Said to Rig Currency Rates to Profit Off Clients*, BLOOMBERG (June 12, 2013) (available at http://bloom.bg/1qGQ3oy); Liam Vaughan, Gavin Finch and Bob Ivry, *Secret Currency Traders' Club Devised Biggest Market's Rates*, BLOOMBERG (Dec. 18, 2013) (available at http://bloom.bg/1ibwUXj).