# CHAN AH WAH & LIM CHEOK KEE WILLY

## 115 EAST STREET

### NEW HYDE PARK NY 11040 USA

February 26, 2018

The Honorable Judge Lorna G. Schofield
United States District Court, Southern District of New York
c/o Pro Se Intake Unit
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 200
New York, NY 10007

**RE: CHAN AH WAH ET.AL. V. HSBC 15-CV-8974-LGS**
**AH WAH CHAN ET.AL. V. HSBC 17-CV-6863-LGS**
**IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIG.**
**13-CV-7789-LGS**
**CHAN AH WAH V. NORTHERN FOOD I/E. INC. 17-CV-6002-CM**
**JOINT AGREEMENT FOR CASE RESOLUTION, TREATMENT AS SUBPART**
**OF INCOME**

Dearest Honorable Judge Schofield,

Good day to you, Your Honor.

**PLEASE TAKE NOTICE** that, I *Pro se* Litigant/Plaintiffs, seeking permission to file information on case status for your knowledge and anticipation.

Thank you for your kind attention to this matter. Your Honor.

**I declare under penalty of perjury that the foregoing is true and correct**.

Dated: March 1, 2018,
Respectfully submitted by all parties counsel,


Cheok Kee Willy Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218
Chanjac5@aol.com

Ah Wah Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218
Chanjac5@aol.com

# CHAN AH WAH & LIM CHEOK KEE WILLY

115 EAST STREET

NEW HYDE PARK NY 11040 USA

February 26, 2018

The Honorable Judge Lorna G. Schofield

United States District Court, Southern District of New York

c/o Pro Se Intake Unit

Daniel Patrick Moynihan United States Courthouse

500 Pearl Street, Room 200

New York, NY 10007

**RE: CHAN AH WAH ET.AL. V. HSBC 15-CV-8974-LGS**
 **AH WAH CHAN ET.AL. V. HSBC 17-CV-6863-LGS**
 **IN RE FOREIGN EXCHANGE BENCHMARK RATES ANTITRUST LITIG.**
 **13-CV-7789-LGS**
 **CHAN AH WAH V. NORTHERN FOOD I/E. INC. 17-CV-6002-CM**
 **JOINT AGREEMENT FOR CASE RESOLUTION, TREATMENT AS SUBPART**
 **OF INCOME**

Dearest Honorable Judge Schofield,

Good day to you, Your Honor.

**PLEASE TAKE NOTICE** that, I *Pro se* Litigant/Plaintiffs, hereby request for an injunction order to warrant collection of debt from HSBC, defendants without necessary delay for civil actions, 15-cv-8974, *Chan Ah Wah et.al. v. HSBC* 15 Civ.8974-LGS and *Ah Wah Chan v. HSBC* 17 Civ.6863-LGS ("Chan Actions") and *Chan Ah Wah v. Northern Food I/E. Inc.* 17 Civ.6002-CM, as stated in **In re Foreign Exchange Benchmark Rates Antitrust Litigation 13-cv-7789-LGS ('FOREX')**, *in rem* to forfeit assets involved in tax evasion and traceable to a company, HSBC Bank USA National Association a custodian bank of HSBC private banking branches located in New York, Manhattan, HSBC Securities (USA) Inc and abroad, United States has a very smart system connecting all foreign exchange trades between United States' desk and United States' defendant bank's foreign desk, U.S. traders to U.S. traders in different group chat room and connected to the line to chat about trading prices, spread, final sale and customers' information into working their respective own organization accounts **PURSUANT** to Article III 2 U.S.C., 18 U.S.C. Section 981 (a)(1)(C), on the ground that it was derived from violations of United States law, pursuant to 18 U.S.C. Section 981(a)(1)(A) on the ground that it is property involved in one or more money

laundering offenses in violation of 18 U.S.C. Section 1956 and/or 1957.

The statement regarding 'JOINT AGREEMENT FOR CASE RESOLUTION, TREATMENT AS SUBPART OF INCOME' have been agreed on by all parties in the FOREX by this Court on FOREX Consolidated Action Complaint ('CAC') and TAC are identical fact for Chans Actions that <u>this case is stayed pursuant to paragraph 21 of the Preliminary Approval Order (Dkt. No. 536)</u> *<u>In re Foreign Exchange Benchmark Rates Antitrust Litigation 13-cv-7789-LGS</u>* <u>('FOREX'). No. 13 Civ.7789, which enjoins member of the FOREX settlement class from prosecuting any claim related to the alleged manipulation of the FX benchmark rates until this Court has finally determined whether the FOREX settlement should be approved. It is not intended to substitute right to do another Motion to Dismiss for Defendants have exhausted their right in doing so and should not use this information pursuant to this Court's Preliminary Approval Order (Dkt. No. 536) and Defendants' individual stipulation agreement in FOREX.</u> Plaintiffs CHAN AH WAH AND LIM CHEOK KEE had filed a claim on November 29, 2017 (LIM CHEOK KEE WILLY Claim#: 10003612) and on January 12, 2018 (LIM CHEOK KEE WILLY Claim#: 1000420), and CHAN AH WAH had filed a claim on November 29, 2017 (CHAN AH WAH Claim#:1534676) and on January 12, 2018 (CHAN AH WAH Claim#: 10004208) and the claim status are pending for claim administrator, Garden City Group ('GCG'). In order to get compensation for the lawsuit being settled, plaintiffs need to file for claim in OTC FX Spot and FX Exchange-Traded structured product eligible for more than USD1500 million in compensation that also include medical harm and cost that plaintiffs' family suffered through during the time period. As a member for this exclusive event featuring OTC and Exchange-Traded now in progress where GCG identify the members efficiently, has hosted in upcoming action to support this Preliminary Approval Order (Dkt. No. 536) featuring OTC FX spot and FX Exchange-Traded structured product events' instruction for joining and if plaintiffs won't be able to join the membership, Defendant HSBC has to send tape recording of multi-chat room transcript of United States trader in foreign desk of Defendant HSBC traded United States trader/broker-dealer in United States desk in multi-chat room participation, to be sure we are on the distribution list today. Moreover, the filing status for plaintiffs CHAN AH WAH AND LIM CHEOK KEE WILLY are pending and more items have been added to the filing portal for plaintiffs in GCG site.

**Money Laundering: An Abridged Overview of 18 U.S.C. 1956 and Related Federal Criminal Law**

Charles Doyle (Senior Specialist in American Public Law)

February 8, 2012

----------------------------------------------------------------------------------------------------

Congress Research Service 7-5700 www.crs.gov RS22401

**CRS Report for Congress** --------------------------------------------------------------------------

*Prepared for Members and Committees of Congress*

<u>**Money Laundering**</u>

**Summary**

This is an overview of the elements of federal criminal money laundering statutes and the sanctions imposed for their violation. The most prominent is 18 U.S.C. 1956. Section 1956 outlaws four kinds of money laundering –promotional, concealment, structuring, and tax evasion laundering of the proceeds generated by designated federal, state, and foreign underlying crimes (predicate offenses)—committed or attempted under one or more of three jurisdictional conditions (i.e., laundering involving certain financial transactions, laundering involving international transfers, and stings). Its companion, 18 U.S.C. 1957, prohibits depositing or spending more than $10,000 of the proceeds from a Section 1956 predicate offense. Violations of Section 1956 are punishable by imprisonment for more than 20 years; Section 1957 carries a maximum penalty of imprisonment for 10 years. Property involved in either case is subject to confiscation. Misconduct which implicates Sections 1956 and 1957 may implicate other federal criminal statutes as well. Federal racketeer influenced and corrupt organization (RICO) provisions outlaw acquiring or conducting the affairs of an enterprise (whose activities affect interstate or foreign commerce) through the patterned commission of a series of underlying federal or state crimes. RICO violations are also 20-year felonies. Every RICO predicate offense, including each "federal crime of terrorism," is automatically a Section 1956 money laundering predicate offense. A second related statute, the Travel Act (18 U.S.C. 1952), punish interstate or foreign travel, or the use of interstate or foreign facilities, conducted with the intent to distribute the proceeds of a more modest list of predicate offenses or to promote or carry on such offenses when an overt act is committed

in furtherance of that intent. Such misconduct is punishable by imprisonment for not more than five years. Other federal statutes proscribe, with varying sanctions, bulk cash smuggling, layering bank deposits to avoid reporting requirements, failure to comply with federal anti-money laundering provisions, or conducting an unlawful money transmission business.

The Supreme Court has held that the Section 1956 ban on attempt international transportation of tainted proceeds for the purpose of concealing their ownership, source, nature, or ultimate location is limited to instances where concealment is a purpose rather than an attribute of the transportation (simple smuggling is not proscribed as such), *United States v. Cuellar,* 533 U.S. 550 (2008). In a second case, the Court indicated that for purpose of Section 1956 the "proceeds" of a predicate offense often referred to the profits rather than the gross receipts realized from the office, *United States v. Santos*, 533 U.S. 507 (2008). Congress responded by defining "proceeds" for purposes of Section 1956 and 1957 as the property obtained or retained as a consequence of a predicate offense, including gross receipts, P.L. 111-21, 123 Stat. 1618 (2009)(S.386)(111th Cong.).

This is an abridged version of CRS Report RL33315, *Money Laundering: An Overview of 18 U.S.C. 1956 and Related Federal Criminal Law,* by Charles Doyle, without the footnotes, appendices, or most of the citations to authority found in the longer report. Related CRS Reports include CRS Report RL33020, *Terrorist Financing: U.S. Agency Efforts and Inter-Agency Coordination,* by Martin A. Weiss et.al., and CRS CRS Report RS21547, *Financial Institution Customer Identification Programs Mandated by the USA PATRIOT Act,* by Maureen Murphy.

**18 U.S.C. 1956**

Section 1956(a)(2) outlaws the interstate or international transportation or transmission (or attempted transportation or transmission ) of funds (1) with the intent to promote a predicate offense; (2) knowing that the purpose is to conceal laundering of the funds and knowing that the funds are the proceeds of predicate offense; or (3) knowing that the purpose is to avoid reporting requirements and knowing that the funds are the proceeds of a predicate offense.

Section 1956(a)(3) is a sting section. It outlaws financial transactions (or attempted transactions) that the defendant believes involve the proceeds of a predicate offense and that are intended to (1) promote a predicate offense, (2) launder the proceeds, or (3) avoid reporting requirements.

All but 2 of the 10 Section 1956 crimes are related in one way or another to the commission or purported commission of at least one of a list of predicate offenses, "specified unlawful activities." The predicate offense come in three varieties: state crimes, foreign crimes, and federal crimes. The list of state crimes is relatively short and consists of any state crime that is a RICO predicate offense, that is, any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in Section 102 of the Controlled Substance Act), which is chargeable under state law and punishable by imprisonment for more than one year. The list of foreign crimes recognized as Section 1956 predicate offense is very much the same—violations of the laws of another country involving murder, kidnapping, bribery, drug trafficking and the like—but it applies in cases involving a financial transaction occurring in whole or in part in this country. The list of federal predicate offenses is considerably longer if for no other reason than it is specific rather than generic.

Each of the 10 criminal proscriptions found in Section 1956 outlaws both the completed offense and the attempted to commit Section 1956(h) outlaws conspiracy to violate any of these proscriptions.

***Consequences:*** Prison terms, fines, civil penalties, and confiscation may follow as a consequence of conviction of a money laundering offense. Any violation of Section 1956 is punished by imprisonment for not more than 20 years. Violations of Section 1956(a)(1) and (a)(2), the financial institution and interstate or foreign transmission offenses, are punishable by a fine of no more than the greater of $500,000 or twice the value of the property involved

in the offense. Sting violations are punishable by a fine of not more than the greater of $250,000 ($500,000 for an organization) or twice the amount involved in the offense. Violators of any provisions of Section 1956 are subject to a civil penalty of no more than greater of $10,000 or the value of the property involved in the offense. Forfeiture is the confiscation of property to the government as a consequence of the property's proximity to some form of criminal activity. The proceeds of a confiscation are generally shared among the law enforcement agencies that participate in investigation and prosecution of the forfeiture. Section 1956 provides a vehicle for confiscation in two very distinct ways. First, the "proceeds" of any Section 1956 predicate offense (and any property traceable to such proceeds) are subject to confiscation without the necessity of any actual violation of Section 1956. **Second, property "involved" in a Section 1956 money laundering offense (or property traceable to such involved property) may be confiscated**. The Eighth Amendment prohibit excessive fines. Fines are excessive if they are grossly disproportionate to the gravity of the offender's misconduct. While the excessive fines clause may impose limits upon the permissible extent of the confiscation for failure to comply with anti-money laundering reporting statutes, forfeitures under Section 1956 are not ordinarily considered excessive because of the gravity of the offense and its predicate offenses.

The Supreme Court recently held that proscription in Section 1956 against attempted international transportation of tainted proceeds for the purpose of concealing their ownership, source, nature, or ultimate location is limited to instances where concealment is a purpose rather than an attribute of the transportation (simple smuggling is not proscribed as such), *United States v. Cuellar,* 553 U.S. 550 (2008). In a second case, the Court indicated that for purpose of Section 1956, in many instances the "proceeds" of a predicate offense referred to net receipts or profits realized from the offense, *United States v. Santos,* 553 U.S. 507 (2008). Congress preferred a different reading of "proceeds," which is an amendment to Section 1956, it defined to mean any property obtained or retained through the commission of a predicate offense, including gross receipts, 18 U.S.C.1956(c)(9)(P.L. 111-21 Stat. 1618

(2009)(S.386)).

**18 U.S.C. 1957**

Unless there is some elements of promotion, concealment, or evasion, Section 1956 does not make simply spending or depositing tainted money a crime. Section 1957 does. It outlaws otherwise innocent transactions contaminated by the origin of the property involved in the transaction.

Using most of the same definitions as Section 1956, the elements of 1957 cover anyone who:

1.  A. in the United States,
    B. in the special maritime or territorial jurisdiction of the United States, or
    C. outside the United States if the defendant is an American,
2.  Knowing
3.  A. engages or
    B. attempts to engage in
4.  a monetary transaction
5.  in or affecting U.S. interstate or foreign commerce
6.  in criminally derived property that
    A. is of a greater value than $10,000 and
    B. is derived from specified unlawful activity.

Section 1957 also proscribes attempts to violate its provisions. Section 1956 (h) outlaws conspiracy to violate Section 1957. Violations of Section 1957 and conspiracy to violate Section 1957 are each punishable by imprisonment for not more than 10 years and/or by a fine of not more than the greater of $250,000 ($500,000 for an organization) or twice the amount involved in the transaction. Violators of Section 1957 are subject to a civil penalty of no more than the greater of $10,000 or the value of the property involved in the offense. Any property involved in a violation of Section 1957 or traceable to property involved in a violation of Section 1957 is subject to confiscation under either civil or criminal procedures, and the applicable law is essentially the same as in the case of Section 1956.

**Travel Act**

The money laundering provisions of Sections 1956, 1957 punish transactions involving promotion, concealment, evasion, spending, and depositing. The Travel Act, 18 U.S.C. 1952,

punishes interstate or foreign travel (or use of the facilities of interstate or foreign commerce) conducted with the intent to distribute the proceeds of a more modest list of predicate offenses or to promote or carry on such offenses when there is an overt act in furtherance of that intent. The Travel Act is a Section 1956 and 1957 predicate offense (specified unlawful activity); Section 1956 and 1957 are Travel Act predicate offenses (unlawful activity); and although the money laundering predicate offense list is more extensive, several of the Travel Act predicate offenses are also money laundering predicates. The Travel Act essentially condemns three crimes such with an interstate element: the distribution of the proceeds of a predicate offense, the promotion of a predicate offense, or the commission of a violent crime in aid of a predicate offense. The first two variants bear some resemblance to the concealment and promotion offenses of Section 1956 and somewhat more remotely to the deposit/spending proscriptions of Section 1957. The violent crime component of the Travel Act is only coincidentally related to money laundering and consequently will be mentioned only in passing.

The courts often abbreviate their statement of the elements to encompass only whichever of the three versions is at issue:

**Distribution**—The essential elements of a violation under section 1952 (a)are: "(1) travel in interstate or foreign commerce; (2) with the specific intent to distribute the proceeds of an unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent," *United States v. Hinojosa*, 958 F.2d. 624,929 (5th Cir. 1992).

**Facilitation**—The government must prove that the defendant "(1) travels in interstate or foreign commerce [or uses an interstate facility] (2) with intent to…promote…any unlawful activity and (3) that the defendant thereafter performs or attempt to perform an act of promotion…of any unlawful activity," *United States v. Driver*, 535 F.3d 424.430 (6th Cir. 2008)

**Violence**—"To prove a violation of the Travel Act, the government was required to establish that [defendant]: (1) used a facility of interstate or foreign commerce; (2) with intent to commit any lawful activity (including arson..); and (3) thereafter performed an additional act to further the unlawful activity," *United States v. Salameh*, 152 F.3d 88, 152 (2d Cir. 1998).

The distribution and facilitation offenses of the Travel Act, 18 U.S.C. 1952(a)(1) and 18

(3)

U.S.C.1952 (a)(3), are punishable by imprisonment for not more than five years; the crime-of-violence-in-furtherance offense is punishable by imprisonment for not more than 20 years. Offenders of any of the three offenses are subject to a fine of the greater of not more than $250,000 ($500,000 for organizations) or twice the gain or loss associated with the offense. Property associated with a violation of Section 1952 is not subject to confiscation solely by virtue of that fact, although the property may be confiscated by operation of the laws governing 1952 predicate offenses.

### 31 U.S.C. 5322—Reporting Requirements

Section 5322 penalize willful violation of several monetary transaction reporting requirements found in Subtitle 53-II of title 31 of the United States Code and elsewhere. The section's coverage extends to violation of:

-31 U.S.C.5313-financial institution reports of cash transaction involving $10,00 or more (31 C.F.R.§ 103.22);

-31 U.S.C.5314-reports by persons in the U.S. of foreign financial agency transactions (31 C.F.R. §103.24);

-31 U.S.C. 5316-reports by any person taking $10,000 in cash out of the U.S. or bringing it in;

-31 U.S.C.5318-suspicious transaction reports by financial institutions;

-31 U.S.C.5325-reports by financial institutions issuing cashier's checks in amounts of $3000 or more (31 C.F.R. §103.29);

-31 U.S.C. 5326-cash transaction reports by financial institution and/or various trades or business pursuant to Treasury Department geographical orders (31 C.R.S. § 103.26);

-31 U.S.C. 5331-reports of trades and business other than financial institutions of cash transactions involving $10,000 or more (31 C.F.R. § 103.30);

-12 U.S.C. 1829b –record keeping requirement of federally insured depository institutions;

-12 U.S.C. 1953-record keeping by uninsured banks or similar institutions;

Simple violations of Section 5322 are punishable by imprisonment for not more than five years, a find of not more than $250,000, or both. Violations committed during the commission of another federal crime or as part of a pattern of illegal activity involving more than $100,000 over the course of a year are punishable by imprisonment for not more than 10 years; a fine of not more than $500,000 (not more than $1 million for a special measures violation (31 U.S.C. 5318A) or a violation involving a breach of due diligence with respect to private banking for foreign customers or foreign shell banks (31 U.S.C 5318(i), (j); or both.

Section 5322 is a Travel Act predicate offense and RICO predicate offense, but not a Section 1956 or 1957 money laundering predicate offense. Property associated with violations of two of the sections within its coverage is subject to confiscation. Under Section 5317(c), property becomes forfeitable when it is involved in, or traceable to, a violation of 31 U.S.C. 5313 (reporting relating to cash transactions involving $10,000 or more) or of 31 U.S.C. 5316 (reports relating to taking $10,000 or more out of the United States or to bring it into the United States).

## 31 U.S.C. 532—Anti-Structuring

Section 5324 condemns causing a financial institution to fail to file a required report, causing the submission of a false report, restructuring transactions to evade a reporting requirement, or attempting to do so. Violations are punishable by imprisonment for not more than 5 years (not more than 10 years if committed in conjunction with another federal offense or if committed as part of a pattern of activity involving $100,000 or more) and a fine of not more than $250,000 (not more than $500,000 for organizations), with the maximum fine doubled if the offense is committed in conjunction with another federal crime or as part of a pattern of activity involving $100,000.

## 31 U.S.C. 5332—Bulk Cash Smuggling

Section 5332 outlaws carrying or attempting to transport more than $10,000 in unreported, "concealed" cash across a U.S. border with the intent to evade 31 U.S.C.5316 reporting requirements. The proscribed methods of concealment seem to envelope any method short of public display. The offense carries a prison term of not more than five years, but also calls for confiscation of the cash and related property.

## 18 U.S.C. 1960—Money Transmitters

Section 1960 prohibits unlicensed money transmitting businesses and defines such businesses as (A) those that are required by state law to be licensed and are not; (B) those that fail to comply with federal regulatory provisions; or (C) those that transmit money they know is derived from, and intended to finance, criminal activity. Offenders face imprisonment for not more than five years and/or a fine of not more than $250,000 (not more than $500,000 for

organizations).

**18 U.S.C. 1961-1964—Racketeer Influenced and Corrupt Organizations (RICO)**

All the racketeering predicate offenses listed in 18 U.S.C. 1961(1) are by definition money laundering predicate offenses under Section 1956 and 1957. RICO makes it a federal crime for any person to:

1.conduct or participate, directly or indirectly, in the conduct of

2.the affairs of an enterprise

3.engaged in or the activities of which affect, interstate or foreign commerce

4. A. through the collection of an unlawful debt, or

    B. through a pattern of racketeering activity (predicate offenses).

**RICO** violations are punishable by imprisonment for not more than 20 years (not more than life imprisonment if any of the applicable predicate offenses carries a life sentence). Offenders also face fines of up to $250,000 (up to $500,000 for organizations) as well as the confiscation of any property associated with the offense. They may also be liable to their victims for triple damages and attorney fees, and at least when sued by government, subject to the equitable remedies.

```
Author Contact Information
Charles Doyle
Senior Specialist in American Public Law
cdoyle@crs.loc.gov, 7-6968
```

The following are responses to filed letters as stated in the Judge's Order (ECF 976) for the Chans filed letters at Docket No. 954, 956,958,959,962,966,968,971 and 973 to that argument, information or documentation that they are class members, to HSBC's letter dated January 23, 2018 that the Chans (Chan Ah Wah and Lim Cheok Kee (the "Chan") are parties to this action; this letter explained determination that the Chans are members of the settlement class.

'While an FX spot trade may be entered into and executed at any time, customers often use what are called daily fixing rates. A fixing rate is a published exchange rate at a moment in time or over a short interval of time. To place an order at a fixing rate,

a customer gives the dealer instructions to buy or sell a quantity of currency at a fixing rate. The dealer guarantees execution at the fixing rate.' See CAC and TAC No. 128.of pg.53. 'Prior to the Fixes, Defendants' customers will place orders to buy or sell a specific currency at one of the Fixes. The Defendant agrees to transact with its customers at that Fix. Because this order is for a future time, Defendants are exposed to unexpected interim movements in the price of that currency.' See CAC and TAC No. 129.of pg.53. 'Defendants will go into market and attempt to purchase or sell currency before the Fixes to fulfill their customers' order. If a Defendant is able to buy the currency it needs to sell to its customer at an average price that is less than the Fix, the Defendant will profit off the loses money on the transaction.' See CAC and TAC No. 130.of pg.53. 'While there are a number of Fixes used by FX market participants, in OTC trading, the major Fixes are the WM/Reuters Closing Spot Rates and the ECB Fixing Rates. These Fixes are used in the valuation and performance management of investment portfolios held by pension funds and asset manager globally.  The rates established at these Fixes are also used as reference rates in financial derivatives.  The WM/Reuters Closing Spot Rates are more widely used than the ECB Fixing Rates.' See CAC and TAC No. 131.of pg. 'The Fixes are particularly useful to major participants in the FX market, such as pension funds, mutual funds, insurance companies, and hedge funds. These entities are the most rapidly growing segment of FX market participants. Because many of these entities participate in the FX market in a way that is ancillary to their investing activities, rather than as primary source of profits, the Fixes take on a more critical role for them. These customers are generally not seeking to speculate on currency movements, but rather, to repatriate payments, such as dividends, interest, and redemptions on foreign entity and debt instruments that are paid in foreign currencies to U.S. dollars. Accordingly, these entities are continually re-balancing their portfolio to adjust their proportions of domestic and foreign holdings in response to shifting economic conditions.' See CAC and TAC No. 132.of pg.53. 'In addition, the Fixes are also customarily used to mark –to-market FX exposures. Before the Fixes became the standard benchmark, portfolio managers used different method to mark-to-market, some of which were dependent on a single dealer's quote. The Fixes were adopted to mark FX exposures to market because the Fixes had the perceived advantages of universality and independence from any specific dealer.' See CAC and TAC No. 133.of pg.53.'Trading at the Fixes is popular because the Fixes allow non-speculating entities to achieve their goals while removing tracking error when comparing fund performance to indexed benchmarks, such as

those created by FTSE Group and MSCI Inc., which track stocks and bonds in multiple countries, or to other portfolio.' See CAC and TAC No. 134.of pg.54.'The widespread use and acceptance of the Fixes as pricing mechanism and as the primary benchmark for currency trading globally has caused the Fixes to occupy a crucial role in the operation of financial markets.' See CAC and TAC No. 135.of pg.55.

## 1.   WM/Reuters

'The WM/Reuters rates are the most important fixing rates in the FX markets. WM/Reuters publishes fixing rates for spot rates and forwards. WM/Reuters calculates fixing rates for Trade Currencies every half hour from 6:00 a.m. in Hong Kong/Singapore to 10:00 p.m. in the U.K. WM/Reuters defines Trade Currencies to include, among others, the major currencies traded against the U.S. dollar and the euro.' See CAC and TAC No. 136.of pg.55. 'The most widely used WM/Reuters rates are the WM/Reuters Closing Spot Rates for Trade Currencies, which are calculated around 4:00 p.m. London time (11:00 a.m. new York time). The WM/Reuters Closing Spot Rates are popular, in part, because they are set at the end of the trading day in London when the market is most liquid.' See CAC and TAC No. 137.of pg.55. 'For Trade Currencies, the 4:00 p.m. fix is based on actual trades, using bids and offers extracted from a certain electronic trading system during a one-minute window ("fixed period"). The WM/Reuters Closing Rates are calculated using the median of a snapshot of bid and ask order rates and actual spot transactions in the 30 seconds before and the 30 seconds after 4:00 p.m. London time (11:00 a.m. in New York). Trades and rates from Currenex, Reuter Dealing 3000, and EBS are used in the validation and calculation.' See CAC and TAC No. 138.of pg.56.

'The process for capturing the information used to calculate the WM/Reuters Closing Rates is automated and anonymous. Because these rates are based on the median value of the transactions, the WM/Reuters Closing Rates do not take the notional size of the quotes and transaction into account; all quotes and transactions are weight equally.' *Id.*No. 139.of pg.56. 'WM/Reuters also provides fix rates for forward and non-deliverable forward contracts which are published as premiums or discounts to the WM/Reuters spot rates.Thus, manipulation of the WM/Reuters spot rates (as alleged herein) will necessarily impact the WM/Reuters forward rates and future rates.' *Id.*No. 140.of pg.56.

## 2.   The ECB Rates

'Like the WM/Reuters rates, the ECB reference rate provides spot FX rates throughout the day for euro –denominated currency pairs. The European Central

Bank owns and administers euro foreign exchange reference rates for 32 different currencies on a daily basis. The rates are published for currency pairs that are actively traded against the euro. The ECB reference rate is the second most frequently used global FX benchmark'. *Id*. No. 141.of pg.56 'The ECB fix is the exchange rate for various spot FX currency pairs as determined by the European Central Bank at 1:15p.m. GMT, or 2:15 p.m. CET. For G10 currency pairs, the ECB fix is based upon spot FX trading activity by market participants at or around the times of the 1:15 ECB fix. Only one reference exchange rate (the mid-rate) is published for each currency. "The rate is "based on the regular daily concertation procedure between central banks within and outside the European System of Central Banks."" This process is referred to as the "ECB fix" and reflects the rate at that particular moment in time.' *Id*.No. 142.of pg.57. 'The ECB reference exchange rates are published both by electronic market information providers and on the ECB's website shortly after the concertation procedure has been completed.' *Id*.No. 143.of pg.57 'The ECB fix is used in global financial markets by various market participants, including banks, asset managers, pension funds, and corporations. Like the WM/Reuters Closing Spot Rates, the ECB fix rates are used to value foreign currency-denominated assets and liabilities, and in the valuation and performance management of investment portfolios held by pension funds and asset managers. The rates established at the ECB fix are also used as a reference rate in financial derivatives.' *Id*.No. 144.of pg.57.

3.    **Other Benchmark Rates**

'Other FX benchmark rates are priced through actual market transactions or through the use of indicative rates. For instance, the Russian ruble/U.S. dollar. CME/Emerging Markets Trader Association benchmark rates are based on indicative rates submitted by market participants to the CME are a component of the final settlement rate of the CME's RUB/USD future contract.[92]This rate is supposed to be based on a bank's honest assessment of the current prevailing market rate at which it could execute $100,000 RUB/USD spot transaction for next-day value in the Moscow marketplace.' *Id*.No. 145.of pg.57. 'The Association of Banks in Singapore publishes a range of daily spot rate fixing for deliverable and non-deliverable currency markets. Those rates stem from 11:00 a.m. submissions by a panel of banks selected by ABS to represent each panel bank's current bid and offer spot rates for Indonesian rupiah, Indian rupee, Singapore dollar, and Thai baht against the U.S. dollar, among others.' *Id*.No. 146.of pg.58.

'Most major banks in Tokyo publish their own fixing rates at 9:55 a.m. Japan Standard

Time for a variety of Japanese yen currency pairs. Defendant BOTM's rates are often considered the most significant rate, and are used for approximately 90% of fixing orders across Tokyo'. *Id*.No. 147.of pg.58 'The Treasury Markets Association ("TMA") in Hong Kong publishes FX rates, which consist of spot fixings for the USD/Hong Kong dollar (HKD) and USD/Chinese yuan (CNY) currency pairs. These fixing rates are calculated by averaging the middle quotes after excluding a number of the highest and lowest quotes from the contributing banks appointed by the TMA" . *Id*.No. 148.of pg.58

**D. The FX Market Is Concentrated and Dominated by Defendants**

'Beginning in the late 1990s, the FX market experienced a substantial increase in concentration, with the number of banks covering 75% market share declining: *Id.* No. 149.of pg.59.



Defendants now dominate the FX market. According to the 2012 and 2013 FX Surveys by Euromoney, an industry publication, Defendants' individual and aggregate shares of the global FX market for 2012 and 2013 are:

| Defendant | 2012 Market Share (Rank) | 2013 Market Share (Rank) |
|---|---|---|
| Deutsche Bank | 14.57% (1) | 15.18% (1) |
| Citigroup | 12.26% (2) | 14.90% (2) |
| Barclays | 10.95% (3) | 10.24% (3) |
| UBS | 10.48% (4) | 10.11% (4) |
| HSBC | 6.72% (5) | 6.93% (5) |
| JPMorgan | 6.60% (6) | 6.07% (6) |
| RBS | 5.86% (7) | 5.62% (7) |
| Credit Suisse | 4.68% (8) | 3.70% (8) |
| Morgan Stanley | 3.52% (9) | 3.15% (9) |
| Goldman Sachs | 3.12% (10) | 2.75% (11) |
| BNP Paribas | 2.63% (11) | 2.52% (12) |
| Bank of America | 2.41% (12) | 3.08% (10) |
| Defendants' Aggregate Market Share: | 83.8% | 84.25% |

'Defendants also dominate the U.S. spot market. The Federal Reserve Bank of New York reported that as of April 2013, the top ten banks engaged in 98% of all spot volume in the FX market, up from 91% in April 2010. Moreover, the five largest banks by volume accounted for 80% of spot transactions in the United States in April 2013. The FX market has other high barrier to entry. A large amount of capital is required to provide liquidity to customers. FX dealers must provide immediate liquidity to customer based on the assumption that inventory can be offloaded within the day.' _Id._ No. 150.of pg.60. 'A small and close-knit group of traders employed by Defendants dominate FX trading. These traders have strong ties formed by working with one another in prior trading positions. Many of these traders also live near each other, many living in the same neighborhoods in the Essex countryside just northeast of London's financial district. They belong to the same social clubs, golf together, dine together, and sit on many of the same charity boards. As Andre Spicer, a professor at the Cass Business School in London, said, "The foreign-exchange market has a very strong culture, in which practitioners feel more attached to each other than they do

their banks. It is also dominated by an extremely small group of individuals, often with strong social ties formed by working with each other at some point in the past." These social and professional ties in the FX trading community create incentives and opportunities for collusion. As one former Citigroup banker noted, "This is a market in which price fixing and collusion could actually work. *Id*. No. 151.of pg.60,61.

### E.        The FX Market Is Unregulated and Opaque

'Notwithstanding its size, importance, and concentration, the FX market is one of the world's least regulated financial markets, with most trading taking place OTC, away from exchanges. The United States does not have any specific rules or agencies governing FX spot, outright forward, or FX swap transactions, and such transactions are exempt from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 11-203, 124 Stat 1376 (2010).' *Id*. No. 152.of pg.61. 'There is no centralized exchange or institution that collects and posts real-time trade information on OTC market. While Defendants' dealing proprietary platforms allow them to match buyers with sellers, Defendants' real-time order flow and volume data is not available to the market, such as it would be on an exchange, where the entire market knows who is buying and selling at a given moment. Defendants closely guard their real-time order flow and volume data and do not make it commercially available for purchase. This substantially limits knowledge of traders' conduct inside these dealing platforms and on the voice trading desk. Absent an agreement to collude, each bank would not share this information with one another; however, as explained here, Defendants *did* share this information with one another.' *Id*. No. 153.of pg.61. 'Defendants enjoy informational advantages over Plaintiffs and other investors as a result of this market opacity. Knowledge of a customer's identity, trading patterns, and orders allows Defendants to predict the direction of market movements.' *Id*. No.    154.of     pg.62.'Defendants' ability    to    predict-and manipulate-market movements grows when they share this information with one another.' *Id*. No. 155.of pg.62. 'With relatively few firms having a large share of the FX market protected by high barriers to entry, and with the lack of regulation and limited customer access to real-time pricing and volume information, the FX market exhibits characteristics that antitrust law and economics have identified as making a market susceptible to collusion and manipulation.' *Id*. No. 156.of pg.62.

## II.  DEFENDANTS CONSPIRED TO FIX PRICES IN THE FX MARKET

'As alleged below, beginning at a time unknown, but at least as early January 1, 2003, Defendants conspired to manipulate the WM/Reuters Closing Spot Rates in the FX

market on a daily basis. Defendants' conspiracy targeted the pricing of over two dozen currencies, including the most heavily traded currency pairs, throughout each trading day. Defendants' conspiracy encompassed: (1) price fixing of bid/ask spread; (2) price fixing various benchmark rates, including, but not limited to, WM/Reuters benchmark rates and the ECB reference rate; and (3) other collusive conduct, such as triggering client stop-loss orders and limit orders. UBS traders interrogated by FINMA officials agreed that the anti-competitive conduct alleged herein was "common practice." ' *Id.* No. 157.of pg.62. [HSBC Portfolio managers and her team used email to send the trade confirmation/contract note for call-option/put-option/swap option to us and disclosure these sensitive information has no liability in electronic communication law are job convenience for traders in multi-chat room exchanging their customer information in participating trades with each other and pursuant to their bank Standard Terms and Condition of service in CAC & TAC No.68.of pg.26, 'the cash deposit saving accounts' terms and conditions also designated that Plaintiff [us] authorizing all banks with the HSBC Europe branch to act on Plaintiffs'[us] behalf in its specialized area, which for Defendants is forex trading and also authorized defendants to deal with their property "taking into account of any applicable law, regulation, order, directive, market practices, notice or request of any regulator, government body or agency (whether or not having the force of law)" of all applicable jurisdictions, and to, among other things'," Deposit the underlying trading assets (or any part thereof) with the bank [hsbc]'s nominees, agents, brokers, custodians [HSBC Bank USA National Association] or the relevant exchanges or clearing houses (the "intermediaries"), and/or to create (whether in the name of the bank[HSBC] or on behalf of the customer)[Our name as the entity and also for our new members] or to cause to be created security interests (whether by way of mortgages, charge or otherwise) [call-option/put-option/derivatives etc to our cash deposit saving account with their group account in wrapped pool of product as new trade for their benefit in their organization of HSBC] over such underlying trading assets (or any part thereof) in favor of the intermediaries [HSBC Bank USA National Association, National Bank] on such terms and conditions as the bank may think fit..[this prove what U.S. traders in foreign desk of HSBC traded with U.S. desk and broker-dealer of HSBC, are really up to]..to carry out their conspiracy through these communications[traders to traders and broker-dealer in United States of HSBC] Defendants regularly exchanged their customers' confidential order[by sharing information in violation of advertising disclosure, marketing disclosure and material omission acted money laundering pursuant to 18 **U.S.C.** **1956** Section

1956(a)(2), Section     1956(a)(3), *et.seq.*,18     **U.S.C.**     **1957**,*et.seq* by     HSBC employees/agents] flow information before the fixe[U.S. desk traders used our cash deposit as a tool for their spread collusion in benchmark rates' fixes benefit their open position for themselves [hsbc] and deducted almost all of our cash deposit from our saving account in violation of gross negligence of their employees and agent act alone]. exploiting shared confidential information [put up credit score in cheat spreadsheet like Equifax and update false score to provider, HSBC portfolio managers and teams used cheat 'spread' sheet to false score in buy and sell in currency pairs and use our score to pair with their provider at custodian bank [HSBC Bank USA National Association] of HSBC Private Bank in violation of advertising disclosure, material omission and marketing disclosure combined gross negligence, privacy, copyrights all rights in electronic communication law, money laundering pursuant to 18     **U.S.C.**     **1956** Section     1956(a)(2), Section 1956(a)(3), *et.seq.*,18 **U.S.C.** **1957**,*et.seq* to all inclusive of, and Northern Food advertised in global web that employment of the food is organic according to the spreadsheet listed on the packed food and these false listing on advertised information in disfavor of the customer online due to re-pack expired reuse product to distribution for sale online in violation of advertising disclosure, marketing disclosure, material omission, gross negligence, money laundering pursuant to 18 **U.S.C.** **1956** Section     1956(a)(2), Section     1956(a)(3), *et.seq.*,18     **U.S.C.** **1957**,*et.seq* of Northern Food I/E. Inc act breaches to FDA these conspiracies involved in customers' trust for their good standing logo brand in HSBC, Equifax, Northern Food in  violation of copyrights, all rights to electronic communication law in United States, money laundering pursuant to 18 **U.S.C.** **1956** Section 1956(a)(2), Section  1956(a)(3), *et.seq.*,18 **U.S.C.** **1957**,*et.seq* to customers and public interest at stake, national interest at risk], Defendants executed concerted trading strategies [Equifax is an ongoing effort to provide social security to United States public community and address safer national interest by a comprehension program with public information with customers' sensitive confidential of personal kind to publish for provider in financial and consumer industry and these information shared at the expense of the customer for fees charged to obtain effective accountability of person to display their honest and goodness type to get provided a service in rental housing, finance housing, auto sales, student loan, banks' credit cards shared these information from Equifax that locked false information and did not updated proper information like identity theft were not at fault of the customer and made up of, in order to benefit their organization [HSBC input debt 'loan' on the

saving account statement falsely for their benefit to use debt incurred for fixes of benchmark WM/Reuter rates in other purpose of debt recovery into re-selling the debt structured product and take risk from their [hsbc] book for good name, and Equifax did not investigate the each entry just take from third partys' information put on program spreadsheet and shared with provider like employer who see the credibility and effective accountability of the future employ, and these causing jeopardy to the public system as these events were once part of the 2008 economic crisis, reports reveal on HSBC's take on Chans' speculation accounting to the account expert analysis, trades revealing take on chat communication to bank's multi trader's chat, raising effect on foreign desk of HSBC to United States, in particular the bank used their guideline [Equifax] to provide their service in credit card, opening bank account, refinance mortgage, new loan for car, house etc. and with consequence of their inter-relationship between Equifax and all banks in United States to improper providing incorrect sensitive information for the account of a person and ruined their live for the person/people does not derserve to suffer like us, we do not deserve to suffer and they are in violation of customer service advertising disclosure, material omission, marketing disclosure combined gross negligence, money laundering pursuant to 18 U.S.C. 1956 Section 1956(a)(2), Section 1956(a)(3), et.seq., 18 U.S.C. 1957, et.seq, and there is a collusion between Equifax and the banks in sharing confidential information falsely because there is no effort to investigate and find the proper cause and change to the right way for public and national interest in effective accountability on credibility, just simply to profit from the fees they charged on the accountability report and put public in darkness like us, we have no way to fight back and indirectly freeze the social security of United States and the social security department of United States has to foot the bill created by these inter-relationship Equifax, Northern Food and HSBC's conspired to collude for fees, interest, profit to their organization at the expense of the United States government as Northern Food reuse the stock of expired product and hurt people of United States of all ages health and social security, Northern Food conspired with their teams on strategies to act in furtherance to earn more profit into selling expired, unfit food, unhealthy stock by unpack, change production date to current, dispose the bigger carton packaging and sort into smaller individual that has no food sustainability for consume, to direct harm and hurt the public and national interest, as these reuse product has no trace of tax to ensure the responsible agency to impose tax for the incoming invoice of purchase these original stock has limited quantity and money generated from these re-use structure product in daily consumer product

earned the same or more percentage of the original product like JP Morgan Chases'
U.S. product leaked in our HSBC private bank, Malaysia branch contract note and
traced to the reuse product of 1980s and the reuse production of these vanilla option
could maximize to 1:72 times like Northern Food, and there is money laundering
involving these profit like the bank reuse the structure product in their branches to
put a "firewall" in BVI [British Virgin Island] companies like their practice in account
book in different names and the profit in these book will never know to the taxation
agency in United States and switch from branches to branches in wire transfer to
confuse the account statement of their profit from making false entry credit score in
our cash deposit saving account in HSBC private bank, Singapore branch or Swiss
branch, and enable intention to launder money for new purpose of use, these impact
the United States in social security that the unauthorized, unwelcome entity used this
way to United States to infuse arm purchase and dangerous tactic to attack national
interest posed risk to social security in United States and used these laundered
money as clear stock to reinvest in the healthy Wall Street financial economy to hurt
the United States' economy in a way it is very difficult to get exposed like those legal
U.S. entities and individuals used this way as exposed in "panama list" and "paradise
list" revealed the seriousness of the laundering money activities pursuant to 18
**U.S.C.   1956** Section    1956(a)(2), Section    1956(a)(3), *et.seq.,***18   U.S.C.
1957,***et.seq** they had ongoing, the high risk these dangerous, unwanted risk existed
in the public interest. interstate commerce for these companies generated income or
profit from United States like legal companies hide their profit in sister company in
BVI tactics like "panama list" and "paradise list" that former HSBC private banks'
head, Andy Yong was talking about and with his encouragement we also opened an
BVI company and he told us that this way is for tax evasion from any authority in BVI
companies exposed these legal companies evaded taxes to pay for the health of the
government expenses and stop the government printing further money selling more
debt that Justin my elder son has piled national debt on him and there is no money to
create superb modern facilities for these younger generation to care for their own,
these profit were taken away as illegitimate purpose in creating social security issue
and disability the financial economic power to bring wealth to this country in United
States as created by their ancestor who worked so hard for their younger generation
to profit and live better,   better than anyone else deserved and they ended up with
student loan unable to pay for economy failure these events were once part of 2008
economic crisis, due to un-loyalist concerted conspiracies and these student have to
endure the pain from their [Equifax, HSBC, Northern Food] falsely to advertise and

involvement in tax evasion from the U.S. government, causing the huge debt to national interest and closure of the government agencies due to expenses and debt problem in the circle of problems, in violation to gross negligence, advertising disclosure, marketing disclosure, material omission, privacy electronic communication law, money laundering pursuant to 18 U.S.C. 1956 Section 1956(a)(2), Section 1956(a)(3), et.seq.,18 U.S.C. 1957,et.seq all inclusive breaches] designed to manipulate, and which actually did manipulate[interstate commerce of United States] the Fixes. see No.183 of Pg. 69. 'Defendants' collusive actions allowed them to substantially reduce their risk in fx trading [using other people's wealth to 'rob' them and become their own capital in this way to put falsely debt/loan on book of saving account in HSBC private banks' branches manipulated by United States trader in foreign desk of HSBC bank branches traded United States desk trader to utilize as tool and tactic to cheat tax evasion for packing into new trade by pooling in confusing statement and cannot sort out by plain looking at it, to a new trade to enjoy the members' benefit of free of trades' fee for new trades, tax exemption etc provided on book to show to public to boost their profit and zero debt for reduction risk to their stock share price in New York Stock Exchange for massive explosive profit that final stop is to manipulate the fixes and steadily stream of incomes to go to their sister companies at elsewhere branches to hide the taxable profit from United States Internal Revenue Service. Equifax saved their effort in employment in employing more professional more expensive manpower to supervisor the book of spreadsheet involved in the livelihood of public interest by taking information posed a risk of false statement to add to their score spreadsheet blindly and never employed expert to check the reviews and complaints by public concern to fix the issue causing devastated consequences to a future of a person ability to live happier and healthy, ended up no way to get help and suffered heavy deep stres related to employment, incurred debt from so-called no credible person in a manipulator's consequences in economy failure for example in year 2008 and these affected the social security of the suffered person into depending on drug, alcohol, and aggressive behavior to harm others e.g. robbing money to buy food, marriage broke up, children abuse, homeless, used food stamp, toll health benefit from government etc. because Equifax saved employment expenses' and profit made to employ highly expertise personnel to work their agency performance effectively by greatly depend on false statement from provider and provide these false statement to other provider and in a circle causing harm to public system, as Northern Food used bad tactic to comply to business practice in paying proper

insurance for employment in risking their profit out and providing false statement to provider form employee ineligibility to gain compensation like Chan Ah Wah was promised by email contract mutually  has the same force on written form as to electronic communication law in United States governed and strictly in force for possible illegal money gaming business generated money to launder for other risky purpose in concealment, like the court as judicial system let their lawyer filed electronically as credible status as lawyer are public notary or witness and Northern Food did not honor this email contract greatly reduce the risk to Chan Ah Wah in compensation for his personal injury on his back, shoulder and caused him interval pain every now and then, as former employer, Northern Food made a deal in email contract to him that his former employer will not opposed to Chan Ah Wah's application for unemployment insurance from Department of Labor for his illegal work dismissal and Northern Food lied to the department that Northern Food will re-employ Chan Ah Wah after two months due to shared program by the Labor Department with employer and Labor Department told Chan Ah Wah that he is illegal to work in United States for he is not a United States citizen for former employer, Northern Food has reported Chan as an illegal person not to work in United States while Northern Food deducted Chans' state and federal tax to his employment salary for his social security and disabilities' insurance premium and Northern Food saved the risk of paying more social security unemployment insurance and disability to claiming premium add to this to their book on profit. Structured debt falsely from our saving account statement to be their book in zero debt for the risk to encourage their team of traders to participate in multi-chat rooms with client and traders at third-party banks in order to exchange information.' this action greatly reduced the risk of not earning spread and grabbing other customer information to commit another false debt input in book for their [hsbc, Equifax, Northern Food] own profit again] ..and to reap supra-competitive profits at the expense of  plaintiffs [us]. Defendants faced less risk in their market making activity [HSBC using own customer's cash deposit to round up as debt to product debt recovery from another branch and from that debt recovery structured into big massive profit. commission, fees, in many structured product to other banks and their own branches, this way faced absolute targeted profit as already calculated and the projected cash in own customer book is as forceful as tactic tool to move their stock price because custodian bank [HSBC Bank USA National Association, national bank] of private bank used these cash wire transfer to them and shared the cash deposit account holder information with broker-dealer so made the market as the custodian bank, HSBC Bank USA National

Association provided a bank escrow number to Chan Ah Wah and Lim Cheok Kee for their two accounts numbers to remit cash to HSBC and sell make up debt to counterparty in the multi-chat room [credit suisse, citibank etc] as a steadily income, profit for HSBC including highly commission] Defendants' front book. Additionally, Defendants' trader could reap even great profit in commission to sell more, more trades created intentionally for debt structured into product for sale to another profits to HSBC [see HSBC portfolio managers and team persuaded us to open with them, put a cheat spreadsheet to convince us the cash deposit  was safe and sound with her in HSBC, make the currency pair in buy and sell closed out position to show us a false profit generated and stolen US$500,000 from our cash deposit saving account, in violation in representation, material omission combined gross negligence, money laundering pursuant     to **18    U.S.C.    1956** Section         1956(a)(2), Section 1956(a)(3), *et.seq.,* **18  U.S.C.  1957,** *et.seq,* this way were  to  generate  super-high interest, fees, cost, commission, profits as their teams including United States traders and traders trading for tax evasion for they were paid in percentages to clients' monthly portfolio in sales, Equifax was paid a fee resulting as profit/commission to their report to service provider in a way as intermediaries generated *profit out of the whole American national steadily indirect capture incorrect information from the providers like the banks' reporting late payment, non-payment these negative information from their credit card, a source to create credit card debt for securitization of structured product for massive sale to profit from with paying applicable tax to the U.S. government, issuing in  position limit him [the future employ] in getting high paid job, to get well paid and more saving for next round to buy a bigger house, live well but in return these circumstances by Equifax* will make life more difficult to use limit money to sufficiently paid for groceries, utilities, possibly ended up bad credit debt for more late payment, more risk in default payment and eventually bad credibility like Chan Ah Wah and Lim Cheok Kee where there is no way to effectively take a refinance loan from citibank to their fully paid house to pay back credit card debt and Chan Ah Wah could not get a better job for these need to see his credit score, and was forced to sell his car to stop force selling of the car due to non-payment, situation worsen by now for disconnection of utilities are calling and limit position for children to go to college, go spend a dinner at the restaurant etc..causing suffering to us, Northern Food supposedly a standby vehicle for Chan Ah Wah to wait for opportunity to invest in other field like flipping house to gain income for they come to United States for better tomorrow and dreams, for their children's daily expenses to get a refinance from the house they are staying and

there is no way out at all, the Chans did thought of taking their own lives and stop the pain that HSBC created for them, and Chan Ah Wah need employment status to qualify for a house loan even the house was a cash equity from bank application and from the way connected that HSBC falsely repossessed their cash deposit used for daily expenses for their children and the sudden work dismissal was promised to able get unemployment insurance payment to pay for children's expenses while Chan Ah Wah searched for another job to not to jeopardize the limit position they had, and circumstances elated to the promised contract by email with Northern Food was breached and Chan Ah Wah was unable to get any money from the agency to pay for two months back stage payment, this action heavily deepen the financial situation of Chan Ah Wah and Lim Cheok Kee ended worsen credit reporting from Equifax as to their ability to secure a personal loan or any sort to turn around the hardship they faced despite HSBC firmly refused to refund the cash deposit they debited from their cash deposit fraudulently locked that matched with their HSBC private banks' Standard terms and conditions shall prevail, and the stress tension of the family because Northern Food illegally dismissed insured worker who is injured on unlawful basis and re-employed lower wages including real unauthorized to work worker replacing the steady work load they have in their capacity, in actual the profit in less manpower at the interval saved into greater profit to Northern Food, and using selling in social media platform created greater profit from their repacking of unqualified product that it is very difficult to assess their tax payable to United States government and causing other on site retail store facing bankruptcy due to electronic sales on internet provide more cheaper to customer because they saved the monthly rental from storefront and this way United States government lose a great deal of retail shop income taxation to finance their government expenses, for these profit could not be traced for taxation for electronic communication law is not powerful to regulate from and given the illegal profit a back door a way to go another company's book for accounting e.g. BVI companies popularly used as exposed in "panama list" and "paradise list" that is like stealing money from the United States government for tax evasion and the only way to repossess is to used warrant from Court to action *in rem* to forfeit assets involved in tax evasion and traceable to a company, HSBC Bank USA National Association a custodian bank of HSBC private banking branches located in New York, Manhattan, HSBC Securities (USA) Inc and abroad, United States has a very smart system connecting all foreign exchange trades between United States' desk and United States' defendant bank's foreign desk, U.S. traders to U.S. traders in different group chat room and connected to the line to chat about

trading prices, spread, final sale and customers' information into working their respective own organization accounts **PURSUANT** to Article III 2 U.S.C., 18 U.S.C. Section 981 (a)(1)(C), on the ground that it was derived from violations of United States law, pursuant to 18 U.S.C. Section 981(a)(1)(A) on the ground that it is property involved in one or more money laundering offenses in violation of 18 U.S.C. Section 1956 *et.seq* and/or 1957 *et.seq.*] 'Defendants' conduct in furtherance of their conspiracy included: (1) creating and participating in exclusive interbank chat rooms; (2) improperly sharing confidential client and proprietary trading information; (3) coordinating trading to influence the FX rates; (4) monitoring the conduct of co-conspirators to ensure secrecy and compliance with the conspiracy; (5) using code names and misspelled words in interbank communications to evade detection; and (6) agreeing to "stand down" by holding off buying and selling currency to benefit co-conspirators.' *Id.* No. 158.of pg.63.

'As a result of Defendants' conspiracy allowed them to eliminate their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs. Plaintiffs were harmed.' *Id.* No. 159.of pg.63. [Details sound measure to exception Clause of Sherman Act, 15.U.S.C. Section 6a, this statue "lay down a general rule placing all (nonimport) activity involving foreign commerce outside the Sherman Act's reach" but then bring back certain conduct so long a it "direct, substantial, reasonably forseeable effect" on American domestic, import or (certain export commerce)"give rise to a Sherman Act claim. In *FOREX* claims brought by plaintiffs to apply American antitrust laws to Defendants' foreign conduct for harm suffered in the United States, the Complaint expressed "United States persons and transactions occurring in the United States" or confined its claims to those arising out of foreign exchange transactions. Plaintiff here who claims in the Complaint does allege transaction on a U.S. exchange or with a U.S. desk of a Defendant, the details of the FX instruments and transactions over which Plaintiff are suing, its allegations suggest that Plaintiffs transacted entirely during the relevant period. Plaintiffs currently reside in New York and that their oldest son was born in New York in 2000, a United States citizen. Plaintiffs decided to bring their children "back to New York" after Defendants deducted from their account in August 2010.Id.No.16. pg.5, Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States, including in this District, Manhattan, Southern District of New York. During all "Relevant" Period (from 2003 through mid 2012), Defendants used the instrumentalities of interstate commerce, including interstate wires, international electronic signal and

the U.S. mail, to effectuate their illegal scheme. *Id.* No. 17 of pg.6,This court has personal jurisdiction over Defendant, because Defendants' collusive and manipulative acts took place, in substantial part, in New York specifically, Manhattan, Southern District of New York and in the United States generally. And under the New York Statue long-arm §302 (a) (1); see *Deutsche Bank Securities. Inc. v. Montana Board of Investment_N.E.2d_7 N.Y.3.Id.* No. 18.of pg.6.Defendant is subject to personal jurisdiction in this forum because they are either incorporated or have their principal place of business here, in the New York District, Manhattan, Southern District of New York New York Banking Law § 200-b (1) provides that a New York resident may maintain "cause of action" against a foreign banking corporation, the statue is applicable as the Plaintiffs in this case alleged to be a resident of New York, finally the New York Court of Appeals has interpreted § 200-b to confer subject matter jurisdiction and Defendants conducted substantial operations in business in the United States, is "essentially at home" in this country [United States], as required for the exercise of General Jurisdiction. *Id.* No.19 of pg.7, Defendant is also subject to personal jurisdiction in this forum because Defendant has substantial FX instrument business and contractually consented to jurisdiction in at least two International Swaps and Derivatives Association Agreement. ("ISDA") The agreements include a consent "to the non-exclusive jurisdiction of the courts of the States of New York and the United States District Court located in the Borough of Manhattan in New York City" expressly limited to "any suit, action or proceedings relating to th[e] Agreement[s]." This consent is applicable to Plaintiffs here even because the ISDA agreements confer to a contractual right to the counterparties to those agreements, the counterparties is Plaintiffs in this action. Therefore, Plaintiffs satisfy the due process requirements for exercise of personal jurisdiction in this case. *Id.* No.20 of pg.7, Defendant is subject to specific jurisdiction because of defendants' FX operations in the United States, give rise to the reasonable inference that they participated in the alleged conspiracy in the United States or participated elsewhere with the aim to cause harm in the United States and even operate or maintain office here. "The [s]pecific or conduct-linked jurisdiction…'depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that take place in the forum state and is therefore subject to the State's regulation. *Id.* No.21 of pg.7,8, Defendants' with consolidated assets of $50 billion or more is subject to the regulatory and supervisory requirements for large bank holding companies and non-bank financial companies that pose risk to the United States' financial stability under Dodd-Frank Act; created a framework for enhanced

prudential regulation and supervision of financial institutions that are deem to be" systemically important" to the U.S. financial system, including U.S. banks holding companies with consolidated assets of $50 billion or more. It is also because the Federal Reserve Bank in the United States has authority to take certain actions including to preclude merger, restrict financial product offered, restrict, terminate or impose conditions on activities or require the sale or transfer of assets against any systemically important bank holding company with assets greater than $50 billion that is found **to pose a grave threat to financial stability in the United States.** In addition to the increased capital, liquidity, stress testing and other enhanced prudential and structural requirements, large international banks like Defendants has to file resolution plans identifying material subsidiaries and core business lines and strategy to resolve institution in case of financial distress, including identifying how insured bank subsidiaries would be adequately protected from risk created by other affiliates.*Id.* No.22 of pg.8, 9, Dodd-Frank also requires that single counterparty lending limits applicable to Defendants' National Bank in the United States, take into account credit exposure arising from derivative transactions, securities borrowing and lending transactions; and repurchase and reverse repurchase agreements with counterparties. There are also provisions in Dodd-Frank that relate to governance of executive compensation, including disclosures evidencing the relationship between compensation and performance and a requirement that some executive incentive compensation is forfeitable in the event of an accounting restatement. In relation to requirements for bank transactions with affiliates, beginning in July 2012 the current quantitative and qualitative limits on bank credit transactions with affiliates also include credit exposure related to repurchase agreements, derivatives and securities lending/borrowing transactions. This provision may limit the use of intercompany transactions between us [HSBC] and our affiliates, which may impact our current funding, hedging and overall internal risk management strategies. *Id.* No.23 of pg.9, Title VII of the Dodd-Frank Act imposes a comprehensive regulation of over-the-counter ("OTC") derivatives markets, including credit default, equity, foreign exchanges and interest rate swaps Implementation of Title VII is the responsibility of the CFTC(for swaps based non-securities underliers or broad-based security indies), the SEC (for swaps based on individual securities and narrow-based security indies) and, to lesser extent, the U.S. banking regulators (for certain rules applicable to banks). The CFTC has adopted many significant provisions, in particular, certain swap dealers, including Defendants have provisionally registered with the CFTC and become

members of the National Futures Association, subjecting them to an extensive array of corporate governance requirements, business conduct standards, reporting requirements, mandatory clearing of certain swaps and other regulatory standard effecting their derivatives businesses. In addition to these rules, as a provisionally registered swap dealer that is a national bank like Defendants; will become subject to capital and margin requirement established by OCC.*Id.* No.24 of pg. 9,10, In September 2014, The CFTC re-proposed margin rules for non-cleared swaps and security-based participant, would limit categories of eligible collateral for cash, for variation margin, and cash and certain asset types (subject to standardized haircuts) for initial margin. The two re-proposal would follow a phased implementation schedule, with variation margin requirements coming into effect on December 1, 2015, and initial margin requirements phasing in annually for different counterparties from December 1, 2015 until December 1, 2019, depending on the transactional volume of the parties and their affiliates. Defendants' National Bank engaged in equity and credit derivatives businesses that are subject to the SEC's jurisdiction under Title VII of the Dodd-Frank Act. In 2014, the SEC finalized rules regarding the cross-border application of the security-based swap dealer and major security-based swap participant definitions. These definitions share many similarities with parallel guidance finalized by the CFTC in July 2013.*Id.* No.25 of pg.10, It is expected that the SEC will finalize many of its OTC derivatives rules during 2015, including compliance dates for certain provisions of its security-based swap transaction data reporting rules. Because Defendant National Bank's equity and credit derivatives businesses are also subject to the CFTC's jurisdiction under Title VII, material differences between the final SEC rules and existing CFTC rules could materially increase our cost of compliance with Title VII...Id. Section 716 of the Dodd-Frank Act included a 'swaps push out' provision that would have effectively limited the range of OTC derivatives activities in which an FDIC-insured bank, including Defendant's National Bank could engage. *Id.* No.26 of pg.10,11, Section 716 of the Dodd-Frank Act included "swap push out" provision that would have effectively limited the range of OTC derivatives activities in [United States] which an Federal Deposit Insurance Corporation ("FDIC") including Defendants' national bank could engage. In December 2014, the Federal Reserve Bank ("FRB") further extended by in place the conformance period to July 21, 2016 for investments in and relationships with covered funds and foreign funds that were in place prior to December 31, 2013 ("legacy covered funds"). The FRB also indicated that it intend to act next year to grant an additional one-year extension, until July 21, 2017, for the

same legacy covered fund investment and relationship. *Id.* No.27 of pg.11, The final Volcker Rule restricts proprietary trading as principal within a "trading account" in financial instruments", each as defined in the final Volcker Rule, subject to various exemptions. Certain exemptions apply to the types of financial instruments that are covered by the final Volcker Rule. Generally, securities, derivatives, futures and options on all such instruments are covered, while loans, currencies and commodities are not covered. In addition, there are exemptions for activities, among others, that constitute market making, underwriting, hedging, and trading of U.S. government, agency or municipal securities and certain foreign sovereign debt securities, Each of these exemptions, however, is generally subject to its own set of compliance requirements and conditions. "T*he Federal Reserve, under intense pressure from members of Congress (on both sides of the aisle), said in s short statement Monday that it was extending the deadline for banks to comply with keys aspects of the so-called "Volcker Rule," the new government regulation that aims to curb excess risk-taking by financial institutions. **This delay will allow banks to continue supporting what has become a frothy corporate debt market, increasing the risk of another 2008-like cataclysmic financial event**.*".*Id.* No.28 of pg.11,12, Several activities engaged by Defendants will be subject to restrictions designed to ensure compliance with the final Volcker Rule also restricts acquiring or retaining an ownership interest in, or sponsoring or having certain relationships with, "covered funds." Covered funds generally include entities that would be an investment company under the Investment Company Act of 1940 (the "1940 Act"), but for the exemptions provided in Section 3(c)(1) or Section 3(c)(7) of the 1940 Act, as well as certain commodity pool. The final Volcker Rule includes exemption, among others, for certain limited investments in conjunction with asset management activities for customers, for loan securitizations, for asset-backed commercial paper conduits, and for underwriting and market making in covered funds. As with the proprietary trading restriction, the exemptions are generally subject to a variety of compliance requirements and conditions. Any limited, yet permissible, investments in covered funds are required to be deducted from the Tier 1 capital of banking entities. *Id.* No.29of pg.12. United States trader of foreign desk of Defendant HSBC private bank, Singapore branch, Swiss branch, Nassau branch, Hong Kong branch etc were visiting their New York office, HSBC Bank USA National Association, National bankings' United States traders/broker-dealer and ask[buy]/ make in trade being in a FX spot, United States traders/broker-dealer responds, "confirm, done" trade in English sounds, were visiting the United States FX trading platform from the

trade confirmation [HSBC private bank] of the trade from United States traders can make a pool community of trades being in for their capital cash to satisfy the stress test and capital requirement to comply with, really want to make the trade confirmation in U.S. desk trader for the benefit to them[HSBC]. The ask [buy]/make will make again, now, really to do that in a later second U.S. traders come and ask[buy]/make that trade, later, then the third U.S. traders come and ask/[buy] make that trade, "oh please help trade make a sound fix!" All of you want to make a fix, asked each others, replied with hopeful said that in CAC & TAC replied well with Judge Schofield said that we get to FOREX settlement deal, says best to each other in stipulated agreement individually to last trader/broker-dealer for to reap supra-competitive profit at the expenses of plaintiffs, impact the live of others, in violation of money laundering, pursuant to **18 U.S.C. 1956** Section 1956(a)(2), Section 1956(a)(3), *et.seq.,***18 U.S.C. 1957,***et.seq.*Any property involved in a violation of Section 1957 or traceable to property involved in a violation of Section 1957 is subject to confiscation under either civil or criminal procedures, and the applicable law is essentially the same as in the case of Section 1956. The Travel Act, 18 U.S.C. 1952, punishes interstate or foreign travel (or use of the facilities of interstate or foreign commerce) conducted with the intent to distribute the proceeds of a more modest list of predicate offenses or to promote or carry on such offenses when there is an overt act in furtherance of that intent. The Travel Act essentially condemns three crimes such with an interstate element: the distribution of the proceeds of a predicate offense, the promotion of a predicate offense, or the commission of a violent crime in aid of a predicate offense. The first two variants bear some resemblance to the concealment and promotion offenses of Section 1956 and somewhat more remotely to the deposit/spending proscriptions of Section 1957. The violent crime component of the Travel Act is only coincidentally related to money laundering and consequently will be mentioned only in passing., **31 U.S.C. 5322—Reporting Requirements** Section 5322 penalize willful violation of several monetary transaction reporting requirements found in Subtitle 53-II of title 31 of the United States Code and elsewhere. [see more detail in this letter definition under Summary for money laundering, **31 U.S.C. 532—Anti-Structuring** Section 5324 condemns causing a financial institution to fail to file a required report, causing the submission of a false report, restructuring transactions to evade a reporting requirement, or attempting to do so, **31 U.S.C. 5332—Bulk Cash Smuggling** Section 5332 outlaws carrying or attempting to transport more than $10,000 in unreported, "concealed" cash across a U.S. border with the intent to

evade 31 U.S.C.5316 reporting requirements. The proscribed methods of concealment seem to envelope any method short of public display. The offense carries a prison term of not more than five years, but also calls for confiscation of the cash and related property, **18 U.S.C. 1960—Money Transmitters** Section 1960 prohibits unlicensed money transmitting businesses and defines such businesses as (A) those that are required by state law to be licensed and are not; (B) those that fail to comply with federal regulatory provisions; or (C) those that transmit money they know is derived from, and intended to finance, criminal activit,**18 U.S.C. 1961-1964—Racketeer Influenced and Corrupt Organizations (RICO)** All the racketeering predicate offenses listed in 18 U.S.C. 1961(1) are by definition money laundering predicate offenses under Section 1956 and 1957. RICO makes it a federal crime for any person to: 1.conduct or participate, directly or indirectly, in the conduct of, 2.the affairs of an enterprise, 3.engaged in or the activities of which affect, interstate or foreign commerce, 4.A.through the collection of an unlawful debt, or, B. through a pattern of racketeering activity (predicate offenses). RICO violations are punishable by imprisonment for not more than 20 years (not more than life imprisonment if any of the applicable predicate offenses carries a life sentence). ]

**Defendants Used Electronic Communications, Including Chat Rooms,**
**Instant Messages, and Emails, to Conspire**

'Defendants' top-level traders used electronic communications, including chat rooms, to meet and conspire for more than a decade. Class Plaintiffs in FOREX consolidated action, are aware of thousands of communications showing traders at more than two dozen banks, including each Defendant, participating in chats where traders coordinated and exchanged information about spreads, currency pairs, and fixes.' *Id.* No. 160.of pg.63. 'Defendants brazenly named their chat rooms "The Cartel," "The Bandits' Club," "The Mafia," "One Team, One Dream." so on. Other chat rooms described themselves as "The Sterling Lads," "the Players," "The 3 Musketeers," "A Co-operative," and "The A-team." Being a member of certain chat rooms was by invitation only, indicating the secret nature of this conduct. These electronic chat rooms replaced the classic smoke-filled backrooms of the past. The transcripts of these chat rooms are reportedly "peppered with allusions to drinks, drugs and women."' *Id.* No. 161.of pg.63,64.'Entry into chat rooms, such as The Cartel, was coveted among traders because of the influence its members exerted in the FX market. For example, in one chat room transcript, traders from JPM, UBS, and Citigroup welcome a trader from Barclays into The Cartel chat room: *Id.* No. 162.of pg.64.

| TIME (UTC) | TRADER | MESSAGE |
|---|---|---|
| 08:02:22 | JP Morgan | You have been given access for a 1 month trial |
| 08:02:24 | UBS | Congratulation |
| 08:02:29 | JPMorgan | This trial will automatically extend |
| 08:02:31 | Barclays | I am honored[…] |

'During investigations by FINMA, UBS foreign exchange traders testified that they had been encouraged by their superior to actively participate in chat rooms with clients and traders at third-party banks in order to exchange information. The FCA noted the value in these chat rooms to traders: *Id.* No. 163.of pg.64.

A "persistent" chat room allows participants to have ongoing discussions with other participants from different firms and in different time zones for extended timeframes. Participants can communicate through electronic messaging over a period of multiple days, weeks or months. There can be multiple participants in a particular persistent chat and once invited an individual will be able to view a continuous record of the entire discussion thread and participate from then on 'Defendants' top-level traders ran the chat rooms. For example, Richard Usher ran The Cartel while he was JPMorgan's chief currency dealer in London and head of spot trading for G10 currencies from 2010-2013 and as a trader at RBS before then. The Cartel's membership numbered a half-dozen or more of Defendants' top traders. Other members of The Cartel included: *Id.* No. 164.of pg.65.

Rohan Ramchandani, Citigroup's head of spot trading in London;
Matt Gardiner, Barclays' director of spot trading for EUR/USD from 2007 to 2011;
Chris Ashton, former head of Barclays voice spot trading globally; and
Niall O'Riordan, UBS's co-global head of G-10 and emerging market spot trading.
Usher, Ramchandani, Gardiner, Ashton, and O'Riordan each have been suspended or fired from their respective institutions. 'Like playing multiple bingo cards, Defendants' FX traders participated in multiple chat rooms, allowing them to simultaneously communicate with numerous other Defendants on a global basis. Defendants' participation in chat rooms demonstrates the widespread reach of their anticompetitive conduct'. *Id.* No. 165.of pg.65. 'Over time, various chat rooms, in furtherance of the conspiracy, evolved to discuss numerous currency pairs beyond those for which they were originally established. The chat rooms often focused on manipulating a particular currency pair. For instance, Defendants formed "The Sterling Lads" to manipulate the exchange rate between British pounds sterling and U.S. dollars (GBP/USD or "cable") – the world's third most-traded currency pair.' *Id.*

( 33)

No. 166.of pg.65. 'Chat room transcripts demonstrate that the traders intended to coordinate their effort to move the market in a direction that favored Defendants. States reflecting coordinated conduct, such as "lets double team em" and "team effort" are replete throughout the chats. This language evidences an agreement to execute joint behavior in furtherance of the conspiracy.' *Id.* No. 167.of pg.65. 'Chats also reflect the success of Defendants' coordinated effort to fix prices in the FX market. After the traders had coordinated trades and fixed spreads and spot rates, they would often congratulate each other on accomplishing a fix on the market with comments like, "[t]hat's how its done" and 'that's how to do a fix' and "won't find that in any textbook." Often, after manipulating the WM/Reuters Closing Spot Rates, The Cartel members "would send written slaps on the back for a job well done.' *Id.* No. 168.of pg.66.'Chat room transcript s also show that Defendants monitored each other's activity to ensure compliance with the overarching conspiracy and threatened to punish traders whose conduct didn't conform to the agreement.' *Id.* No. 169.of pg.66. 'Defendants used code words to avoid detection from authorities. One such code was Defendants' use of the words "pick" and "pickun" as code for the WM/Reuters London fix.Defendants also used codes names to identity customers to each other. The FCA noted that "[t]he value of the information exchanged between the traders and the importance of keeping it confidential between recipients was clear to participants." *Id.* No. 170.of pg.66. 'As a direct result of the numerous government investigations, Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, and UBS now ban their traders from participating in multibank chat rooms. Moreover, as a result of the conduct that occurred in chat rooms, Defendants have terminated or otherwise overseen the departure of more than 50 individuals with trading or supervisory authority over FX trading.' *Id.* No. 171.of pg.66. 'Beginning at a time unknown, but at least as early as January 1, 2003, as part of their conspiracy to fix prices in the FX market, Defendants conspired to fix the bid/ask spreads paid by customers for various currency pairs. As alleged above, there are thousands of communications involving one or more Defendants reflecting discussions about FX spreads. These communications show traders at more than 30 banks, including Defendants, participated in interbank chats where traders coordinated and exchanged information about spreads or customer orders. The conspiracy to fix prices in the FX market affected dozens of currency pairs, including the seven pairs with the highest market volume.' *Id.* No. 172.of pg.67.'Spreads are the most visible and immediate way in which banks compete against each other for customers. In the FX market,

spreads are indicative of price. The bid/ask spread represents the price a dealer is willing to buy and sell a given volume of currency. Trader use the terms "spread" and "price" interchangeably.'*Id.* No. 173.of pg.67. 'Because currency is fungible (there is no difference between one dollar and another), spread are therefore a key competitive issue for securing customers. Customers want narrower spreads, i.e. they want to buy currency for less and sell it for more. Thus, the width of a spread will impact a Defendant's competitiveness in the FX market. By quoting narrower spread than their competitors, Defendants can gain customers and market share. On the other hand, a decision to widen spreads (or decline to tighten spreads) would result in loss of customers and market share. Only through collusion could a dealer quote wider spreads without losing market share and still reap supra-competitive profits. *Id.* No.174.of pg.67. 'Defendants quote bid/ask spreads to their customers in a couple of ways. First, Defendants provide spread matrices to certain customers on a periodic (usually quarterly) basis. These matrices list the bid/ask spreads for various volumes and currencies. These matrices are like a price list, and represent the price that the bank anticipates offering in competition with other banks. The banks with the tightest spreads are most likely to secure customer business. Beyond being a list provided to customers, the spread matrices tended to inform Defendants' views as to what current pricing was in the market.' *Id.*No.175.of pg.67.68. 'Defendants also simply quoted bid/ask spreads to customers throughout the trading day.' *Id.* No. 176.of pg.68.[.Venue is proper under pursuant to Section 4, 12, and 16 of the Clayton Act. 15 U.S.C. §§ 15 and 22 and 28 U.S.C. 1391 (b), (c) and (d) because one or more of the Defendant resided, transacted business, was found, or had agents in this New York District, Manhattan, Southern District of New York, a substantial part of the events giving rise to Plaintiffs' claims rose in New York District, Manhattan, Southern District of New York District, and a substantial portion of the affected interstate trade and commerce described herein has been carried out in New York District, Manhattan, Southern District of New York . 28 U.S.C. §1367 in New York State because there is an ongoing case.*Id.* No. 41.of pg.13. Defendants' collusive and manipulative acts took place in substantial part, in the New York specifically and in the United States generally. These acts were conducted by persons and entities subject to the laws of the United States, including New York, as well as other states and territories. Each Defendant has continuously and systematically entered into FX transactions, including spot transactions, forward contracts, future contracts, and option contracts in this District, New York and other states, throughout the United States.*Id.* No.42.of pg.13.]

Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the District and throughout the United States. These connection between the alleged conduct and the United States is demonstrated herein.

**1. Chat Room Transcripts Demonstrate Spread Fixing**

'Chat room transcripts confirm that Defendants' FX spot trader agreed on spreads they quoted to clients in the FX spot market. When the traders discussed their spreads with each other, they have an explicit understanding that the spread discussed would be the spreads quoted to customers. A trader would artificially adjust his spreads based on the information gained from other traders in the group. Spreads quoted by Defendants in the FX spot market were wider than they would have been absent collusion and Plaintiffs paid these supra-competitive prices' *Id.* No.177.of  pg.68. 'Defendants continued their conspiracy on a regular basis, colluding to fix daily spreads quoted to customer in the FX spot market.' *Id.*No.178.of pg.68.'Defendants did not limit their collusion to major currency pairs; rather, they colluded with respect even to emerging market currencies.' *Id,* No.179. of pg.68. 'For instance, in its order fining Barclays, the New York Department of Financial Services highlighted a series of examples. In one such example, a "Barclays FX trader explicitly discussed with a JP Morgan trader coordinating the price offered for USB/South African Rand to a particular customer, stating, in a November 4, 2010 chat, 'if you win this we should coordinate you can show a real low one and will still mark it little lower haha.' After the JP Morgan trader suggested that they 'prolly shdnt put this on perma chat,' the Barclays trader responded **'if this is the chat that puts me over the edge than oh well. Much worse out there.'"**Id.No.180.of  pg.68. 'Several months later, this Barclays trader was "still instructing traders at other banks to follow his lead. On February 25, 2011, a Standard Chartered FX trader asked 'what bid you want me to show if somwone calls' and the Barclays trader responded 'up to 02.' The [Standard Chartered] trader said 'okok' and 'ill let you know if we get asked.'"" *Id.*No.181.of  pg.69.'By order, *FOREX consolidated action* dated March 31, 2016, Defendants routinely agreed on the spreads for numerous currency pairs. *Id.*No.182.of pg.69[See detail to gap from images from FOREX, there is a catch is a few by only section of why is in employment, eye the gap is you can avoid it by giving in FOREX of WM/Reuters Benchmark Rates Manipulation of, to explain, honesty is the best policy, about you find unavailable reasons for the gap from job-United States trader, Defendants' bank branch [Singapore branch] traded United States trader, Defendants' bank

branch[Swiss branch] traded United States trader, Defendants' bank branch [Nassau branch] traded United States desk in New York HSBC private bank branch office, in HSBC bank USA National Association, National Bank [Intermediaries/Custodian] traded traders/broker-dealer in multi-chat room, longer gaps may be harder explain, is the best policy in money laundering strategies commonly used by many legal companies as they also used banks to help them transmitted their illegitimate profit/commission from tax-evasion action to sister companies in the bermuda to hide their wealth like leaked information from "panama list" and "paradise list" and no longer a secret to all banks and their employees, agents, were unable to find through such BVI companies set up like Nassau branch HSBC private bank has, branches to branches to reasons or whatever reason for United States trader to United States trader to United States trader traded trader/broker-dealer in circle as to turn the conversation/thousand multi-chat room communication statement were doing during that time we pursue to steps in buy and selling FX trades with United States trader of foreign desk of Defendant HSBC traded United States desks' trader/broker-dealer in trade confirmation by telephone directly to, preparing to as quickly as possible try to doing that fixes did, to better the risk removed strategies in New York Stock Exchange to coordinated, to collude, to re-enter the market to benefit their own ADR stock share on board during what did, how did to better steps did in multi-chat rooms' communication transcripts clearly explained, see FOREX for the fixes.]

## C. Defendants Conspired to Fix the Benchmark Rates.

'Beginning at least as early as January 1, 2003, Defendants conspired to manipulate the Fixes. Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the Fixes. Exploiting shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the Fixes' *Id*.No.183.of pg.69. 'Defendants' collusive actions allowed them to substantially reduce their risk in FX trading and to reap supra-competitive profits at the expense of Plaintiffs. Defendants faced less risk in their market making activity recorded in the Defendants' front book. Additionally, Defendants' traders could reap even greater profits for their proprietary (prop) trades made on behalf of their bank and recorded in their individual back books. *Id*.No.184.of pg.69.

## 1. The Fixes Are Susceptible to Collusive Manipulation.

'Defendants understood the methodology used to calculate the WM/Reuters Closing

Spot Rates is vulnerable to manipulation. For example, in a July 4, 2008 meeting of the Bank of England's Foreign Exchange Joint Standing Committee, Chief Dealers Sub Group, the WM Company gave a presentation on the median calculation of the WM/Reuters rates to chief currency traders from RBS, HSBC, Deutsche Bank, Morgan Stanley, JPMorgan, and Citigroup. In response to this presentation, the chief dealers in attendance admitted that the methodology was susceptible to manipulation:

It was noted that WM/Reuters do not use traded volumes data in the calculation of the spot rates. While they have access to Reuters volume data, the same is not the case for EBS data. The Chief Dealer group agreed that actual traded volumes is a key consideration in the calculation of accurate fixings and suggested

that this would be a useful next step in the development of WM/Reuters' model. Furthermore it was suggested that using a snapshot of the market may be problematic, as it could be subject to manipulation. Perhaps WM could use a window of observations, and determine at what point to fix using volume data.' *Id*.No.185.of pg.70.

'As explained below, Defendant seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates.' *Id*.No.186.of pg.71. 'As explained below, Defendants seized on the weakness in this methodology and colluded to manipulate the WM/Reuters Closing Spot Rates. *Id*.No.187.of pg.71.'The ECB Fix is essentially a snapshot of the market rate at exactly 1:15 p.m. GMT or 2:15 p.m. CET. The ECB publishes rates for its 32 currencies by averaging the buying and selling prices of each currency against the euro at 1:15 GMT.' *Id*.No.188.of pg.71. 'Because the ECB Fix represents a "flash" fix, a fixing that reflects a rate at a particular moment in time, Defendants have repeatedly targeted their trades for that precise moment in time in an attempt to substantially skew the rates'.*Id*.No.189.of pg.71.

## 2.   Defendants Shared Confidential Customer Order Information to Manipulate Benchmark Rates, Including the WM/Reuters Closing Spot Rates

'Through electronic means, Defendants shared their confidential customer order information with one another. Each Defendant aggregated its client orders to determine what its individual net position in a specific currency was going to be at London fix. Defendants then shared this information with one another to determine their aggregate net position in a specific currency at the fix. By sharing and aggregating their confidential customer order flows, Defendants could more precisely predict how the market would move than would have been possible acting

alone.' *Id*.No.190.of pg.71'Defendants' sharing of their confidential customer information violates the Federal Reserve Bank of New York's Guidelines for Foreign Exchange Trading Activities," which have been in place for decades. Specifically, Guidelines note:

> Confidentially and customer anonymity are essential to the operation of a professional foreign exchange market. Market participants and their customer expect that their interests and activity will be known only by the other party to the transaction… and an intermediary, if one used. *It is inappropriate to disclose, or to request others to disclose, proprietary information relating to a customer's involvement in a transaction…*
>
> \*   \*   \*
>
> Customer anonymity should not be circumvented with the use of slang or pseudonyms. If confidentiality is broken, management must act promptly to correct the conditions that allowed the eve to occur… *Staff should not pass on confidential and nonpublic information outside of their institution. Such information includes discussions with unrelated parties concerning their trades, their trading positions, or the firm's position.* It is also inappropriate to disclose, or to request others to disclose, information relating to a counterparty's involvement in a transaction….. *Trading room staff should take special precautions to avoid situations involving or appearing to involve trading on nonpublic information. Id*. No. 191.of pg.72.

'Defendants have already produced evidence to government investigators confirming that their traders "inappropriately share[d] market-sensitive information with rivals." Defendants acknowledged in their respective plea agreements that the Department of Justice would have been able to prove that the pleading Defendants "engaged in communications, including near daily conversations, some of which were in code, in an exclusive electronic  chat room, which chat room participants, as well as others in the FX Spot Market, referred the 'The Cartel' or 'The Mafia.'" '*Id*. No. 192.of pg.72.'Evidence obtained by government investigations confirms that "[s]hortly before the fix…it was common for a group of senior currency traders to discuss with their competitors the types and volume of trades they planned to place.[116] A transcript provided by RBS to the UK-FCA revealed that JPMorgan's Richard Usher wrote "messages to trader at other firms [that] included details of his trading positions.[117] Defendants' traders confirmed that "chatroom discussions between rival traders … allowed them to share information about pricing and order books."' *Id*. No. 193.of pg.73.'A number of Defendants have admitted to the Bank of England that they shared their confidential customer information. On April 23, 2012, the Foreign

(39)

Exchange Joint Standing Committee, Chief Dealers Sub Group met at BNP Paribas'
London office. Citigroup's Rohan Ramchandani, who was one of The Cartel
members, was present. James Pearson (RBS), and Martin Millet (Bank of England)
were also present. A person familiar with the UK-FCA's investigation disclosed to the
media that a senior trader present at the meeting turned over his meeting notes.
According to the notes, the traders told Bank of England officials that they shared
information about customer orders before currency benchmarks were set.The official
meeting minutes concealed the admissions made at the meeting.' *Id.* No. 194.of
pg.3.

Trip called home [United States] to his United States desk in New York office [HSBC Bank
USA National Association, National Bank's private bank] Manhattan by United States trader
in foreign desk of HSBC bank branch[private banking], asked to participate in the multi-chat
room with HSBC broker-dealer and several of his friends, traders from other bank, for a
good opportunity to get that spread collusion been wanting, so could earn in a profit without
risk for wider benchmark rate to price to customer broadly in both ask [buy] and bid [sell]
trade quotation and trade close-up, in currency pair from New York office in HSBC Bank
USA National Associations' HSBC Private Bank, New York Branch, swing by trades from
their U.S. trader in their[HSBC] foreign desk in HSBC Private Bank, Singapore branch;
Swiss branch; Nassau branch; Hong Kong branch; etc as many branches stated on their
advertising address in the calendar book for disclosing to their current and future customers
as the big, safe, specialty in wealth management 'HSBC Private Bank' brand logo of HSBC
group, to top up a bag wrapped with pool of trades from all over their [hsbc bank branches]
into a group account with HSBC own trading position and pack like new trade to enjoy the
benefits for 'free trading for their member in the national association', called home[United
States Interstate Commerce] on the United States and to go into a benchmark rates
manipulation called fixes with several other banks a thousand of communications were read
and known to Class Plaintiffs, is a good to get that profit to spread collusion for
supra-competitive profit to them[listed banks in FOREX CAC, TAC in a chart No. 149 of
page.58,59,60] to a spread collusion for supra-competition profit to them, that the Chans

(Chan Ah Wah and Lim Cheok Kee (the "Chan") are parties to this action; by letter the HSBC defendants ("HSBC") explained their determination that the Chans are members of the settlement class; for the Chans filed letters at Docket No. 954, 956,958,959,962,966,968,971 and 973 that argument, information or documentation suggesting that they are class members, that seek the Court to order the settlement class fund to accept the submission from the Chans for release the payment from *FOREX* settlement escrow account in **USD650 million (for each and pay $0 tax in this amount) all inclusive as advertising and material omission, gross negligence, privacy policy, copyright, money laundering, sweepstakes note for BOTH ENTITY CHAN AH WAH <u>USD650 million</u> (for each and pay $0 tax in this amount) AND LIM CHEOK KEE WILLY <u>USD650 million (for each and pay $0 tax in this amount)</u> to us:**

for breach of contract, tort (including negligence and strict liability), advertising disclosure, material omission, privacy policy, money laundering, all inclusive of copyright as accepted by the bank to pay us aggregate damages, cost, fees related to their network practice of U.S. desk trader traded to United States trader of foreign desk of Defendant HSBC private bank, Singapore branch, Swiss branch, Nassau branch, Hong Kong branch etc were visiting their New York office, HSBC Bank USA National Association, National bankings' United States traders/broker-dealer and ask[buy]/ make in trade being in a FX spot, United States traders/broker-dealer responds, "confirm, done" trade in English sounds, were visiting the United States FX trading platform from the trade confirmation [HSBC private bank] of the trade from United States traders can make a pool community of trades being in for their capital cash to satisfy the stress test and capital requirement to comply with, really want to make the trade confirmation in U.S. desk trader for the benefit to them[HSBC]. The ask [buy]/make will make again, now, really to do that in a later second U.S. traders come and ask[buy]/make that trade, later, then the third U.S. traders come and ask/[buy] make that trade, "oh please help trade make a sound fix!" All of you want to make a fix, asked each others, replied with hopeful said that in CAC & TAC replied well with Judge Schofield said that we get to FOREX settlement deal, says best to each other in stipulated agreement individually to last trader/broker-dealer for to reap supra-competitive profit at the expenses of plaintiffs, impact the lives of others, in violation of money laundering, pursuant to **18 U.S.C. 1956** Section 1956(a)(2), Section 1956(a)(3), *et.seq.,***18 U.S.C. 1957,***et.seq.*Any property involved in a violation of Section 1957 or traceable to property involved in a violation of Section 1957 is subject to confiscation under either civil or criminal procedures, and the applicable law is essentially the same as in the case of Section 1956. The Travel Act, 18 U.S.C. 1952, punishes interstate or foreign travel (or use of the facilities of interstate or foreign commerce) conducted with the intent to distribute the proceeds of a more modest list

of predicate offenses or to promote or carry on such offenses when there is an overt act in furtherance of that intent. The Travel Act essentially condemns three crimes such with an interstate element: the distribution of the proceeds of a predicate offense, the promotion of a predicate offense, or the commission of a violent crime in aid of a predicate offense. The first two variants bear some resemblance to the concealment and promotion offenses of Section 1956 and somewhat more remotely to the deposit/spending proscriptions of Section 1957. The violent crime component of the Travel Act is only coincidentally related to money laundering and consequently will be mentioned only in passing., **31 U.S.C. 5322—Reporting Requirements** Section 5322 penalize willful violation of several monetary transaction reporting requirements found in Subtitle 53-II of title 31 of the United States Code and elsewhere. [see more detail in this letter definition under Summary for money laundering, **31 U.S.C. 532—Anti-Structuring** Section 5324 condemns causing a financial institution to fail to file a required report, causing the submission of a false report, restructuring transactions to evade a reporting requirement, or attempting to do so, **31 U.S.C. 5332—Bulk Cash Smuggling** Section 5332 outlaws carrying or attempting to transport more than $10,000 in unreported, "concealed" cash across a U.S. border with the intent to evade 31 U.S.C.5316 reporting requirements. The proscribed methods of concealment seem to envelope any method short of public display. The offense carries a prison term of not more than five years, but also calls for confiscation of the cash and related property, **18 U.S.C. 1960—Money Transmitters** Section 1960 prohibits unlicensed money transmitting businesses and defines such businesses as (A) those that are required by state law to be licensed and are not; (B) those that fail to comply with federal regulatory provisions; or (C) those that transmit money they know is derived from, and intended to finance, criminal activit, **18 U.S.C. 1961-1964—Racketeer Influenced and Corrupt Organizations (RICO)** All the racketeering predicate offenses listed in 18 U.S.C. 1961(1) are by definition money laundering predicate offenses under Section 1956 and 1957. RICO makes it a federal crime for any person to: 1.conduct or participate, directly or indirectly, in the conduct of, 2.the affairs of an enterprise, 3.engaged in or the activities of which affect, interstate or foreign commerce, 4.A.through the collection of an unlawful debt, or, B. through a pattern of racketeering activity (predicate offenses). RICO violations are punishable by imprisonment for not more than 20 years (not more than life imprisonment if any of the applicable predicate offenses carries a life sentence). U.S. trader of foreign desk of their bank branches, the social-media via email and censor the Right, NOTHING left on what we say and HSBC PRIVATE BANK deducted our cash deposit accordingly to their terms and conditions' acceptance as signed for allegedly cheat spreadsheet in spread collusion and <u>attached form a part of the **Rider** as attached form a part of.</u>

**Pay us immediately in FDIC Act of Plain Writing to Pay-as-you-go Act (PAYGO ACT)**

**enforced in compliance with ,** for the best, is good for us, to issue a check or direct deposit to the following:

TD Bank account #:4255590759
Routing #: 026013673
Account name: Ah Wah Chan and Cheok Kee Willy Lim
TD Bank Branch address:   136-20 38th Main Street
                          Flushing, NY 11354


**I declare under penalty of perjury that the foregoing is true and correct.**


Dated: New York, New York
       February 26, 2018,
       By all parties Counsels,

Cheok Kee Willy Lim
115 East Street,
New Hyde Park, NY 11040
Cell: 917-868-5218

Ah Wah Chan
115 East Street
New Hyde Park, NY 11040
Cell: 917-868-5218

(43)

## Rider to Declaration and Exhibits

The undersigned, hereby sworn and declared:

To see deviled trade of the day, stop measure to exceptional development because it's always been done this way, the more, the more will grow, OTC class certification, Exchanged Traded certification, Contracts, Ethics, Compliance Education, Community Investment formerly broker-dealer choice. Deviled United States trader brought deviled trade to a social room at one, was approached says to think is to bring trades to a house of trading an old trade gathering at broker-dealer, one of the dealer who don't think it it wrong to bring deviled trades to United States exchange platform, fix them, ask them for quotation, done the trades each day net around the clock style on New York office in Manhattan, online and in office multi-chat room connect, measure up to each other, replied, "not correctly asked, how do you do that?" replied, "fix them," smirked and, "do you, do that?"replied, "not if you fix them correctly!" The HSBC, "just how?" responded, "make sure boil out of those responded make." The old woman responded, "make you boil the hell out of those trades" responded out of the old responded sure the more says--straight and sound gotton than a sincere "Huh?" have more trouble can remember, business works for business, these events were once part of the 2008 crisis, reports reveals on HSBC's take on Chans' speculation, accounting expert analysis those trades revealing take on chat communications to the banks' multi trader's chat raising effect on U.S. traders foreign desk of HSBC to United States. The best for 5 now. Apply choice like each week the aid is confirms new rising to show this video to watch, pacer.gov in CAC--know each met and wanted right away reading trading trip called home (U.S.) to New York trader asked to up in continue break taking and taking about work here for great deal on best selling online booking only for membership booking defecated in pant to hide an arrest intentionally in an effort to bring made matrice featured reuse reinvented vanilla option/swap option leaked from JP Morgan Chases' tranche reference number design along with shared counterparty, with dealer, signs they meant to inspire, or make in statement after get in overwatch cannot be clash to let the developer made good with united winning goal against a message wake and a forever ! moment. The United States trader can trade in home and abroad, with a U.S. trader in foreign desk of defendant HSBC any bank branches.

Why last job in message believed (FOREX) from a sender do know for this trade, the Chans did, you haven't left to talk about why leaving negative about justified make, always fit in, "Defendants communicated with one another, including in chat rooms, via instant messages, and by email, to carry out their conspiracy. Through these communications, Defendants regularly exchanged their customers' confidential order flow information before the Fixes. Exploiting shared confidential information, Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate, the Fixes' *Id.*No.183.of pg.69. 'Defendants' collusive actions

end up with the defendants after this warrant surfaced. Set a calendar to check in, might only to review job the amount to add on to pay the new members your contact make to change perfect number on the top. It's terrible if off the "enough to pay" for each come pay-as-you-go and net payment out with check to them immediately like ours' as example, the way to get collection of debt from them. You never know when might arrive and letter you have ready to pay, right away, rather than to update it. Set a check in every need to the detail of new members, save on digitizing your memories you have to do as a housekeeper, add any new amount (you asked from them in advance) if you contact them by email, this is sure to ON the amount to top up as prove to the Court for warrant to repossession their property for immediate sale to cash out and pay the collection of debt to our new members without delay or if they delayed payment to them, come and go basis everyday. It would be terrible if you sent off the perfect letter to the court with your 'owed amount of payment' to new members and they refused to cooperate and top up to date because of the 'WOW' factor of the amount you need, this would be simple way to easy manage our event for new members. Put in the hand of top "repossession" law to upload, might like more than enough to go! Enter now!

This sound a bit good, is exactly what Chan Ah Wah asked [buy] following the bid [sell] went into the structure pool of products by United States trader in multi-chat room with other banks' traders transforming the options/futures into structured 'securities' in many forms[like JP Morgan Chase's series of U.S. retirement plan and pension fund as leak product reference number in our HSBC Private Bank's branch sold to us causing many other left in the risk in their principal capital become zero for identify the identical product clash the value to zero that the bank employees promised customer these structure products were principal protected and in advertising disclosure and material omission combined in violation] to sell to counterparty in the multi-chat room [Credit Suisse, Citibank etc.], otherwise looking good on our cash deposit saving account steadily earned profit and growing in huge size in wealth [to USD600 million for both entity] all those years. Yet Chan Ah Wah [including lim cheok kee] was told that their cash deposit is safe abd sound by disclosing a cheat 'spread'sheet in pairing ask[buy] and bid [sell] for spread to them[hsbc] to gain their [Chan Ah Wah and Lim Cheok Kee] trust to their HSBC Private Bank, Singapore branch or Swiss branch[advertising disclosure, material omission combined gross negligence, privacy in violation] to keep them as long as they could to further make up the fund[margin call to obtain cash from Chan Ah Wah and Lim Cheok Kee and repossessed as the bank [hsbc]'s own capital for their profit in their organization, thus deducted almost all their cash deposit from their saving account in violation of FDIC Act of plain writing to comply with PAYGO Act/in an action in *rem* to forfeit assets involved in and traceable to a company located in the United States and abroad pursuant to Article III Section 2 U.S.C.,18 U.S.C. Section 981(a)(1)(C), on the ground that it was derived

(46)

from violations of U.S. law, pursuant to 18 U.S.C. Section 981 (a)(1)(A) on the ground that it is property involved in one or more money laundering offenses in violation of  18 U.S.C. Section 1956 and/or 1957, for an order of warrant to manage effective accountability of federal agency, federal system without unnecessary delay for public interest, taxation issue and welfare of the children in the United States], instead they[Chan Ah Wah and Lim Cheok Kee] were caught in many stock, bond, mutual fund, annuities, etc. after the United States desk traders in HSBC Bank USA National Associations' HSBC Private Bank, New York branch added into the group account pack like new trade to enjoy benefit entitled of, the United States desk trader replied back: Chan Ah Wah buy at WM/rates for FX currency, sell at WM/rates for FX currency, Amount done! measure up to the exceptional advisor by HSBC Private Bank as to fiduciary bank?[gross negligence for all accounts involved] with figure of spreading conspiracy theories that generally [the terms and conditions signed and dated by the bank and us as acceptance to direct payment of aggregate amount pursuant to their agreement in liability and voiced no opposition to 'save only for direct and reasonably forseeable losses resulting from the gross negligence or willful default of the bank or its employee.' see item 7.1 (f) and 'any act or omission of any agent of the bank; and' 7.1(f) and see item 7.1 (e). and item 2.5 'the customer[hsbc] irrevocably consents to the taping or other means of recording, by or on behalf of the bank[us, including the tape recording of U.S. desk trader trades with U.S. trader of foreign desk in their bank branches, of oral and telephone conversations between the bank representatives [including portfolio managers and her team in their private bank branches, email, telephone transcript and chat transcript] and the customer [hsbc] or an authorized agent [Equifax and Northern Food]. Such recordings or transcripts thereof may be used by the bank as evidence in any dispute that may arise.' Item 2.6. 'If any document dispatched by the Customer to the Bank, including any instruction, confirmation, contract or transaction, is for any reason undated, the time and date as shown on the Bank's time chop as imprinted on such document at the time of its receipt shall be conclusive evidence of the time and date of such document." **Sub-Section 19. Netting**-'If on any date there are any amounts which would otherwise be payable hereunder in the same currency by the Bank to the Customer and the Customer to the Bank, if the Bank so determines and directs on such date, each party's obligation to make payment of any such amount will be satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay the other party the excess of the larger aggregate amount over the smaller aggregate amount.'

It's better to let someone think you are an idiot than to open your mouth and prove it, it's to think an idiot open mouth prove is easy...you are not doing it right. keep the chat transcript coming and learn more for booking list, press advantage choice for intentional harm to us, reveals cause of so-called wealth management specialist - HSBC Private Bank to honestly managed client's wealth with customer's interest upfront to their, break work, reading a New

York City traders of HSBC traded with the countryside foreign desk trader of HSBC banks' branches continued names around the head office in HSBC Bank USA National Association, a National bank of United States of America for deal on e-booking online for member use only. [copyright, all rights in electronic communication in violation]

Trip called home [United States] to his United States desk in New York office [HSBC Bank USA National Association, National Bank's private bank] Manhattan by United States trader in foreign desk of HSBC bank branch[private banking], asked to participate in the multi-chat room with HSBC broker-dealer and several of his friends, traders from other bank, for a good opportunity to get that spread collusion been wanting, so could earn in a profit without risk for wider benchmark rate to price to customer broadly in both ask [buy] and bid [sell] trade quotation and trade close-up, in currency pair from New York office in HSBC Bank USA National Associations' HSBC Private Bank, New York Branch, swing by trades from their U.S. trader in their[HSBC] foreign desk in HSBC Private Bank, Singapore branch; Swiss branch; Nassau branch; Hong Kong branch; etc as many branches stated on their advertising address in the calendar book for disclosing to their current and future customers as the big, safe, specialty in wealth management 'HSBC Private Bank' brand logo of HSBC group, to top up a bag wrapped with pool of trades from all over their [hsbc bank branches] into a group account with HSBC own trading position and pack like new trade to enjoy the benefits for 'free trading for their member in the national association', called home[United States Interstate Commerce] on the United States and to go into a benchmark rates manipulation called fixes with several other banks a thousand of communications were read and known to Class Plaintiffs, is a good to get that profit to spread collusion for supra-competitive profit to them[listed banks in FOREX CAC, TAC in a chart No. 149 of page.58,59,60] to a spread collusion for supra-competition profit to them, that the Chans (Chan Ah Wah and Lim Cheok Kee (the "Chan") are parties to this action 15-cv-8974, *Chan Ah Wah et.al. v. HSBC* 15 Civ.8974-LGS and *Ah Wah Chan v. HSBC* 17 Civ.6863-LGS , ("Chan Actions") as stated in **In re Foreign Exchange Benchmark Rates Antitrust Litigation 13-cv-7789-LGS**; by letter the HSBC defendants ("HSBC") explained their determination that the Chans are members of the settlement class; for the Chans filed letters at Docket No. 954, 956,958,959,962,966,968,971 and 973 that argument, information or documentation suggesting that they are class members, that seek the Court to order the settlement class fund to accept the submission from the Chans for release the payment from *FOREX* settlement escrow account in **USD750 million (for each and pay $0 tax in this amount) all inclusive as advertising and material omission, gross negligence, privacy policy, copyright, money laundering, sweepstakes note for BOTH ENTITY CHAN AH WAH** <u>**USD750 million**</u> **(for each and pay $0 tax in this amount) AND LIM CHEOK KEE WILLY** <u>**USD750 million (for each and pay $0 tax in this amount) to us:**</u>

 for breach of contract, tort (including negligence and strict liability), advertising disclosure, material omission, privacy policy, money laundering, all inclusive of copyright as accepted by the bank to pay us aggregate damages, cost, fees related to their network practice of U.S. desk trader traded to United States trader of foreign desk of Defendant HSBC private bank, Singapore branch, Swiss branch, Nassau branch, Hong Kong branch etc were visiting their

New York office, HSBC Bank USA National Association, National bankings' United States traders/broker-dealer and ask[buy]/ make in trade being in a FX spot, United States traders/broker-dealer responds, "confirm, done" trade in English sounds, were visiting the United States FX trading platform from the trade confirmation [HSBC private bank] of the trade from United States traders can make a pool community of trades being in for their capital cash to satisfy the stress test and capital requirement to comply with, really want to make the trade confirmation in U.S. desk trader for the benefit to them[HSBC]. The ask [buy]/make will make again, now, really to do that in a later second U.S. traders come and ask[buy]/make that trade, later, then the third U.S. traders come and ask/[buy] make that trade, "oh please help trade make a sound fix!" All of you want to make a fix, asked each others, replied with hopeful said that in CAC & TAC replied well with Judge Schofield said that we get to FOREX settlement deal, says best to each other in stipulated agreement individually to last trader/broker-dealer for to reap supra-competitive profit at the expenses of plaintiffs, impact the lives of others, in violation of money laundering, pursuant to **18 U.S.C. 1956** Section 1956(a)(2), Section 1956(a)(3), *et.seq.,* **18 U.S.C. 1957,** *et.seq.* Any property involved in a violation of Section 1957 or traceable to property involved in a violation of Section 1957 is subject to confiscation under either civil or criminal procedures, and the applicable law is essentially the same as in the case of Section 1956. The Travel Act, 18 U.S.C. 1952, punishes interstate or foreign travel (or use of the facilities of interstate or foreign commerce) conducted with the intent to distribute the proceeds of a more modest list of predicate offenses or to promote or carry on such offenses when there is an overt act in furtherance of that intent. The Travel Act essentially condemns three crimes such with an interstate element: the distribution of the proceeds of a predicate offense, the promotion of a predicate offense, or the commission of a violent crime in aid of a predicate offense. The first two variants bear some resemblance to the concealment and promotion offenses of Section 1956 and somewhat more remotely to the deposit/spending proscriptions of Section 1957. The violent crime component of the Travel Act is only coincidentally related to money laundering and consequently will be mentioned only in passing., **31 U.S.C. 5322—Reporting Requirements** Section 5322 penalize willful violation of several monetary transaction reporting requirements found in Subtitle 53-II of title 31 of the United States Code and elsewhere. [see more detail in this letter definition under Summary for money laundering, **31 U.S.C. 532—Anti-Structuring** Section 5324 condemns causing a financial institution to fail to file a required report, causing the submission of a false report, restructuring transactions to evade a reporting requirement, or attempting to do so, **31 U.S.C. 5332—Bulk Cash Smuggling** Section 5332 outlaws carrying or attempting to transport more than $10,000 in unreported, "concealed" cash across a U.S. border with the intent to evade 31 U.S.C.5316 reporting requirements. The proscribed methods of concealment seem to envelope any method short of public display. The offense carries a prison term of not more than five years, but also calls for confiscation of the cash and related property, **18 U.S.C. 1960—Money Transmitters** Section 1960 prohibits unlicensed money transmitting businesses and defines such businesses as (A) those that are required by state law to be licensed and are not; (B) those that fail to comply with federal regulatory provisions; or (C) those that transmit money

they know is derived from, and intended to finance, criminal activit,**18 U.S.C. 1961-1964—Racketeer Influenced and Corrupt Organizations (RICO)** All the racketeering predicate offenses listed in 18 U.S.C. 1961(1) are by definition money laundering predicate offenses under Section 1956 and 1957. RICO makes it a federal crime for any person to: 1.conduct or participate, directly or indirectly, in the conduct of, 2.the affairs of an enterprise, 3.engaged in or the activities of which affect, interstate or foreign commerce, 4.A.through the collection of an unlawful debt, or, B. through a pattern of racketeering activity (predicate offenses). RICO violations are punishable by imprisonment for not more than 20 years (not more than life imprisonment if any of the applicable predicate offenses carries a life sentence). U.S. trader of foreign desk of their bank branches, the social-media via email and censor the Right, NOTHING left on what we say and HSBC PRIVATE BANK deducted our cash deposit accordingly to their terms and conditions' acceptance as signed for allegedly cheat spreadsheet in spread collusion and <u>attached form a part of the **Rider**</u> as attached form a part of.

**Pay us immediately in FDIC Act of Plain Writing to Pay-as-you-go Act (PAYGO ACT)**

**enforced in compliance with ,** for the best, is good for us, to issue a check or direct deposit to

the following:


TD Bank account #:4255590759
Routing #: 026013673
Account name: Ah Wah Chan and Cheok Kee Willy Lim
TD Bank Branch address:   136-20 38th Main Street
                                                      Flushing, NY 11354



**I declare under penalty of perjury that the foregoing is true and correct.**


Dated: New York, New York
              February 26, 2018,
              By all parties Counsels,


_____                                    _____
Cheok Kee Willy Lim                                                      Ah Wah Chan
115 East Street,                                                                115 East Street
New Hyde Park, NY 11040                                        New Hyde Park, NY 11040
Cell: 917-868-5218                                                       Cell: 917-868-5218